**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CARTER COE, by and through his parent and next friend, CAROLINE COE; REED ROE, by and through his parent and next friend, RILEY ROE; NICOLE NOE, by and through her parent, NORMAN NOE; KARL KOE; and JAY DOE, *on behalf of themselves and all similarly situated*, <br><br> *Plaintiffs*, <br><br> v. <br><br> TODD BLANCHE, in his official capacity as Acting Attorney General of the United States; U.S. DEPARTMENT OF JUSTICE; NYU LANGONE HEALTH SYSTEM; NYU LANGONE HOSPITALS; and NYU GROSSMAN SCHOOL OF MEDICINE, A DIVISION OF NEW YORK UNIVERSITY, <br><br> *Defendants*. | <br><br><br><br><br><br><br><br> Case No. <br><br> **CLASS ACTION** |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**INTRODUCTION**

1.      On May 7, 2026, NYU Langone Hospitals was one of several institutions to receive a federal grand jury subpoena from the U.S. Attorney's Office for the Northern District of Texas (hereafter "the Subpoenas"). The Subpoenas are part and parcel of the efforts by the current federal administration ("the Administration") to "end" gender-affirming medical care for transgender people, which is part of a larger set of attacks on transgender people across the country.

2.      Plaintiffs—and the similarly situated members of the proposed class—are minors, their parents, and young adults unwittingly caught in the crosshairs of that attack simply because they received medically necessary gender-affirming medical care here in New York City, near their

1

homes in the New York City area, and with the expectation that their private medical records would remain private.

3.      Of particular concern to Plaintiffs, the Subpoenas seek the identifying and detailed sensitive health information of all transgender persons who received medical care as treatment for their gender dysphoria while they were minors, as well as the identity of their parents. Through the Subpoenas, DOJ seeks to gravely and unjustifiably invade the privacy of Plaintiffs in violation of their rights under Fourth and Fifth Amendments to the Constitution of the United States. For NYU, compliance with the Subpoenas would also violate well-established state law prohibiting a breach of the statutory physician-patient privilege.

4.      The Subpoenas at issue here were not issued for a proper purpose or on a clean slate but as part of the Administration's systematic campaign to exclude transgender people from public life and to "end" the gender-affirming medical care that enables many transgender people to live authentically as themselves. The U.S. Department of Justice ("DOJ") previously issued civil administrative subpoenas to healthcare institutions across the country that have lawfully provided this care demanding the identities and sensitive health information of every transgender patient who received gender-affirming medical care as a minor.

5.      Federal district courts across the country limited DOJ's ability to obtain such information, quashing or limiting multiple of the civil subpoenas, finding that the civil subpoenas were issued for an improper purpose or violated the rights of the patients whose information they sought.

6.      Faced with this wall of resistance to its discriminatory and improper aims, DOJ has now shifted tactics, purportedly moving the locus of its "investigation" to the Northern District of

Texas and relying on grand jury subpoenas to obtain the same information it was prohibited from obtaining through other means by multiple courts.

7. DOJ's aims are not to impartially enforce the law—no federal law prohibits the provision of gender-affirming medical care to minors, which the U.S. Supreme Court has determined is for the states to regulate—but rather to effectuate the Administration's policy priorities to "end" the gender-affirming medical care, even if coercion is necessary.

8. The Subpoenas represent a gross overreach of governmental power, founded on an improper purpose to "end" gender-affirming medical care and cast transgender persons into the shadows.

9. Because Plaintiffs are at imminent risk of having their rights under the United States Constitution and New York State law violated, this Court's intervention is necessary.

## JURISDICTION AND VENUE

10. This Court has jurisdiction pursuant to 28 U.S.C. § 1331, as this action arises under the laws of the United States and the United States Constitution; 28 U.S.C. § 1346, as a civil action against the United States founded upon the Constitution, an Act of Congress, or an executive regulation; and 28 U.S.C. § 1361, as an action to compel an officer or agency to perform a duty owed to plaintiffs.

11. This Court has jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a), as those claims are so related to the federal claims at issue that they form part of the same case or controversy and derive from a common nucleus of operative fact.

12. An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court may grant declaratory, injunctive, and other relief pursuant to 28 U.S.C. §§ 2201-2202.

13. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2), (c)(2), and (e)(1). Plaintiffs Carter Coe and Caroline Coe, Reed Roe and Riley Roe, Karl Koe, and Jay Doe and Defendants NYU Langone Health System, NYU Langone Hospitals, and NYU Grossman School of Medicine, a Division of New York University, are residents of this district; Defendants Blanche and DOJ are an officer of the United States sued in his official capacity and an agency of the United States, respectively; and a substantial part of the events or omissions giving rise to this Complaint occurred and continue to occur within the Southern District of New York.

## PARTIES

### A. Plaintiffs

14. Plaintiff **Carter Coe**, by and through his parent and next friend, **Caroline Coe**, is a transgender minor. Caroline Coe and Carter Coe live in the Bronx, New York. Carter Coe received gender-affirming medical care at NYU Langone within the time range set out in the Subpoenas. That care included puberty blocking medication to treat gender dysphoria.

15. Plaintiff **Reed Roe**, by and through his parent and next friend, **Riley Roe**, is a transgender minor. Riley Roe and Reed Roe live in Poughkeepsie, New York. Reed Roe received gender-affirming medical care at NYU Langone within the time range set out in the Subpoenas. That care included puberty blocking medication and hormone therapy to treat gender dysphoria.

16. Plaintiff **Nicole Noe**, by and through her parent, **Norman Noe**, is a transgender minor. Norman Noe and Nicole Noe live in Brooklyn, New York. Nicole Noe received gender-affirming medical care at NYU Langone within the time range set out in the Subpoenas. That care included puberty blocking medications and estrogen to treat gender dysphoria.

17. Plaintiff **Karl Koe** is a transgender person living in New York, New York. Karl Koe received gender-affirming chest masculinization surgery through NYU Langone within the time

range set out in the Subpoenas. As a minor, Karl Koe also received testosterone to treat gender dysphoria, also within that time range, through Mount Sinai Health System.

18.    Plaintiff **Jay Doe** is a transgender person living in New York, New York. Jay received birth control medication for menstrual suppression to treat gender dysphoria at NYU Langone within the time range set out in the Subpoenas.

19.    Plaintiffs Carter Coe, Reed Roe, and Nicole Noe are collectively referred to as the **Minor Plaintiffs**. Their parents, Caroline Coe, Norman Noe, and Riley Roe, respectively, are collectively referred to as the **Parent Plaintiffs**.

20.    Plaintiffs Karl Koe and Jay Doe are collectively referred to as the **Adult Plaintiffs**.

### B. Defendants

21.    Defendant **Todd Blanche** is the Acting Attorney General of the United States. He is sued in his official capacity. Attorney General Blanche is responsible for all aspects of the operation and management of the U.S. Department of Justice ("DOJ"), including implementing and fulfilling DOJ's duties under the U.S. Constitution and statutory law. As such, Attorney General Blache supervises and directs the administration and operation of the United States Attorneys' Offices. *See* 28 C.F.R. § 0.5.

22.    Defendant **United States Department of Justice** is a cabinet agency within the executive branch of the United States government. 28 U.S.C. § 501. DOJ has several divisions, including the Civil and Criminal Divisions. DOJ also directs and oversees United States Attorneys' Offices, including the U.S. Attorney's Office for the Northern District of Texas.

23.    Defendants DOJ and Acting Attorney General Blache are collectively referred to as **DOJ** or the **DOJ Defendants**.

24.     Defendants **NYU Langone Health System, NYU Langone Hospitals, and NYU Grossman School of Medicine, a Division of New York University**, are medical care providers and corporations, organized and existing under the laws of New York, with their principal place of business in Manhattan, New York. Through their provision of professional medical services to patients, including Plaintiffs, they have established a physician-patient relationship with their patients pursuant to New York Civil Practice Law and Rules 4504(a) ("CPLR 4504(a)").

25.     Defendants NYU Langone Health System, NYU Langone Hospitals, and NYU Grossman School of Medicine, a Division of New York University, are collectively referred to as **NYU** or the **NYU Defendants**.

**FACTUAL BACKGROUND AND ALLEGATIONS**

**A.  Gender Identity and Transgender People**

26.     "Gender identity" refers to a person's internal sense of belonging to a particular gender.

27.     "Birth-assigned sex" refers to the sex individuals are assigned at birth, typically based on their external genitalia.[1]

28.     Most people are cisgender, meaning that their gender identity matches their birth-assigned sex.

29.     Transgender people have a gender identity that differs from their birth-assigned sex. A transgender boy is someone with a birth-assigned sex of female who has a male gender identity. A transgender girl is someone birth-assigned sex of male who has a female gender identity.

---

[1]     The terms "sex designated at birth" or "sex assigned at birth" are more precise than the term "biological sex" because there are many biological sex characteristics, and they do not always align with each other. Intersex individuals, for example, have reproductive anatomy that does not align with binary male and female classifications.

**B. Gender Dysphoria and Its Medical Treatment**

30.    Gender dysphoria is a serious medical condition marked by clinically significant distress arising from the incongruence between a person's gender identity and their birth-assigned sex.

31.    The American Psychiatric Association codifies gender dysphoria as a diagnosis in the *Diagnostic and Statistical Manual of Mental Disorders, 5th edition, Text Revision* ("DSM-5-TR").[2]

32.    To be diagnosed with gender dysphoria, the "incongruence" between one's gender identity and birth-assigned sex must have persisted for at least six months and be accompanied by clinically significant distress or impairment in social, occupational, or other important areas of functioning.

33.    Gender dysphoria is highly treatable and can be ameliorated through medical treatment. The medical treatment of gender dysphoria is often referred to as "gender-affirming medical care."

34.    Physicians, including those at NYU Hospitals and other hospitals in New York City, who provide gender-affirming medical care "are informed by expert evidence-based guidelines."[3] These guidelines provide a framework for the safe and effective treatment of gender dysphoria, including for adolescents, and are evidence-based, well-researched, and based on widely accepted clinical practices.

35.    Under these guidelines, health professionals perform a comprehensive biopsychosocial assessment of adolescents who present with gender identity-related concerns, and

---

[2]    Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 511 (5th ed., Text Rev. 2022).

[3]    Nat'l Acad. Scis., Eng'g & Med., *Understanding the Well-Being of LGBTQI+ Populations* 361 (Patterson, Sepúlveda & White eds., 2020).

after the onset of puberty and depending on the particular clinical needs of each patient, treatment might include pubertal suppression and/or hormone therapy. Surgery is rare in minors, but some older adolescents are treated with chest surgery when medically indicated.

36.     As is typical with all healthcare, treatment for gender dysphoria depends on the individualized benefits and risks involved, as well as each patient's personal characteristics and developmental status.

37.     Medical treatment for gender dysphoria aims to reduce, or even eliminate, the clinically significant distress associated with gender dysphoria by aligning a transgender person's body with their gender identity and thus allowing them to live in a manner consistent with such identity.

38.     As with all medications, transgender patients—and, in the case of adolescent patients, their parents—are counseled on the potential risks associated with care. Also, as with all medications, treatment is only initiated where patients (and, in the case of adolescent patients, their parents) are properly informed and consent to the care.

Medical treatment recommended for and provided to transgender adolescents with gender dysphoria is effective. Gender-affirming medical care can substantially reduce lifelong gender dysphoria and eliminate the medical need for some surgeries or other medical interventions later in life. And transgender adolescents' mental health outcomes consistently improve after receiving gender-affirming medical treatment. In many instances, this medical care is lifesaving.

39.     Gender-affirming medical care is also safe and supported by robust evidence comparable to the evidence of efficacy supporting other medical treatments, especially those in pediatrics. The medical interventions used to treat gender dysphoria are also used to treat other conditions in both adolescents and adults. These medical interventions carry the same risks when

prescribed for gender dysphoria as when prescribed for other conditions and diagnoses. And the risks accompanying these interventions are comparable to those associated with many other medical interventions to which parents routinely consent on behalf of their children.

40. If left untreated, gender dysphoria can result in, inter alia, clinically significant levels of anxiety or depression, post-traumatic stress disorder, eating disorders, substance abuse, self-harm, and suicidality, as well as other negative physical and mental health consequences.

**C. The Administration's Attacks on Transgender People and Gender-Affirming Medical Care**

41. From its very first day, the Administration began a broad-based systematic campaign attacking transgender people based on a mandate to eradicate "gender ideology," the Administration's derogatory term for acknowledging the existence of transgender people. *See* Exec. Order No. 14168, *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, 90 Fed. Reg. 8615 (Jan. 20, 2025) ("Gender EO").

42. The following week, the President established as "the policy of the United States that it will not fund, sponsor, promote, assist, or support" gender-affirming medical care for minors, and proclaimed that the Administration "will rigorously enforce all laws that prohibit or limit" such care, declaring it to be a "stain on our Nation's history," and that "it must end." *See* Exec. Order No. 14187, *Protecting Children From Chemical and Surgical Mutilation*, 90 Fed. Reg. 8771, § 1 (Jan. 28, 2025) ("Denial-of-Care EO").

43. A series of sweeping implementation efforts followed, including not only by the U.S. Departments of Health and Social Services ("HHS") and the U.S. Federal Trade Commission ("FTC"), but also by the U.S. Department Justice ("DOJ"), culminating in the issuance of civil investigative demands and subpoenas to over twenty hospitals and the grand jury subpoena at issue in this case propounded upon NYU Langone Hospitals.

44.    On January 20, 2025, President Trump issued the Gender EO, a cross-cutting effort to reverse existing protections and deny recognition of transgender people's existence. *See*, *e.g.*, Gender EO § 2 (declaring "the policy of the United States to recognize two sexes, male and female;" rejecting that a person might have a gender identity different from their birth-assigned sex as a "false claim").

45.    The Gender EO mandated all agencies to interpret sex-based terms to encompass only the Administration's preferred definition of "biological sex" (i.e., birth-assigned sex), including with regard to government-issued identification documents and personnel records, § 3(c), (d); rescinded provisions of prior executive orders combating discrimination against LGBTQ people, § 7(b); barred federal funding from being "used to promote gender ideology," § 3(g); mandated housing in accordance with a person's birth-assigned sex in federal prisons and federally-funded shelters, § 4; and directed federal agencies to rescind guidance, forms, and policies acknowledging the existence of transgender people, §§ 3(e), 7(c).

46.    Additional Executive Orders followed, with the Administration using the power of the purse to enforce its erasure of transgender people and its refusal to recognize any form of discrimination based on transgender status; targeting gender-affirming medical care for transgender adolescents through the Denial-of-Care EO; excluding transgender people from military service; threatening federal funding for schools that recognize and affirm transgender students' identities; and barring transgender athletes from school sports. *See*, *e.g.*, Exec. Order No. 14151, *Ending Radical and Wasteful DEI Programs and Preferencing*, 90 Fed. Reg. 8339 (Jan. 20, 2025); Exec. Order No. 14173, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, 90 Fed. Reg. 8633 (Jan. 21, 2025); Exec. Order No. 14183, *Prioritizing Military Excellence and Readiness*, 90 Fed. Reg. 8757 (Jan. 27, 2025) ("Military Ban EO"); Exec. Order

No. 14190, *Ending Radical Indoctrination in K-12 Schooling*, 90 Fed. Reg. 8853 (Jan. 29, 2025); Exec. Order No. 14201, *Keeping Men Out of Women's Sports*, 90 Fed. Reg. 9279 (Feb. 5, 2025) ("Sports Ban EO").

47.    These Executive Orders employ dehumanizing, inaccurate rhetoric to cast transgender people, gender-affirming medical care, and transgender-inclusive policies as an existential threat to "the validity of the entire American system," Gender EO § 1, as antonymic with "an honorable, truthful, and disciplined lifestyle," lacking "humility and selflessness," Military Ban EO § 1, and as a source of "endangerment, humiliation, and silencing of women and girls," Sports Ban EO § 1.

48.    Federal agencies took immediate action to carry out the Gender and Denial-of-Care EOs' campaign against transgender people and gender-affirming medical care.

49.    For example, within days of the Gender EO, Secretary of State Rubio ordered staff at the U.S. Department of State to suspend any passport application where the applicant is seeking to change their sex designation from the definition provided in the Gender EO.

50.    Contemporaneously, the Bureau of Prisons ("BOP") initiated transfers of transgender women to men's prisons and paused access to gender-affirming medical care.[4]

51.    The Office of Personnel Management instructed federal agencies to "take down all outward facing media (websites, social media accounts, etc.) that inculcate or promote gender ideology."[5]

---

[4]    *See*, *e.g.*, Bureau of Prisons, *Management of Inmates with Gender Dysphoria*, No. 5260.01 (Feb. 19, 2026), https://tinyurl.com/3cwbfxxh.

[5]    U.S. Off. of Pers. Mgmt., *Initial Guidance Regarding President Trump's Executive Order Defending Women* 1 (Jan. 29, 2025), https://tinyurl.com/243c49d6 [https://perma.cc/M2HN-SRLY].

52.    The Office of Management and Budget also promised to stop the use of federal funds to promote "transgenderism."[6]

53.    Within days, agencies from the National Park Service to the Centers for Disease Control removed references to transgender people from government websites.[7]

54.    Similarly, the National Institutes of Health terminated hundreds of research grants relating to LGBTQ+ people because the research related to "transgender issues" and, according to the Administration, "research based on gender identity … do[es] nothing to enhance the health of many Americans" and "ignore[s] biological realities."[8]

55.    The President has characterized gender-affirming medical care for adolescents as "barbaric," referring to "the sinister threat of gender ideology" as "one of the most prevalent forms of child abuse facing our country today."[9]

56.    In December 2025, HHS Secretary Kennedy went further and sought by fiat to unilaterally establish that *any* provision of gender-affirming medical care for minors is *per se* below the standard of care.[10] The same day, HHS published proposed rules (1) barring Medicaid and Children's Health Insurance Program funds from paying for gender-affirming medical care,[11]

---

[6]    Matthew J. Vaeth, Off. of Mgmt. & Budget, M-25-13, *Temporary Pause of Agency Grant, Loan, and Other Financial Assistance Programs* 1 (Jan. 27, 2025), https://tinyurl.com/3zpchy7r [https://perma.cc/6UM5-XBV8].

[7]    *See*, *e.g.*, Juliana Kim, *Park Service erases 'transgender' on Stonewall website, uses the term 'LGB' movement*, NPR (Feb. 14, 2025), https://tinyurl.com/3pj27pap [https://perma.cc/6UM5-XBV8]; Ilan H. Meyer & Lauren J. Bouton, The Williams Inst., *Impact of Executive Orders on Access to Federal Data* (Feb. 2025), https://tinyurl.com/2c9a4d4y [https://perma.cc/3P6M-XKJA].

[8]    Am. Ass'n of Physicians for Hum. Rts., Inc. v. Nat'l Insts. of Health, 795 F.Supp.3d 678, 688, 696-97 (D. Md. 2025).

[9]    The White House, *National Child Abuse Prevention Month, 2025* (Apr. 3, 2025), https://tinyurl.com/42swzwe5 [https://perma.cc/3ZCX-X7ZL].

[10]    *See* Declaration of HHS Secretary Re: Safety, Effectiveness, and Professional Standards of Care for Sex-Rejecting Procedures on Children and Adolescents (Dec. 18, 2025) ("Kennedy Declaration"), https://tinyurl.com/3hdneup7 [https://perma.cc/8QML-W6RB].

[11]    Medicaid Program; Prohibition on Federal Medicaid and Children's Health Insurance Program Funding for Sex-Rejecting Procedures Furnished to Children, 90 Fed. Reg. 59441-01 (proposed Dec. 19, 2025) (to be codified at 42 C.F.R. pt. 441, 457).

(2) prohibiting hospitals from providing gender-affirming medical care as a condition of participation in Medicare and Medicaid,[12] and (3) excluding gender dysphoria from disability-based antidiscrimination protections.[13]

57.     HHS's General Counsel also publicized his referrals of children's hospitals providing gender-affirming medical care to HHS's Office of Inspector General "for failing to meet 'recognized standards of health care,' citing Kennedy's declaration."[14]

58.     Within days, reaffirming "this administration's priority to end all sex-rejecting procedures on minors," HHS sent letters to medical organizations, requesting that they end their "promot[ion]" of gender-affirming medical care and "revise [its] medical guidelines and guidance that advise medical professionals to provide these procedures to minors."[15]

59.     HHS further threatened that if they did not do so, HHS "will use all authority under the law . . . to aggressively pursue any medical organization that participates in" gender-affirming medical care for youth.[16]

60.     Administration officials have publicly celebrated that "more than 30 hospitals and hospital systems . . . have announced they are no longer performing sex-mutilating and sex-

---

[12]     Medicare and Medicaid Programs; Hospital Condition of Participation: Prohibiting Sex-Rejecting Procedures for Children, 90 Fed. Reg. 59463-01 (proposed Dec. 19, 2025) (to be codified at 42 C.F.R. pt. 482).

[13]     Nondiscrimination on the Basis of Disability in Programs or Activities Receiving Federal Financial Assistance, 90 Fed. Reg. 59478-01 (proposed Dec. 19, 2025) (to be codified at 45 C.F.R. pt. 84).

[14]     Orion Rummler, *Three hospitals are under investigation for providing gender-affirming care to trans youth*, The 19th (Jan. 7, 2026), https://tinyurl.com/3muuawv7.

[15]     Ex. 14 - Dec. 30, 2025, Letter from James O'Neill, Deputy Secretary of Health and Human Servs., to Kate Fryer, Chief Executive Officer, Endocrine Society, at 1, *Endocrine Soc'y v. Fed. Trade Comm'n*, No. CV 26-532 (JEB) (D.D.C. May 7, 2026), Dkt. No. 9-17, https://tinyurl.com/2czkkp42.

[16]     *Id.* at 2.

rejecting procedures for minors," and then continued to publicly refer non-compliant hospital groups for investigation by the HHS Office of Inspector General.[17]

61.    The Kennedy Declaration has since been found unlawful, both procedurally and substantively, with a federal district court noting that in issuing the declaration, HHS Secretary Kennedy exhibited an "unserious regard for the rule of law" that, "tragically, … is one of a long list of examples of how a leader's wanton disregard for the rule of law causes very real harm to very real people," and noting that in so doing HHS Secretary Kennedy had "act[ed] with cruelty."[18]

62.    That court also held that "[t]he Kennedy Declaration exceeded Defendants' statutory authority, flouted applicable notice and comment rulemaking procedures, and impeded [States'] rights to regulate the medical profession and their discretion to design their own statutorily-compliant Medicaid plans."[19]

63.    In addition, the Federal Trade Commission ("FTC") has similarly issued sweeping civil investigative demands ("CIDs") to non-profit medical organizations engaged in medical research and education, merely because they acknowledge transgender people's existence and express support for gender-affirming medical care.[20]

64.    A federal district court has since found that these medical organizations are likely to succeed on the merits of their claims that the CIDs—akin to administrative subpoenas—

---

[17]    *See* HHS General Counsel Mike Stuart (@HHSGCMikeStuart), X (Feb. 3, 2026, at 5:25 PM CT), https://tinyurl.com/y7943fu6 [https://perma.cc/Y3TW-EXXH]; *see also* The White House, *President Trump Promised to End Child Sexual Mutilation – and He Delivered* (July 25, 2025), https://tinyurl.com/yxc3bkvv [https://perma.cc/E8AX-5UHC]; The White House, *President Trump Is Delivering on His Commitment to Protect Our Kids* (Feb. 3, 2025), https://tinyurl.com/8kpj5akd [https://perma.cc/QNG5-WQBQ].

[18]    *Oregon v. Kennedy*, No. 6:25-CV-02409-MTK, 2026 WL 1048354, at *1 (D. Or. Apr. 18, 2026).

[19]    *Id.* at *16-17.

[20]    *See*, *e.g.*, *Endocrine Soc'y v. Fed. Trade Comm'n*, No. CV 26-512 (JEB), 2026 WL 1257289 (D.D.C. May 7, 2026); *World Pro. Ass'n for Transgender Health v. Fed. Trade Comm'n*, No. CV 26-532 (JEB), 2026 WL 1257321 (D.D.C. May 7, 2026); *see also* Vittoria Elliott, *The FTC Is Ramping Up to Target Transgender Rights*, Wired (Apr. 24, 2026), https://tinyurl.com/3z6uc9mx [https://perma.cc/5HU8-8J6Z].

constitute First Amendment retaliation, finding that retaliatory animus was the but-for cause for their issuance based on both "[t]he breadth and vigor of Government action levied against proponents of the view that there can be an incongruence between an individual's sex and gender identity," and the "sorely wanting" evidence of any "plausible" non-retaliatory motive by the government, even taking the agency's own "explanation at face value."[21]

### D. DOJ's Role in the Attacks on Transgender People and Gender-Affirming Medical Care

65.    The Denial-of-Care EO imposed specific obligations on DOJ to explore legal avenues for limiting or ending the provision of gender-affirming medical care.

66.    Then-Attorney General Pam Bondi diligently took on these mandates, with federal law enforcement entities publicly pronouncing their intent to target transgender people and medical care providers.

67.    On April 22, 2025, Attorney General Bondi issued a Memorandum to the Department (hereafter the "Bondi Memo") characterizing gender-affirming medical care as "a radical ideological agenda"; an "infect[ion visited upon] an entire generation"; the work of "politically captured profiteers"; "barbaric practice[s]" that "maim and steriliz[e] children"; and as "genital mutilation."[22]

68.    The Bondi Memo directed "the Civil Division . . . to undertake appropriate investigations of any violations of the Food, Drug, and Cosmetic Act by manufacturers and distributors engaged in misbranding by making false claims about the on- or off-label use of

---

[21]    *Endocrine Soc'y*, 2026 WL 1257289, at *9-14.

[22]    Off. of Att'y Gen., *Memorandum: Preventing the Mutilation of American Children* (Apr. 22, 2025), https://tinyurl.com/y6xcv8jk [https://perma.cc/CG7Z-8HRA] ("Bondi Memo"). A copy of the Bondi Memo is attached hereto as **Exhibit C**.

puberty blockers, sex hormones, or any other drug used to facilitate a child's so-called 'gender transition.'"[23]

69.    On June 2, 2025, the Federal Bureau of Investigations ("FBI") posted on X.com the following: "Help the FBI protect children. As the Attorney General has made clear, we will protect our children and hold accountable those who mutilate them under the guise of gender-affirming care. Report tips of any hospitals, clinics, or practitioners performing these surgical procedures on children at 1-800-CALL-FBI or http://tips.fbi.gov."[24]

70.    On June 11, 2025, the Civil Division of DOJ announced it would follow through on the directives set for in the Denial-of-Care EO and the Bondi Memo, with Assistant Attorney General Brett Shumate issuing a memorandum committing to prioritizing these investigations.[25]

### E.  DOJ Issues Civil Administrative Subpoenas to Healthcare Institutions

71.    Soon after the Shumate Memo, DOJ issued civil administrative subpoenas, under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), to more than twenty healthcare institutions across the country whose care for their patients includes gender-affirming medical care.[26]

72.    Upon information and belief, these administrative subpoenas are related to the same "investigation" for which the Subpoenas at issue here were issued and are substantially identical to the Subpoenas at issue here.

---

[23]    *See id.*

[24]    FBI (@FBI), X (June 2, 2025), https://tinyurl.com/5966hpdc [https://perma.cc/6WRE-RZRG].

[25]    Off. of Assistant Att'y Gen., *Memorandum: Civil Division Enforcement Priorities* (June 11, 2025), https://tinyurl.com/3bvnxxxj [https://perma.cc/V6R6-SSKB] ("Shumate Memo"). A copy of the Shumate Memo is attached hereto as **Exhibit D**.

[26]    See U.S. Dep't of Justice, Press Release No. 25-717, *Department of Justice Subpoenas Doctors and Clinics Involved in Performing Transgender Medical Procedures on Children* (July 9, 2025), https://tinyurl.com/cpp2byvj [https://perma.cc/H66N-9QY8]; Jo Yurcaba, *DOJ subpoenas more than 20 doctors and clinics that provide trans care to minors*, NBC News (July 10, 2025), https://tinyurl.com/5fa2d853 [https://perma.cc/3C7G-S3MA].

73.    Multiple entities that received these administrative subpoenas, or families of patients at some of these entities, filed motions seeking to quash or limit the subpoenas. *See*, *e.g.*, *In re Admin. Subpoenas to Children's Hospitals*, No. 1:26-cv-01834 (D. Md.); *In re: 2025 Subpoena to Children's Nat'l Hospital*, No. 1:25-cv-03780 (D. Md.); *In re 2025 Children's Hospital of Los Angeles Subpoena*, No. 2:25-cv-11183 (C.D. Cal.); *In re Dep't of Justice Admin. Subpoena No. 25-1431-030*, No. 1:25-mc-00063 (D. Colo.); *In re 2025 UPMC Subpoena*, No. 2:25-mc-01069 (W.D. Pa.); *In re Subpoena No. 25-1431-014*, No. 2:25-mc-00039 (E.D. Pa.); *In re Admin. Subpoena No. 25-1431-019*, No. 1:25-mc-91324 (D. Mass.); *In re Subpoena Duces Tecum No. 25-1431-016*, No. 2:25-mc-00041 (W.D. Wash.); *QueerDoc PLLC v. U.S. Dep't of Justice*, No. 2:25-mc-00042 (W.D. Wash.).

74.    Prior to April 30, 2026, each of the courts that considered these motions quashed the administrative subpoenas or limited the ability of DOJ to obtain identifying and sensitive health information.[27]

75.    On September 3, 2025, in a case involving Seattle Children's Hospital, the federal district court in the Western District of Washington set aside the administrative subpoena to that hospital while noting that the true purpose was "to pressure hospitals into ending gender-related care for minors."[28]

---

[27]    *See In re: 2025 Subpoena to Children's Nat'l Hospital*, No. 1:25-cv-03780, 2026 WL 160792 (D. Md. Jan. 21, 2026); *In re Dep't of Justice Admin. Subpoena No. 25-1431-030*, No. 1:25-mc-00063, 2026 WL 33398 (D. Colo. Jan. 5, 2026), *appeal docketed*, No. 26-1104 (4th Cir. Feb. 2, 2026); *In re 2025 UPMC Subpoena*, No. 2:25-mc-01069, 2025 WL 3724705 (W.D. Pa. Dec. 24, 2025), *judgment entered*, No. 2:25-MC-01069, 2026 WL 570419 (W.D. Pa. Mar. 2, 2026), *appeal docketed*, No. 26-1401 (3d Cir. Mar. 4, 2026); *In re Subpoena No. 25-1431-014*, 810 F.Supp.3d 555, 583 (E.D. Pa. 2025); *In re Admin. Subpoena No. 25-1431-019*, 800 F.Supp.3d 229 (D. Mass. 2025), *appeal docketed*, No. 25-2092 (1st Cir. Nov. 14, 2025); *In re Subpoena Duces Tecum No. 25-1431-016*, No. 2:25-mc-00041, 2025 WL 3562151 (W.D. Wash. Sept. 3, 2025); *QueerDoc PLLC v. U.S. Dep't of Justice*, 807 F.Supp.3d 1295, 1303 (W.D. Wash. 2025), *appeal docketed*, No. 25-7384 (9th Cir. Nov. 24, 2025).

[28]    *In re Subpoena Duces Tecum No. 25-1431-016*, 2025 WL 3562151 at *11.

76.     On September 9, 2025, in a case involving Boston Children's Hospital, the federal district court in District of Massachusetts quashed another administrative subpoena, stating that subpoena's "true purpose" was to interfere with "Massachusetts' right to protect GAC within its borders, to harass and intimidate BCH to stop providing such care, and to dissuade patients from seeking such care."[29]

77.     On November 21, 2025, in a case involving Children's Hospital of Philadelphia, the district court for the Eastern District of Pennsylvania struck three requests contained in the administrative subpoena that sought patient-identifying information or sensitive health information. Like the Subpoena at issue here, these requests sought documents: (1) identifying the names, addresses, and social security numbers of its minor patients prescribed puberty blockers and hormone therapy and their families' identifying information; (2) the minor patient's medical treatment records including diagnoses; and, (3) describing each minor patient's informed consent process, patient intake, parent or guardian authorization, and use of medicine not approved by the Food and Drug Administration. The district court in the Eastern District of Pennsylvania found that DOJ's asserted concerns in support of the subpoena "describe policy disagreements about the propriety of medical care," and did not serve as a legitimate basis for a subpoena.[30]

78.     On December 24, 2025, in a case involving UPMC Children's Hospital of Pittsburgh, the federal district court in the Western District of Pennsylvania quashed the same three provisions of the administrative subpoena at issue in that case that sought patient-identifying information or sensitive health information. In doing so, the court stated that it was joining other

---

[29]     *In re Admin. Subpoena No. 25-1431-019*, 800 F.Supp.3d at 239.
[30]     *In re Subpoena No. 25-1431-014*, 810 F.Supp.3d at 583.

courts "in finding that the government's demand for deeply private and personal patient information carries more than a whiff of ill-intent."[31]

79.     On January 5, 2026, in a case involving Children's Hospital of Colorado, a federal magistrate judge in the District of Colorado recommended that the motion to quash the administrative subpoena to the hospital in that case be granted. In doing so, the court observed that "government's aim is not actually to investigate FDCA violations, but to use the FDCA as a smokescreen for its true objective of pressuring pediatric hospitals into ending gender-affirming care through commencing vague, suspicionless 'investigations.'"[32]

80.     On January 21, 2026, in a case involving Children's National Hospital in Washington, DC, a district court in Maryland concluded that the administrative subpoena to the hospital "appears to have no purpose other than to intimidate and harass the Hospital and Movants, and those similarly situated," that "[t]he Government seeks to fulfill its policy agenda through compliance born of fear," and that "the Subpoena is the classic impermissible fishing expedition."[33]

81.     Upon information and belief, having encountered unanimity from the courts in finding that the administrative subpoenas directed at hospitals were issued for an improper purpose and inappropriately sought patient-identifying information pertaining to transgender minors, DOJ shifted tactics to obtain the same information.

82.     On April 30, 2026, DOJ for the first time moved to enforce an administrative subpoena, filing its motion regarding the subpoena sent to Rhode Island Hospital in the U.S.

---

[31]     *In re 2025 UPMC Subpoena*, 2025 WL 3724705, at *2.

[32]     *In re Dep't of Justice Admin. Subpoena No. 25-1431-030*, 2026 WL 33398, at *7.

[33]     *In Re 2025 Subpoena to Children's Nat'l Hosp.*, 2026 WL 160792, at *9.

District Court for the Northern District of Texas.[34] DOJ did so notwithstanding that it was still in active communications with counsel for Rhode Island Hospital as to the scope and parameters of the information to be produced in response to the administrative subpoena.[35] It also did so notwithstanding that neither the attorneys who issued the subpoena or were involved in those communications nor Rhode Island Hospital had any connection to the Northern District of Texas.

83.    Within hours of the filing of DOJ's motion, and without notice having been given to or any response received from Rhode Island Hospital or any other party, the district court in the Northern District of Texas granted DOJ's motion to enforce.[36]

84.    On May 4, 2026, the Rhode Island Child Advocate, as representative of the interests of transgender minors in the state's custody and care, moved to quash the administrative subpoena propounded upon Rhode Island Hospital in the U.S. District Court for the District of Rhode Island.[37]

85.    On May 11, 2026, the night before the hearing in the proceedings in Rhode Island was set to take place, it was revealed that a grand jury in the Northern District of Texas had issued grand jury subpoenas to at least one healthcare entity seeking the same information that DOJ was seeking through the civil administrative subpoenas that courts had found lacked a proper purpose.[38]

86.    Upon information and belief, the DOJ Defendants have sought to employ grand jury subpoenas in a venue where the care at issue has been banned by the state, before a perceived

---

[34]    Pet. for Enforcement of Admin. Subpoena, *In Re: Administrative Subpoena 25-1431-032*, No. 4-26MC-006-0 (N.D. Tex. Apr. 30, 2026) (ECF No. 1).

[35]    Emergency Motion to Stay Pending Appeal, *In Re: Administrative Subpoena 25-1431-032*, No. 4-26MC-006-0 (ECF No. 8).

[36]    Order, *In Re: Administrative Subpoena 25-1431-032*, No. 4-26MC-006-0 (ECF No. 2).

[37]    Emergency Motion to Quash Subpoena Duces Tecum, *In re Admin. Subpoena 25 1431 032 to Rhode Island Hosp.*, No. CV 1:26-MC-0007-MSM-AEM, 2026 WL 1392565 (D.R.I. May 14, 2026) (ECF No. 1).

[38]    Joseph Goldstein, *N.Y.C. Hospital Is Subpoenaed Over Trans Youth Health Care*, NY Times (May 12, 2026), https://tinyurl.com/2psr8r9v.

more favorable audience, as an end-run to the quashals and limitations that numerous courts across the country have deemed necessary, and which have hampered DOJ's ability to use civil administrative subpoenas to chill the provision of gender-affirming medical care and seek the identities of transgender adolescents, their families, and their sensitive health information.

87.    On May 13, 2026, the district court in District of Rhode Island enjoined DOJ from seeking, receiving, using, retaining, or disseminating any patient-identifying information or sensitive health information produced by Rhode Island Hospital in response to the administrative subpoena at issue there, including any other materials that identify, or reasonably permit the identification of, Rhode Island's children. In doing so, the court found that the subpoena was issued for an improper purpose, and that it demands the production of records that cannot be obtained consistent with the constitutional privacy rights of Rhode Island children.[39]

88.    During the hearing in Rhode Island, counsel for DOJ represented that the investigation began in Washington, D.C. and could not specify when the investigations were transferred to the Northern District of Texas. However, upon information and belief, each of the DOJ attorneys involved at the time that the so-called investigations started and the administrative subpoenas were issued was from DOJ headquarters in Washington, DC. The District of Rhode Island court concluded that DOJ's actions in the Northern District of Texas amounted to forum shopping "in an obvious effort to shield its recent investigative tactics—previously rejected by every other court to review them—from this Court's review, in favor of a distant forum that DOJ deems friendly to its political positions."

---

[39]    *In re Admin. Subpoena 25-1431-032 to RI Hosp.*, 2026 WL 1329792.

21

**F. NYU's Provision of Gender-Affirming Medical Care to Transgender Adolescents**

89. Recognizing the safety and efficacy of medical treatment for gender dysphoria, NYU offered gender-affirming medical care as treatment for a transgender adolescent's gender dysphoria for many years. That is until February 2026 when NYU stopped providing these necessary health services in response to some of the Administration's coercive actions.[40]

90. In 2012, NYU established an LGBTQ Advisory Council, to further NYU Langone's commitment to delivering quality care to each LGBTQ patient and to reduce disparities that exist in these populations.[41]

91. For several years, NYU established and maintained a Transgender Youth Health Program through which it provided comprehensive gender-affirming medical and psychosocial services for transgender youth. Until February 2026, this included medical services such as gender-affirming hormones, pubertal suppression, surgical services, fertility preservation, and voice therapy, in addition to psychological and social support services.

92. Following the issuance of the Gender and Denial-of-Care EOs, NYU paused its provision of medical services as treatment for gender dysphoria for transgender young people.

93. When the provisions of the executive orders that directly threatened NYU's federal funding based on its provision of gender-affirming medical care to transgender minors were enjoined, NYU resumed providing the healthcare it had long provided to its adolescent transgender patients.

94. In February 2026, in response to declarations and proposed rules by the Administration that threatened NYU's eligibility for federal funding and to participate in the

---

[40] Joseph Goldstein, *Manhattan Hospital Ends Medical Treatment for Transgender Youth*, N.Y. Times (Feb. 17, 2026), https://tinyurl.com/ysxr7jmp.

[41] *NYU Langone Medical Center Achieves the Gold Standard of Equality in Healthcare*, NYU Langone Health., https://tinyurl.com/3remvfrf [https://perma.cc/J2XN-EB64] (last visited May 31, 2026).

Medicaid, Medicare, and CHIP programs, NYU preemptively ceased providing health services to transgender minors as treatment for gender dysphoria that it provides to other minors, such as puberty-delaying medication or hormone therapy.

95.    On February 25, 2026, the Office of the New York Attorney General sent a letter to NYU Langone noting that "NYU Langone's change in policy is self-imposed; there has been no change in federal law to require the cessation of medically necessary transgender healthcare," and that "[t]he threat of federal funds being withheld or rescinded because of the provision of gender-affirming care does not excuse providers' and medical institutions' existing duties and obligations under New York law," which "prohibit[s] discrimination based on a patient's membership in a protected class, including sex, gender identity, and disability, and remain in full effect."

96.    Thereafter, on or about March 10, 2026, Mehmet Oz, administrator of the Centers for Medicare and Medicaid Services, sent a letter to New York Attorney General Letitia James where he proclaimed that his "office stands behind NYU's decision" and derided medical treatment for gender dysphoria by proclaiming, "Our children are not guinea pigs."[42]

97.    A week later, on March 18, Deputy Attorney General Blanche sent another letter to New York Attorney General James where he noted that DOJ officials were in contact with representatives of NYU Langone and proclaimed that DOJ "will take all necessary actions to defend the hospital's decision to cease offering [gender-affirming] procedures."

98.    To date, notwithstanding that the Kennedy Declaration has been set aside as unlawful by a federal district court and that no rule conditions federal funding on the provision of gender-affirming medical care to minors, NYU has refused to resume providing medical care as treatment for a transgender minor's gender dysphoria.

---

[42]    Carl Campanile, *Dr. Oz rips AG James, defends NYU Langone decision to ax transgender treatment for kids*, New York Post (Mar. 11, 2026), https://tinyurl.com/3fn7cn8u [https://perma.cc/4P3Y-25CM].

**G. DOJ Issues Grand Jury Subpoena to NYU Langone and, Upon Information and Belief, Other Hospitals in New York City**

99.    On May 7, 2026, NYU Langone Hospitals received a grand jury subpoena from the U.S. Attorney's Office in the Northern District of Texas ("the Subpoena"). A copy of the subpoena is attached hereto as **Exhibit A**.[43]

100.    The Subpoena directs NYU to produce seventeen broad categories of records, from January 1, 2020, through May 5, 2026, by 9:00am on June 10, 2026.

101.    Among other documents, the Subpoena commands the production of "[d]ocuments sufficient to identify each patient who underwent Sex-Rejecting Procedures."

102.    For each patient identified, the Subpoena further demands the production of all "documents relating to the clinical indications, diagnoses, or assessments that formed the basis for providing Sex-Rejecting Procedures, including the prescribing of puberty blockers or hormones, and all documents relating to the Sex-Rejecting Procedures care provided to each patient . . . from initial consultation to the most recent treatment provided."

103.    In addition, the Subpoena directs the production of "[a]ll documents relating to informed consent, patient intake, and parent or guardian authorization for minor patients identified . . . , including any disclosures about off-label use (i.e., uses not approved by the United States Food and Drug Administration) and potential risks of puberty blockers and/or hormones."

104.    The Subpoena defines "Sex-Rejecting Procedures" as follows:

"Sex-Rejecting Procedures" means any medical, surgical, pharmaceutical, or clinical intervention provided to an individual under eighteen years of age that is intended or reasonably expected to suppress, alter, or eliminate endogenous pubertal development, or to modify primary or secondary sex characteristics, for the purpose of aligning with or affirming a minor's asserted gender identity rather than the minor's biological sex. These include, for example, puberty suppression, hormone administration, surgical intervention, voice modification interventions, or

---

[43]    Plaintiffs use the term "the Subpoenas" to refer to the Subpoena issued to NYU as well as any other similar subpoena issued to a healthcare institution in New York City.

24

other medical or clinical services that are functionally integral to, preparatory for, or undertaken in furtherance of such interventions or procedures. An intervention or treatment is considered a Sex-Rejecting Procedure based on its intended purpose and expected physiological or functional effect, and not on the terminology or classification used by a health care provider or facility.

105.    The Subpoena defines the term "puberty blockers" to mean "any gonadotropin-releasing hormone ('GnRH') agonists or related drugs (e.g., leuprolide, triptorelin) used to delay the onset of puberty."

106.    The Subpoena further defines the term "hormones" to mean "testosterone, estrogen, and any other hormonal drugs used in hormonal treatments sometimes known as 'gender affirming hormone therapy' ('GAHT') or transgender hormone therapy used to induce cross-sex characteristics," and states that "[t]his includes hormone-blocking drugs, such as spironolactone, used to suppress naturally-occurring hormones for the facilitation of GAHT."

107.    On May 11, 2026, pursuant to New York State's Shield Law, N.Y. Exec. L. § 837-x, NYU made public that it had received the Subpoena through a public notice on its website. A copy of the public notice by NYU is attached hereto as **Exhibit B**.

108.    Upon information and belief, NYU also provided virtually identical notices to the public notice to affected patients, including Plaintiffs and members of the proposed Class, through MyChart, an online portal that allows patients to manage their health information and communicate directly with their healthcare providers.[44]

109.    Though the Subpoena was purportedly issued pursuant to the authority of a grand jury in the Northern District of Texas, it requests that materials responsive to it be made available in electronic format to Special Agent Bradley Cooper in the Kansas City Field Office of the FDA Office of Criminal Investigations.

---

[44]    *See* S. Baum, *NYU Langone First Known Hospital to Face Federal Criminal Subpoena Over Trans Youth Care*, Erin in the Morning (May 11, 2026), https://tinyurl.com/mpdr3pey [https://perma.cc/R7E8-CDHY].

110. The Subpoena further notes that DOJ has purportedly considered the predicate requirements of 45 C.F.R. § 164.512 (f)(1(ii)(C)(1)-(3), under HIPAA, and determined that "[d]e-identified information could not reasonably be used in its stead."

111. Had NYU not posted a notice of receipt of the Subpoena from the Northern District of Texas, Plaintiffs would not have known that their personal identifying and sensitive health information was at risk of being coercively disclosed to the DOJ.

112. Upon information and belief, NYU would not disclose the patient-identifying information and sensitive health information of Plaintiffs and putative members of the Class but for being compelled to do so by the DOJ Defendants.

113. NYU has not obtained consent from any Plaintiff—or, upon information and belief, from any member of the proposed Class—to disclose the patient-identifying information and sensitive health information of Plaintiffs and putative members of the Class to the DOJ Defendants.

114. While Plaintiffs do not have confirmation as to whether substantially similar information as that requested by the Subpoena to NYU is being sought from other health institutions in New York City, upon information and belief, DOJ has sent virtually identical federal grand jury subpoenas to other healthcare institutions in New York City, including Mount Sinai Health System.

115. Upon information and belief, New York healthcare institutions including Mount Sinai Health System would not disclose the patient-identifying information and sensitive health information of Plaintiffs and putative members of the Class but for being compelled to do so by the DOJ Defendants.

## H. The Current DOJ Has Abandoned Any Notion of Regularity in Its Investigations and Grand Jury Proceedings

26

116.    Under the current Administration, DOJ has abandoned any notion of independence or good faith, such that it cannot benefit from a presumption of regularity.

117.    Under Defendant Blanche, "the pace of investigations against Mr. Trump's perceived enemies has accelerated."[45] This includes investigations targeted at transgender people and those who support them.

118.    There are myriad examples of how DOJ and the Administration have used the levers of power to go after those that purportedly have wronged the President or who have defied the Administration's policies.

119.    For example, as a district court in Tennessee found, under Defendant Blanche's direction, DOJ engaged in a malicious prosecution based on a "tainted investigation" initiated based on Defendant Blanche's "vindictive motive."[46]

120.    Similarly, as a district court in the District of Columbia held, DOJ opened an investigation into then-Chair of the Federal Reserve Jerome Powell and issued grand jury subpoenas "for an improper purpose."[47] As the court found, "[a] mountain of evidence suggests that the Government served the[] subpoenas on the Board to pressure its Chair into voting for lower interest rates or resigning."[48] In doing so, the court observed that, at least under this Administration, DOJ and U.S. Attorneys' Offices are doing the President's bidding, noting that one U.S. Attorney was "pushed out for refusing to prosecute the President's opponents."[49]

---

[45]    Glenn Thrush, *Trump's Fund Shows Blanche Choosing Loyalty Over Pushing Back*, N.Y. Times (May 21, 2026), https://tinyurl.com/bdhdzuea.

[46]    *United States v. Abrego García*, No. 3:25-CR-00115, 2026 WL 1454303 (M.D. Tenn. May 22, 2026).

[47]    *In re Grand Jury Subpoenas Nos. [Redacted] & [Redacted]*, No. MC 26-12 (JEB), 2026 WL 710202, at *9 (D.D.C. Mar. 13, 2026), *reconsideration denied*, No. MC 26-12 (JEB), 2026 WL 1224046 (D.D.C. Apr. 3, 2026).

[48]    *Id.* at *13.

[49]    *Id.* at *9.

27

121.    DOJ's use of its prosecutorial powers to go after perceived opponents of the President or effectuate the Administration's policy priorities is not the exception, it is the rule. For example, DOJ has launched (often repeatedly) grand jury investigations and sought indictments against former FBI Director James Comey, New York Attorney General Letitia James, and Democratic U.S. Senators, among others.[50]

122.    DOJ has also sought the identities of those aligned with those perceived to oppose the Administration's policy priorities. For example, in relation to its prosecution of journalist Don Lemon for his coverage of a protest in Minnesota, DOJ sought a warrant for the "subscriber information in any form kept" for Mr. Lemon's internet-based news show, "The Don Lemon Show." Among the information sought by the warrant was the names of subscribers, the mailing addresses, residential addresses, business addresses, and email addresses of subscribers, the telephone numbers of subscribers, and the Internet Protocol addresses from which the "Don Lemon Show" was accessed. The court denied the warrant, in part, because "subscriber information is not needed to prove or disprove the commission of a crime – indeed, it is hard to see how such information could be relevant evidence of the commission of a crime."[51]

123.    The aforementioned request for the identities of those not being investigated of a crime but who presumptively may not align with the Administration's policy priorities is consistent with the Subpoenas' request for the identifying and sensitive health information of Plaintiffs and members of the proposed Class.

124.    The abuses by DOJ under the Administration are not limited to whom they target, but are also illustrated by DOJ's misconduct in grand jury and court proceedings.

---

[50]     *See* Protect Democracy, *Tracking retaliatory use of arrests, prosecutions, and investigations by the Trump administration* (May 21, 2026), https://tinyurl.com/sfdpyt68 [https://perma.cc/58QR-38W6] (collecting examples).

[51]     Order Denying Search Warrant Applications, *In re. Search Warrants*, Nos. 26-mj-205, 26-mj-206, 26-mj-207, 26-mj-208, 26-mj-209 (D. Minn. Feb. 24, 2026), at 4-5, https://tinyurl.com/bdzzkpwn.

125.    A federal district court in Illinois recently observed that DOJ has engaged in "prosecutorial vouching" in grand jury proceedings, in which its prosecutors put their "personal credibility and trustworthiness on the line in support of the charges," and engaged in "improper prosecutorial communications of a substantive nature with the grand jurors outside of the grand jury room."[52]

126.    In Wyoming, a panel of three federal judges threw out nine indictments after an examination of the grand jury proceedings revealed misconduct by DOJ's attorneys.[53]

127.    Under DOJ leadership from the Administration, prosecutors have lied and withheld critical information from courts, with one federal district court noting that there has been "a serious breakdown in the ethical codes."[54]

128.    DOJ has also stacked the deck in their own favor in some cases by removing from the panel some grand jurors who had voted against them when considering an earlier version of the charges.[55]

129.    And reminiscent of the DOJ's shift in tactics here after encountering resistance in the courts, as a district court in the District of Oregon observed, federal "agencies under the current administration have a significant and troubling history of evading or flouting prior court orders."[56]

130.    Indeed, even in relation to the purported investigations at issue in this case, DOJ has already been found to have engaged in misconduct. For example, in its decision involving the

---

[52]    Hannah Meisel, *'Broadview 6' trial canceled as prosecutors acknowledge misconduct before grand jury*, Capitol News Illinois (May 21, 2026), https://tinyurl.com/2mdzw392 [https://perma.cc/5AF3-9DAY].

[53]    *E.g.*, Order Dismissing Indictment, *United States v. Benito Coon*, No. 1:26-cr-00039 (D. Wyo. May 15, 2026) (ECF 49), https://tinyurl.com/4ztsr2wn [https://perma.cc/P3V5-CUPA].

[54]    *E.g.*, Kyle Cheney and Josh Gerstein, Judge mulls contempt over DHS' 'patently false' allegation in deportation case, Politico (May 4, 2026), https://tinyurl.com/3mb84t6n.

[55]    Alan Feuer, *As Trump Politicizes Justice Dept., Prosecutors Struggle With Grand Juries*, N.Y. Times (May 26, 2026), https://tinyurl.com/msme29t9.

[56]    *Oregon*, 2026 WL 1048354, at *19 (collecting examples).

administrative subpoena to Rhode Island Hospital for the same information being requested by the

Subpoenas here, the federal district court in Rhode Island found as follows:

> As citizens, we trust that federal prosecutors, when wielding this awesome power against a state, a company, or certainly against vulnerable children, will play fair and be honest with its counterparts and the judiciary.
>
> DOJ has proven unworthy of this trust at every point in this case. It has misrepresented and withheld information to both this Court and the United States District Court for the Northern District of Texas … . It did so in an obvious effort to shield its recent investigative tactics—previously rejected by every other court to review them—from this Court's review, in favor of a distant forum that DOJ deems friendly to its political positions. Its representatives have, under oath, misrepresented salient facts. It has misled the parties with whom it was negotiating in Rhode Island, who have now been placed in an untenable and unprecedented procedural position.[57]

That court also noted that this "appalling," "reckless disregard for the duty of candor owed to a

federal court" was not the first time the team of DOJ lawyers counseling cases regarding the

administrative subpoenas, "in their crusade to obtain transgender children's medical records, acted

in ways that appear to deviate from the norms of professional conduct expected of attorneys

representing the United States."[58]

## I. DOJ Has Admitted Patient-Identifying Records of Transgender Adolescents Are Not Necessary for Its Investigations Related to Gender-Affirming Medical Care

131.    DOJ has already conceded in multiple instances related to its subpoenas to

providers of gender-affirming medical care that it does not need patient-identifying information or

patients' sensitive health information.

132.    For example, DOJ entered into a settlement agreement in a challenge to an

administrative subpoena sent to Children's Hospital of Los Angeles wherein it noted that it had

---

[57]    *In re Admin. Subpoena 25 1431 032 to Rhode Island Hosp.*, 2026 WL 1392565, at \*1.

[58]    *Id*. at \*2, n.5 (citing *In re Subpoena No. 25-1431-014*, 810 F. Supp. 3d 555, 582 (E.D. Pa. 2025) (responding to inconsistency in a DOJ attorney's declaration with a reminder that "sworn declarations filed in federal court must reflect verified facts, not speculation recast as fact"); *QueerDoc, PLLC*, 807 F. Supp. 3d at 1303, n.2 (describing DOJ's misuse of a praecipe as reflecting "a fundamental misunderstanding—or deliberate misuse—of court procedure")).

agreed that the hospital could "redact any patient identifying information in records that are produced in response" to the subpoena and that it would provide advanced notice of at least four weeks to the plaintiffs in that case should the government "issue a new subpoena to any entity or person that requests documents or items related to the provision of gender related care by Children's Hospital Los Angeles that contains patient-identifying information."[59]

133.    DOJ has represented in the case involving the administrative subpoena to UPMC Children's Hospital of Pittsburgh that the subpoena would be fully satisfied by production of only de-identified records, so that no individual patient could be identified to the Government.[60]

134.    DOJ made similar representations to the district court in Rhode Island with regards to the administrative subpoena to Rhode Island Hospital. During the May 12, 2026 hearing in Rhode Island, when asked by the court whether "anonymized data is fine; you don't need the actual identifiable data" for *this* investigation, DOJ represented to the court "it has been [its] practice to … of offering anonymized data request or an anonymized data production to recipients." DOJ also stated that "pursuant to [its] approach" regarding other subpoenas relating to this purported investigation, it "would accept anonymized patient data."

**J.  Compliance with the Subpoenas Would Cause Significant Harm to Plaintiffs**

135.    The threatened disclosure of their identifying and sensitive health information invades the Plaintiffs' sense of privacy and undermines their confidence that their information will stay between them and their medical providers.

136.    Plaintiffs' medical records, now subject to collection and disclosure pursuant to the Subpoenas, contain an enormous amount of confidential identifying, personal, and sensitive health

---

[59]    Settlement Agreement, *In Re 2025 Children's Hospital of Los Angeles Subpoena*, No. 2:25-cv-11183-MWC-JDE (C.D. Cal. Jan. 22, 2026) (ECF 25-1), https://tinyurl.com/rdrrfsuh [https://perma.cc/Y6S9-LLD9].

[60]    Motion to File Supplemental Brief, In Re: 2025 UPMC Subpoena, No. 2:25-mc-1069-CB (W.D. Pa. Dec. 16, 2025) (ECF 47), https://tinyurl.com/jtznaauv [https://perma.cc/U3XG-LMDH].

information, including, but not limited to, their names, basic biographical details, family histories, medical histories, details regarding the treatment of their gender dysphoria, letters of support regarding such treatment, other diagnoses, mental health assessments and diagnostic testing, laboratory test results, health risk factors, and information totally unrelated to their gender dysphoria (herein collectively referred to as "sensitive health information").

137.    Each of the Plaintiffs is horrified at the possible invasion of their privacy in their personal and medical information, to which they do not consent.

138.    The threat of disclosure also interferes in the private relationship between patients and their medical providers, and erodes the trust the Plaintiffs placed in their providers, including those at NYU Langone. This interference also impairs the Plaintiffs' trust in seeking out or obtaining medical care, which may result in delayed care and adverse health consequences.

139.    For example, Caroline Coe expended significant time and energy looking for a medical provider with a specific background and felt grateful to find such a provider at NYU Langone but now feels that her choice in provider is being punished, and disclosure threatens to destroy the atmosphere of trust with their medical provider.

140.    For Plaintiffs, like Karl Koe, the threat of disclosure seems intended to intimidate patients and make gender-affirming medical care even more difficult to obtain. Indeed, trust in the ability to have frank and open conversations with their healthcare providers is shaken by the Subpoenas such that Plaintiffs worry that the true goal of collection and disclosure of their identifying and sensitive health information is to make families more apprehensive about seeking out gender-affirming medical care.

141.    The threat of collection and disclosure of Plaintiffs' identifying and sensitive health information also leaves Plaintiffs concerned about violence, harassment, and intimidation that may

result on account of the disclosure of such information, including their transgender status and other health conditions. If private identifying and sensitive health information is obtained by the Administration, shared with others, or released to the public, Plaintiffs worry about vigilantism or harassment that may result from those who oppose gender-affirming medical care, including those in the Administration or who work with it, and it heightens Plaintiffs' fear of being targeted for their transgender status. Such fears have already limited some of the Plaintiffs' travel, for example.

142.    These fears are especially heightened because Plaintiffs are aware of the rhetoric used by the Administration, including the DOJ Defendants, demonizing transgender people and gender-affirming medical care. Plaintiffs cannot and do not trust the Administration, including DOJ, with their medical information, especially since the government has expressed such vitriol and disdain for transgender people.

143.    Given the Administration's targeting and intimidation of providers of gender-affirming medical care, Plaintiffs fear that their names may go on a list and that they will be investigated simply for receiving medical care that they need.

144.    Plaintiffs feel that the true purpose of threatening disclosure is to intimidate patients out of pursuing gender-affirming medical care, making it harder for them to access the care that they need, and are concerned about the Administration's efforts to target gender-affirming medical care. These fears have caused distress and anxiety such that they have affected their ability to concentrate in school or work and led to loss of sleep.

145.    Minor Plaintiffs, in particular, are so concerned with the disclosure of their transgender status and private health information to the government and to the public that their mental health has suffered and they are experiencing severe distress and anxiety.

**CLASS ALLEGATIONS**

146.    Plaintiffs, on behalf of themselves and all similarly situated individuals, bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure.

147.    **Class Definition.** The proposed Class under Federal Rule of Civil Procedure 23(b)(2) for which Plaintiffs seek certification is defined as:

> All individuals who received any medical treatment for gender dysphoria, including any medical, surgical, pharmaceutical, or clinical intervention that is intended or reasonably expected to suppress, alter, or eliminate endogenous pubertal development, or to modify primary or secondary sex characteristics, for the purpose of aligning with or affirming a minor's asserted gender identity rather than the minor's birth sex, while they were under eighteen years of age, from January 1, 2020, through May 5, 2026, at a healthcare institution located in New York City, including NYU Langone Hospitals (and any other NYU entity) and Mount Sinai Health System.

148.    **Subclass Definition.** Plaintiffs also propose and seek certification of a subclass (the "NYU Subclass") under Federal Rule of Civil Procedure 23(b)(2) defined as follows:

> All individuals who received any medical treatment for gender dysphoria, including any medical, surgical, pharmaceutical, or clinical intervention that is intended or reasonably expected to suppress, alter, or eliminate endogenous pubertal development, or to modify primary or secondary sex characteristics, for the purpose of aligning with or affirming a minor's asserted gender identity rather than the minor's birth sex, while they were under eighteen years of age, from January 1, 2020, through May 5, 2026, at NYU Langone Hospitals or any other NYU entity.

149.    **Impracticability of joinder of all Class Members.** The proposed class and subclass are expected to be sufficiently numerous and geographically dispersed that joinder of all members is impracticable. Upon information and belief, well over forty minor patients sought gender-affirming medical care from New York City-based hospitals, including over forty patients at NYU Langone alone, during the relevant time period. The nature of this action also impacts the ability of claimants to institute individual suits given the confidentiality concerns at its center and putative class members' fears of being targeted by DOJ Defendants.

34

150.    **Class Representatives.** Plaintiffs Carter Coe, by and through his parent and next friend, Caroline Coe; Reed Roe, by and through his parent and next friend, Riley Roe; Nicole Noe, by and through her parent, Norman Noe; Karl Koe; and Jay Doe are members of the proposed class and subclass. Each Plaintiff is willing to serve as a class representative and act on behalf of others similarly situated to themselves. Each has committed to looking out for the interests of all class members and is unaware of any conflict they may have with any proposed class members.

151.    **Common Questions of Law and Fact.** This action requires a determination of whether the information sought by the Subpoenas violates the Class's rights under the United States Constitution, and whether compliance with the Subpoena by NYU constitutes a breach of physician-patient confidentiality under New York law as to the NYU Subclass. Adjudication of these issues will in turn determine whether DOJ may seek the Class members' identifying and sensitive health information or be enjoined from requesting or receiving such information through the Subpoenas, and whether or to what extent NYU must comply with the Subpoena.

152.    **Separate suits would create risk of varying conduct requirements.** The prosecution of separate actions by proposed class members against DOJ and/or NYU would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct. Certification is therefore proper under Federal Rule of Civil Procedure 23(b)(1).

153.    **Defendants' actions rest on grounds generally applicable to the relevant class and the resulting legal violations can be remedied by unified relief.** By seeking, collecting, and/or disclosing the same identifying and sensitive health information for each class member, Defendants act on grounds generally applicable to the relevant class, rendering declaratory relief

appropriate respecting the entirety of the class for the particular claim. Certification is therefore proper under Federal Rule of Civil Procedure 23(b)(2).

154. **Venue:** This action can be most efficiently prosecuted as a class action in the Southern District of New York, where Plaintiffs Carter Coe and Caroline Coe, Reed Roe and Riley Roe, Karl Koe, and Jay Doe reside, Plaintiffs and putative Class members received care, the NYU Defendants and other healthcare entities in New York City that may have received Subpoenas reside and do business, and the records at issue are kept.

155. **Class Counsel.** Plaintiffs have retained experienced and competent class counsel. Plaintiffs are represented by the American Civil Liberties Union Foundation ("ACLU"), Lambda Legal Defense and Education Fund, Inc. ("Lambda Legal"), and the New York Civil Liberties Union Foundation ("NYCLU"). The ACLU, Lambda Legal, and NYCLU have extensive federal court experience litigating on behalf of LGBTQ people, including regarding transgender people's access to healthcare, and have served as class counsel and putative class counsel in multiple cases.

## CLAIM FOR RELIEF

### Count I – Violation of the Fifth Amendment – Right to Informational Privacy
### (Plaintiffs and the Class Against the DOJ Defendants)

156. Plaintiffs hereby incorporate by reference and reallege all preceding paragraphs of this Complaint as though fully set forth herein.

157. Plaintiffs state this cause of action on behalf of themselves and members of the proposed class for purposes of seeking declaratory and injunctive relief.

158. The Fifth Amendment to the United States Constitution guarantees that no person shall be "deprived of life, liberty, or property, without due process of law." U.S. Const., amend. V.

159. The substantive protections of the Due Process Clause, as well as other constitutional provisions, give rise to a right to privacy, protecting information that is highly

personal and intimate, which includes personal health and medical information as well as information relating to a person's transgender status.

160.    The Subpoenas seek the disclosure of the transgender status of Plaintiffs and members of the proposed Class by seeking the identities and other identifying health information in relation to their treatment of gender dysphoria. By doing so, the DOJ Defendants violate the right to privacy of Plaintiffs and members of the proposed Class by causing disclosure of their transgender status and by depriving them of significant control over the circumstances around such disclosure.

161.    The Subpoenas unreasonably seek the identifying and sensitive health information of Plaintiffs and members of the proposed Class by seeking disclosure of the comprehensive and intimate details of Plaintiffs' medical and psychological conditions, medications, treatments, procedures, family relationships, counseling, diagnoses, and confidential communications they had with their treating health professionals reflected in the demanded medical records. By doing so, the DOJ Defendants violate the right to privacy of Plaintiffs and members of the proposed Class by causing disclosure of information related to their health and medical care, including but not limited to their gender dysphoria and any related conditions, and by depriving them of significant control over the circumstances around such disclosure.

162.    There is no compelling, or even important or legitimate, interest in the government ascertaining the transgender status and the identifying and sensitive health information of Plaintiffs and members of the proposed Class.

163.    The interests of Plaintiffs and members of the proposed Class in protecting the identifying and sensitive health information sought by the Subpoenas significantly outweigh any interest by the DOJ Defendants in seeking, receiving, using, retaining, or disseminating such

37

information as part of its claimed investigations into healthcare offenses related to gender-affirming medical care.

164.    The nature of the identifying and sensitive health information of Plaintiffs and members of the proposed Class sought by the Subpoenas is so private and deeply personal that it is protected by the Fifth Amendment's right to informational privacy.

165.    The collection and nonconsensual disclosure of the identifying and sensitive health information of Plaintiffs and members of the proposed Class would expose them to stigma, discrimination, harassment, and even violence as a result of their transgender status and other health information, such as mental health diagnoses.

166.    The collection and nonconsensual disclosure of the identifying and sensitive health information of Plaintiffs and members of the proposed Class would erode the healthcare provider-patient relationship and dissuade Plaintiffs and members of the proposed Class from seeking the healthcare they need, which negatively impact their health and wellbeing.

167.    The potential for harm in the collection and nonconsensual disclosure of the identifying and sensitive health information of Plaintiffs and members of the proposed Class sought by the Subpoenas is so private that it outweighs any interest by the DOJ Defendants in seeking, receiving, using, retaining, or disseminating such information as part of its claimed investigations into healthcare offenses related to gender-affirming medical care.

168.    There are no safeguards to protect against the nonconsensual disclosure of the identifying and sensitive health information of Plaintiffs and members of the proposed Class produce in response to the Subpoenas that will prevent the harm flowing from disclosure to DOJ. Nor are there any safeguards that would protect against the nonconsensual disclosure of the identifying and sensitive health information of Plaintiffs and members of the proposed Class to

entities within and outside the Administration that may target Plaintiffs and members of the proposed Class or further seek to effectuate the Administration's efforts to "end" gender-affirming medical care.

169.    The DOJ Defendants further issued the Subpoena for the improper purpose of seeking to end gender-affirming medical care that states like New York have chosen to provide and protect through intimidation and abuse of the federal criminal process.

170.    The DOJ Defendants issued the Subpoenas for the openly discriminatory purpose of preventing transgender people from expressing a gender identity different from their sex designated at birth—and expressing governmental disapproval of people who do so—which are not legitimate governmental interests under any standard of review.

171.    The Subpoenas' request for the identifying and sensitive health information of Plaintiffs and members of the Class is so arbitrary that it shocks the conscience.

172.    Plaintiffs are entitled to a declaration that the Subpoenas' request for their identifying and sensitive health information violates the right to informational privacy under the Due Process Clause of the Fifth Amendment.

173.    Plaintiffs and members of the proposed Class are further entitled to preliminary and permanent injunctive relief preventing the DOJ Defendants from seeking, receiving, using, retaining, or disseminating any identifying or sensitive health information of Plaintiffs and members of the proposed Class through the Subpoenas at issue or substantially similar administrative or grand jury subpoenas issued as part of DOJ's claimed investigations into health care offenses related to gender-affirming medical care.

**Count II – Violation of the Fourth Amendment**
**(Plaintiffs and the Class Against the DOJ Defendants)**

174. Plaintiffs hereby incorporate by reference and reallege paragraphs 1–155 of this Complaint as though fully set forth herein.

175. Plaintiffs state this cause of action on behalf of themselves and members of the proposed class for purposes of seeking declaratory and injunctive relief.

176. The Fourth Amendment to the United States Constitution commands that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const., amend. IV.

177. The Fourth Amendment provides protection against unreasonable and oppressive governmental intrusions on individuals' legitimate expectations of privacy.

178. A grand jury subpoena *duces tecum* that requires the compulsory production of information to which individuals have a legitimate expectation of privacy falls within the scope of the Fourth Amendment's protections and therefore must be reasonable.

179. Although the Supreme Court has held that individuals ordinarily lack privacy interests under the Fourth Amendment when they voluntarily turn information over to third parties, it has clarified that this limitation on the Fourth Amendment's protections is not categorical; rather, the nature, comprehensiveness, and level of intimacy of the information sought by the government must all be considered in determining whether an individual has retained a reasonable expectation of privacy in it. *See generally Carpenter v. United States*, 585 U.S. 296 (2018).

180. The Subpoenas demand the disclosure of vast quantities of sensitive health information of Plaintiffs and members of the proposed Class, including all "documents relating to

40

the clinical indications, diagnoses, or assessments that formed the basis" for their ongoing treatment for gender dysphoria. Though in the hands of third parties like the NYU Defendants or other New York City-based providers, the comprehensive and intimate details of Plaintiffs' medical and psychological conditions, medications, treatments, procedures, family relationships, counseling, diagnoses, and confidential communications they had with their treating health professionals reflected in the demanded medical records and other documents form a "detailed chronicle" of each Plaintiff's deeply personal health and medical history. This highly intimate and sensitive medical information is paradigmatically the sort of private information the Fourth Amendment is meant to protect from unwarranted government encroachment.

181.    Plaintiffs and members of the proposed Class thus have an objectively reasonable and legitimate expectation of privacy in the highly sensitive medical and mental health information DOJ Defendants seek via the Subpoenas, despite it being in the possession of NYU Defendants or other New York City-based healthcare institutions, including Mount Sinai Health System. The expectation is likewise one that society readily and robustly recognizes as objectively reasonable as demonstrated through a host of overlapping safeguards, including New York State's Shield Law, New York State's statutory doctor- and psychotherapist-patient privileges, federal patient privacy laws including HIPAA, as well as the Federal Rules of Criminal Procedure and federal crime victims' rights statutes.

182.    Plaintiffs have subjectively demonstrated their expectation of privacy by disclosing this confidential and privileged information to NYU Langone and other New York City-based healthcare institutions solely for the purpose of receiving medical treatment and subject to those existing legal safeguards. It is further demonstrated by their seeking to vindicate their rights to privacy through this legal action.

41

183.    The DOJ Defendants' seeking of the identifying and private sensitive health information of Plaintiffs and members of the proposed Class through the Subpoenas fails the Fourth Amendment's test for reasonableness. Any intrusions into such significant privacy interests must be tethered to and balanced against a legitimate investigatory need or other government interest, rather than generalized probing instituted in bad faith or out of an intent to harass.

184.    The DOJ Defendants do not seek the disclosure of the identifying and private sensitive health information of Plaintiffs and members of the proposed Class based on any legitimate investigatory need. No such need exists. Rather, the Subpoenas are merely the latest escalation of the Administration's systemic attacks on transgender people and medical treatment for gender dysphoria.

185.    DOJ's investigations are intended not to ferret out illegal activity, but are designed to engage in fishing expeditions to intimidate and harass both the providers and recipients of gender-affirming medical care, which is widely accepted and remains lawful and protected in New York. The government's lack of legitimate purpose and abuse of the grand jury process here overcome any presumption of reasonableness that would normally be afforded to a grand jury subpoena.

186.    By unreasonably violating the legitimate expectation of privacy of Plaintiffs and members of the proposed Class in their sensitive private health information and communications, the DOJ Defendants violate the Fourth Amendment rights of Plaintiffs and members of the proposed Class. This ongoing and imminent injury—the irreversible exposure of the most intimate details of their bodies and inner lives—is not remediable through compensatory damages.

187.    Plaintiffs are entitled to a declaration that the DOJ Defendants' unreasonable demand for identifying and sensitive health information, to which Plaintiffs and members of the

proposed Class have a reasonable and legitimate expectation of privacy and for which Defendants have no legitimate investigatory need, violates the right against unreasonable searches and seizures of the Fourth Amendment.

188.    Plaintiffs and members of the proposed Class are further entitled to preliminary and permanent injunctive relief preventing the DOJ Defendants from continuing to engage in suspicionless intrusions into the identifying and sensitive health information of Plaintiffs and members of the proposed Class, to which they have a reasonable and legitimate expectation of privacy.

**Count III – Breach of Physician-Patient Confidentiality**
**(Plaintiffs and the NYU Subclass Against the NYU Defendants)**

189.    Plaintiffs hereby incorporate by reference and reallege paragraphs 1–155 of this Complaint as though fully set forth herein.

190.    Plaintiffs state this cause of action on behalf of themselves and members of the proposed NYU Subclass for purposes of seeking declaratory and injunctive relief.

191.    Under New York law, there is a well-established cause of action for breach of physician-patient confidentiality prohibiting institutional medical providers from violating the statutory privilege established by New York CPLR 4504(a), which generally shields from disclosure "any information . . . acquired in attending a patient in a professional capacity" without consent. *Chanko v. Am. Broad. Companies Inc.*, 49 N.E.3d 1171, 1176 (N.Y. 2016).

192.    The NYU Subclass's records here fall squarely within that privilege, and they have not consented to any disclosure.

193.    By complying with those portions of the Subpoenas seeking the identities and other personally identifying health information of members of the NYU Subclass, NYU will imminently violate that privilege in violation of state law.

194.    By complying with those portions of the Subpoenas seeking records or any other information relating to the nature of any treatment or diagnosis—including but not limited to their gender dysphoria and any related conditions—in a form that includes or would reveal the identity of any class member, NYU will imminently violate that privilege in violation of state law.

195.    The imminent threat of the disclosure of information protected by the statutory privilege has caused, and will continue to cause, the NYU Subclass significant distress and ongoing injury—including through the irreversible exposure of the most intimate details of their bodies and inner lives.

196.    There is no legitimate justification for the government ascertaining the transgender status and the identifying and sensitive health information of the NYU Subclass in violation of the statutory privilege.

197.    In fact, the DOJ Defendants issued the Subpoena to NYU for the openly discriminatory purpose of preventing transgender people from expressing a gender identity different from their sex designated at birth—and expressing governmental disapproval of people who do so—which are interests specifically at odds with New York's statutory scheme. *See* CPLR 4504(a); N.Y. Exec. L. § 837-x (defining "gender-affirming care" as a "legally protected health care activity"); N.Y. Gen. Bus. L. § 394-I(2)(a) (restricting compliance with "any investigation or proceeding that seeks to impose civil or criminal liability, professional sanctions, or any other legal consequences upon a person or entity for any legally protected health activity").

198.    As established by Counts I and II, federal law does not require—and in fact the Constitution prohibits—compliance with those parts of the Subpoena seeking disclosure of the NYU Subclass's identities, or records or any other information relating to the nature of any treatment or diagnosis.

199.    The NYU Subclass is therefore entitled to a declaration that NYU disclosing their identities in response to the Subpoena—or disclosing records or any other information relating to the nature of any treatment or diagnosis—would constitute a breach of physician-patient confidentiality under New York law.

200.    The NYU Subclass is further entitled to preliminary and permanent injunctive relief preventing NYU from disclosing their identities in response to the Subpoena—or disclosing records or any other information relating to the nature of any treatment or diagnosis—in violation of New York law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and grant the following relief:

A.    Declare that the instant Subpoenas' and any other substantially similar administrative or grand jury subpoena's request for the identifying and sensitive health information of Plaintiffs and members of the Class as part of the Department of Justice's claimed investigations into healthcare offenses related to gender-affirming medical care violates the rights of Plaintiffs and members of the Class to confidentiality and informational privacy under the Fifth Amendment and to be free from unreasonable searches and seizures under the Fourth Amendment;

B.    Declare that disclosure by the NYU Defendants of the identities, medical records, or any other identifying information relating to the nature of any treatment or diagnosis of Plaintiffs and members of the NYU Subclass in response to the Subpoena or any substantially similar administrative or grand jury subpoena as part of the Department of Justice's claimed investigations into healthcare offenses related to gender-affirming

45

medical care would constitute a breach of physician-patient confidentiality under New York law;

C.    Preliminary and permanent injunctive relief preventing the DOJ Defendants from seeking, receiving, using, retaining, or disseminating any identifying or sensitive health information of Plaintiffs and members of the proposed Class through the Subpoenas at issue or any substantially similar administrative or grand jury subpoenas as part of the Department of Justice's claimed investigations into healthcare offenses related to gender-affirming medical care;

D.    Preliminary and permanent injunctive relief preventing the NYU Defendants from disclosing or producing any identifying or sensitive health information of Plaintiffs and members of the proposed Class to the DOJ Defendants in response to the Subpoena at issue or any substantially similar administrative or grand jury subpoenas as part of the Department of Justice's claimed investigations into healthcare offenses related to gender-affirming medical care;

E.    Certify classes as set forth in this Complaint and enter class-wide declaratory and injunctive relief as described above;

F.    Waive the requirement for the posting of a bond of security for the entry of temporary and preliminary relief;

G.    Award Plaintiffs their reasonable fees, costs, and expenses, including attorneys' fees; and

H.    Grant any other and further relief that this Court may deem just and proper.

Dated: June 1, 2026

Respectfully submitted,

 /s/ Omar Gonzalez-Pagan

Robert Hodgson
Gabriella Larios
Anya Weinstock
**New York Civil Liberties Union
Foundation**
125 Broad Street, 19th Floor
New York, New York 10004
Telephone: 212-607-3300
rhodgson@nyclu.org
glarios@nyclu.org
aweinstock@nyclu.org

Chase B. Strangio
Shana Knizhnik*
**American Civil Liberties Union
Foundation**
125 Broad Street, Floor 18
New York, New York 10004
Telephone: 212-549-2500
Facsimile: 212-549-2650
cstrangio@aclu.org
sknizhnik@aclu.org

Elizabeth Gill*
**American Civil Liberties Union
Foundation**
425 California Street, Suite 700
San Francisco, California 94104
Telephone: 415-343-0779
egill@aclu.org

* Motions for admission *pro hac vice*
forthcoming

Omar Gonzalez-Pagan
Karen L. Loewy
**Lambda Legal Defense
and Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, New York 10005
Telephone: 212-809-8585
Facsimile: 855-535-2236
ogonzalez-pagan@lambdalegal.org
kloewy@lambdalegal.org

Nora Huppert*
**Lambda Legal Defense
and Education Fund, Inc.**
3656 N. Halsted Street
Chicago, Illinois 60613
Telephone: 312-605-3233
Facsimile: 855-535-2236
nhuppert@lambdalegal.org

A.D. Sean Lewis*
**Lambda Legal Defense
and Education Fund, Inc.**
800 South Figueroa St., Suite 1260
Los Angeles, CA 90017
Telephone: 213-382-7600
Facsimile: 855-535-2236
alewis@lambdalegal.org

*Attorneys for Plaintiffs*

# Exhibit A

.AO110  (Rev. 12/89) Subpoena to Testify Before Grand Jury

# UNITED STATES DISTRICT COURT

## Northern District of Texas

TO:
NYU Langone Hospitals

Attn: Custodian of Records

530 First Avenue
HCC-15
New York, NY 10016

**SUBPOENA TO TESTIFY
BEFORE GRAND JURY**

SUBPOENA FOR:

☐ PERSON    ☑ DOCUMENT(S) OR OBJECT(S)

YOU ARE HEREBY COMMANDED to appear and testify before the Grand Jury of the United States District Court at the place, date, and time specified below.

| PLACE | COURTROOM |
|---|---|
| 501 W 10th St. Fort Worth, TX 76102-6882 | Grand Jury Room |
| | DATE AND TIME |
| | 6/10/2026        9:00 am |

YOU ARE ALSO COMMANDED to bring with you the following document(s) or object(s):*

PLEASE SEE ATTACHMENT

☐  *Please see additional information on reverse.*

This subpoena shall remain in effect until you are granted leave to depart by the court or by an officer acting on behalf of the court.

| CLERK | | DATE |
|---|---|---|
| *Karen Mitchell* (By) Deputy Clerk | | 5/6/2026 |

| This subpoena is issued on application of the United States of America | NAME, ADDRESS AND PHONE NUMBER OF ASSISTANT U.S. ATTORNEY Ethan Womble Assistant United States Attorney 801 Cherry St., Suite 1700 Fort Worth, TX 76102-6882 (817) 252-5200 |
|---|---|

* If not applicable, enter "none".

R26 TXN 53130

AO110  (Rev. 12/89)  Subpoena to Testify Before Grand Jury

| RETURN OF SERVICE (1) | | |
|---|---|---|
| **RECEIVED BY SERVER** | DATE | PLACE |
| **SERVED** | DATE | PLACE |
| SERVED ON (PRINT NAME) | | |
| SERVED BY (PRINT NAME) | | TITLE |

| STATEMENT OF SERVICE FEES | | |
|---|---|---|
| TRAVEL | SERVICES | TOTAL  0.00 |

### DECLARATION OF SERVER (2)

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
DATE

SIGNATURE OF SERVER

ADDRESS OF SERVER

ADDITIONAL INFORMATION

---

(1)    As to who may serve a subpoena and the manner of its service see Rule 17(d), Federal Rules of Criminal Procedure, or Rule 45(c), Federal Rules of Civil Procedure.

(2)    "Fees and mileage need not be tendered to the witness upon service of a subpoena issued on behalf of the United States or an officer or agency thereof (Rule 45(c), Federal Rules of Civil Procedure; Rule 17(d), Federal Rules of Criminal Procedure) or on behalf of certain indigent parties and criminal defendants who are unable to pay such costs (28 USC 1825, Rule 17(b) Federal Rules of Criminal Procedure)".

| Print | Save As... | Reset |
|---|---|---|

<u>**ATTACHMENT A**</u>

**ATTACHMENT TO THE GRAND JURY SUBPOENA ISSUED TO**

NYU Langone Hospitals
530 First Avenue
HCC-15
New York, NY 10016

## I.  DEFINITIONS

1.      "You," "Your Company," and "the Company" means:

   a.      NYU Langone Hospitals, a New York nonprofit corporation, whose principal place of business is located at 430 East 34th Street, New York, New York, without regard to any name under which it has done business;

   b.      All of its predecessors, subsidiaries, affiliates, branches, divisions, groups, business units, business segments, operations, units, parent organizations, successors, assigns, plants, and any joint ventures of which they were or are a part, including, without limitation, the Transgender Youth Health Program at Hassenfeld Children's Hospital at NYU Langone; and

   c.      Each of its present or former officers, directors, employees, attorneys, representatives, and agents acting or purporting to act or appearing to act on behalf of the Company, whether or not acting within the proper scope of his or her actual authority.

2.      "Employee" means any person including, but not limited to, any independent contractor or agent, all past and present directors, officers, agents, representatives, attorneys, accountants, advisors, and consultants who acted or purported to act on behalf of the Company or who have performed any service for the Company or under its name, whether on a full-time, part-time, piece-work, commission, volunteer, or other basis, and whether paid or unpaid.

3.      "Document" should be afforded the broadest possible meaning and includes every writing or record of whatever type or description, including but not limited to any electronically stored data or paper document, in the possession, custody, or control of the Company. This includes, but is not limited to:

   a.      All material that is handwritten, typed, printed, recorded, transcribed, taped, filmed, in graphic form, or in aural form;

   b.      Drawings, designs, manuals, memoranda, emails, reports, financial reports, notes, diaries, notations of any sort of conversations, working papers, letters, envelopes,

1

telegrams, messages, studies, analyses, books, articles, notebooks, booklets, circulars, bulletins, notices, instructions, pamphlets, pictures, films, videos, voice recordings, maps, work papers, arithmetical computations, calendars (including electronic calendars), date books, task lists, minutes, all communications of any type (e.g., e-mail, voice mail, text messaging, WhatsApp and similar applications), social media content (including posts, messages, comments, and metadata), audio and video files,

c.   Electronically stored data on magnetic or optical storage media as an "active" file or files (readily readable by one or more computer applications or forensics software), including metadata;

d.   Any electronic files saved as a backup, including metadata;

e.   Any deleted but recoverable electronic files, including metadata;

f.   Any electronic file fragments (files that have been deleted and partially overwritten with new data), including metadata;

g.   Every copy of every document where such copy is not identical to the original because of any addition, deletion, alteration, or notation; and

h.   All attachments, enclosures, or other matter affixed to, transmitted with, or incorporated by reference within documents responsive to this Subpoena including, but not limited to, any pages showing who reviewed, approved, or rejected a particular document.

4.   "Relevant Time Period" means **January 1, 2020, through May 5, 2026**. All responsive documents that were prepared, dated, sent, received, altered, in effect, or which came into existence during this period are to be produced pursuant to this Subpoena.

5.   "Or" as well as "and" shall be construed interchangeably in a manner that gives this Subpoena the broadest possible meaning.

6.   "Any" shall be construed to include the word "all" and the term "all" shall be construed to include the word "any."

7.   "Relate to" means to make a statement about, refer to, discuss, describe, reflect, identify, deal with, consist of, or in any way pertain, in whole or in part to the subject.

8.   "Communication" means any transmission or exchange of information, statements, ideas, inquiries, or data between two or more persons orally, in writing, digitally, visually, or electronically regardless of the medium or platform used, including social media interactions, voicemails, and virtual meetings (e.g., Zoom, WebEx, Microsoft Teams). The term includes all drafts, versions, replies, responses, forwards, and attachments associated with or forming part of the communication, as well as any

2

records or logs reflecting the time, date, participants, and content of such communications.

9.  "Sex-Rejecting Procedures" means any medical, surgical, pharmaceutical, or clinical intervention provided to an individual under eighteen years of age that is intended or reasonably expected to suppress, alter, or eliminate endogenous pubertal development, or to modify primary or secondary sex characteristics, for the purpose of aligning with or affirming a minor's asserted gender identity rather than the minor's biological sex. These include, for example, puberty suppression, hormone administration, surgical intervention, voice modification interventions, or other medical or clinical services that are functionally integral to, preparatory for, or undertaken in furtherance of such interventions or procedures. An intervention or treatment is considered a Sex-Rejecting Procedure based on its intended purpose and expected physiological or functional effect, and not on the terminology or classification used by a health care provider or facility.

10. "Puberty blockers" means any gonadotropin-releasing hormone ("GnRH") agonists or related drugs (*e.g.,* leuprolide, triptorelin) used to delay the onset of puberty.

11. "Hormones" includes testosterone, estrogen, and any other hormonal drugs used in hormonal treatments sometimes known as "gender affirming hormone therapy" ("GAHT") or transgender hormone therapy used to induce cross-sex characteristics. This includes hormone-blocking drugs, such as spironolactone, used to suppress naturally-occurring hormones for the facilitation of GAHT.

12. "Minor" means any patient under the age of 18 at the time of consultation, treatment, or prescription.

## II.  DOCUMENTS TO BE PRODUCED

For the Relevant Time Period, please provide in electronic format:

1.  Complete personnel files for each employee, contractor, or affiliate of the Company in the following categories:  (a) those who held authority to perform or order Sex-Rejecting Procedures; (b) those who conducted clinical evaluations related to Sex-Rejecting Procedures; (c) those who engaged in billing or coding activities related to Sex-Rejecting Procedures; and (d) any individual within such person's supervisory or reporting chain.

2.  All documents, including billing records, insurance claims, internal protocols, or guidance, concerning the use of ICD (*i.e.*, International Classification of Diseases) diagnosis codes in connection with the treatment of minor patients receiving Sex-Rejecting Procedures.

3.  All documents that show or relate to any use of diagnosis codes for minors undergoing Sex-Rejecting Procedures other than codes specifically identifying

transsexualism, gender dysphoria, gender incongruence, or gender identity disorder (*e.g.*, codes for endocrine disorder, unspecified hormonal disorders, vocal disorders, medication management, etc.).

4. All documents reflecting communications among Company employees (including physicians, billing staff, and administrators), or between the Company and any third party, relating to whether or how to code or bill for Sex-Rejecting Procedures.

5. All communications with public or private health care benefit programs or plans regarding the use of ICD codes for Sex-Rejecting Procedures, including any inquiries, denials, or appeals related to claims for such procedures or treatment.

6. Any training materials, coding manuals, presentations, or communications relating to billing or coding practices for Sex-Rejecting Procedures.

7. All documents relating to communications between You and any pharmaceutical manufacturer of puberty blockers or hormones, or any compounding pharmacy providing puberty blockers or hormones, relating to the use of such drugs in Sex-Rejecting Procedures for minors.

8. All documents relating to communications between any pharmaceutical manufacturer of puberty blockers or hormones and any of the individuals identified in response to specification 1, *supra*, regardless of whether the document or communication is facially related to Sex-Rejecting Procedures for minors.

9. All documents relating to communications with pharmaceutical sales representatives, marketing departments, or medical science liaisons regarding the use of puberty blockers or hormones for use in or associated with Sex-Rejecting Procedures or the treatment of gender dysphoria, including with regard to the safety and efficacy of such drugs for those uses.

10. All documents, including presentations and promotional materials, received from pharmaceutical manufacturers or compounding pharmacies concerning uses of their products in minors for Sex-Rejecting Procedures or for the treatment of gender dysphoria, including so-called "scientific exchange" materials.

11. All documents relating to contracts, sponsorships, speaking engagements, consulting agreements, grants, or financial or promotional arrangements between You and any manufacturer or compounder of puberty blockers or hormones.

12. Documents sufficient to identify each patient who underwent Sex-Rejecting Procedures.

13. For each such patient identified in Subpoena specification 12, *supra*, documents relating to the clinical indications, diagnoses, or assessments that formed the basis for providing Sex-Rejecting Procedures, including the prescribing of puberty blockers or hormones, and all documents relating to the Sex-Rejecting Procedures care provided

4

to each patient identified in Subpoena specification 12 from initial consultation to the most recent treatment provided.

14. All documents relating to informed consent, patient intake, and parent or guardian authorization for minor patients identified in Subpoena specification 12, *supra*, including any disclosures about off-label use (*i.e.,* uses not approved by the United States Food and Drug Administration) and potential risks of puberty blockers and/or hormones.

15. All documents reflecting communications with pharmaceutical manufacturers, compounding pharmacies, or government agencies relating to the safety and effectiveness of Sex-Rejecting Procedures for treatment of gender dysphoria, including the use of puberty blockers or hormones.

16. All documents relating to any adverse event, side effect, or medically unfavorable consequence or outcome in a minor patient with regard to Sex-Rejecting Procedures.

17. All communications with the World Professional Association for Transgender Health ("WPATH") or any of its members relating to Sex-Rejecting Procedures, including but not limited to communications regarding the safety and efficacy or Sex-Rejecting Procedures, the Standards of Care 8, and billing guidance for Sex-Rejecting Procedures

## III. FORM OF PRODUCTION

We request materials responsive to the above be made available in electronic format. Please forward the documents directly to the individual listed below on or before the return date of this subpoena:

**Special Agent Bradley Cooper**
**FDA Office of Criminal Investigations**
**Kansas City Field Office**
**(913) 396-2129**
**bradley.cooper@fda.hhs.gov**

## HIPAA STATEMENT

The U.S. Department of Justice (the "DOJ") is familiar with the requirements of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") and the regulations providing guidance in the application of that statute.

The DOJ has considered the predicate requirements of 45 C.F.R., § 164.512 (f)(1(ii)(C)(1)-(3) and represents that

- The information requested in this grand jury subpoena attachment is relevant and material to a legitimate law enforcement inquiry;
    - The request is specific and limited in scope to the extent reasonably practicable in light of the purpose for which the information is sought; and
    - De-identified information could not reasonably be used in its stead.

The documents and records requested in this grand jury subpoena attachment requires you to produce are sought by the DOJ in its capacity as a health oversight agency, and this information is necessary to further health oversight activities. *See* 45 C.F.R. §§ 164.512(d) and 164.501. The information sought is the minimum necessary to accomplish the intended purpose of the subpoena. *See* 45 C.F.R. § 164.502(b)(1).

## PRIVILEGE LOG

This grand jury subpoena is not intended to call for the production of any material that is subject to a valid claim of attorney-client or other privilege recognized by the federal courts of the United States. To the extent you or some other party may seek to assert a claim of privilege, work product protection, or other legal claim to preclude production of material called for in this subpoena, a privilege log must be produced. Such a privilege log shall set forth:

a. each document by date, transmittal detail (if any);
b. type of document;
c. author(s) and location (e.g., name of company, firm etc.);
d. recipient(s) and location (e.g., name of company, firm etc.);
e. general subject matter;
f. number of pages;
g. paragraph of the subpoena to which the document is responsive;
h. indicated or known circulation, including the names and titles of all persons to whom the document, or a copy thereof, or any part thereof, was shown; and
i. the privilege asserted with respect to each such document in sufficient detail to facilitate a determination by a reviewing party or court to assess the validity of the claim of privilege.

Failure to produce such a log with sufficient detail to allow a reviewing party or court to assess whether such a claim is valid may result in waiver of any such claim.

6

### NOTICE REGARDING LIABILITY FOR OBSTRUCTION OF JUSTICE

- **18 U.S.C. § 1001 in relevant part provides –**

  (a) Except as otherwise provided in this section, whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully—
  
      (1) falsifies, conceals, or covers up by any trick, scheme, or device a material fact;
  
      (2) makes any materially false, fictitious, or fraudulent statement or representation; or
  
      (3) makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry;
  
  shall be fined under this title, imprisoned not more than 5 years or, if the offense involves international or domestic terrorism (as defined in section 2331), imprisoned not more than 8 years, or both. If the matter relates to an offense under chapter 109A, 109B, 110, or 117, or section 1591, then the term of imprisonment imposed under this section shall be not more than 8 years.

- **18 U.S.C. § 1503 in relevant part provides –**

  (a) Whoever corruptly, or by threats or force, or by any threatening letter or communication, endeavors to influence, intimidate, or impede any grand or petit juror, or officer in or of any court of the United States, or officer who may be serving at any examination or other proceeding before any United States magistrate judge or other committing magistrate, in the discharge of his duty, or injures any such grand or petit juror in his person or property on account of any verdict or indictment assented to by him, or on account of his being or having been such juror, or injures any such officer, magistrate judge, or other committing magistrate in his person or property on account of the performance of his official duties, or corruptly or by threats or force, or by any threatening letter or communication, influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice, shall be punished as provided in subsection (b). If the offense under this section occurs in connection with a trial of a criminal case, and the act in violation of this section involves the threat of physical force or physical force, the maximum term of imprisonment which may be imposed for the offense shall be the higher of that otherwise provided by law or the maximum term that could have been imposed for any offense charged in such case.

- **18 U.S.C. § 1512 in relevant part provides –**

  (b) Whoever knowingly uses intimidation, threatens, or corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to—

7

(1) influence, delay, or prevent the testimony of any person in an official proceeding;

(2) cause or induce any person to—

(A) withhold testimony, or withhold a record, document, or other object, from an official proceeding;

(B) alter, destroy, mutilate, or conceal an object with intent to impair the object's integrity or availability for use in an official proceeding;

(C) evade legal process summoning that person to appear as a witness, or to produce a record, document, or other object, in an official proceeding; or

(D) be absent from an official proceeding to which such person has been summoned by legal process; or

(3) hinder, delay, or prevent the communication to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense or a violation of conditions of probation supervised release, parole, or release pending judicial proceedings;

shall be fined under this title or imprisoned not more than 20 years, or both.

(c) Whoever corruptly—

(1) alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding; or

(2) otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so,

shall be fined under this title or imprisoned not more than 20 years, or both.

(d) Whoever intentionally harasses another person and thereby hinders, delays, prevents, or dissuades any person from—

(1) attending or testifying in an official proceeding;

(2) reporting to a law enforcement officer or judge of the United States the commission or possible commission of a Federal offense or a violation of conditions of probation supervised release, parole, or release pending judicial proceedings;

(3) arresting or seeking the arrest of another person in connection with a Federal offense; or

(4) causing a criminal prosecution, or a parole or probation revocation proceeding, to be sought or instituted, or assisting in such prosecution or proceeding;

or attempts to do so, shall be fined under this title or imprisoned not more than 3 years, or both.

. . .

(k) Whoever conspires to commit any offense under this section shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy.

8

- **18 U.S.C. § 1519 provides –**

    Whoever knowingly alters, destroys, mutilates, conceals, covers up, falsifies, or makes a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States or any case filed under title 11, or in relation to or contemplation of any such matter or case, shall be fined under this title, imprisoned not more than 20 years, or both.

- **18 U.S.C. § 1623(a) in relevant part provides –**

    (a) Whoever under oath (or in any declaration, certificate, verification, or statement under penalty of perjury as permitted under section 1746 of title 28, United States Code) in any proceeding before or ancillary to any court or grand jury of the United States knowingly makes any false material declaration or makes or uses any other information, including any book, paper, document, record, recording, or other material, knowing the same to contain any false material declaration, shall be fined under this title or imprisoned not more than five years, or both.

**CERTIFICATE OF AUTHENTICITY OF DOMESTIC BUSINESS RECORDS**
**PURSUANT TO FEDERAL RULE OF EVIDENCE 902(11)**

Pursuant to Federal Rules of Evidence 803(6) and 902(11) regarding certified domestic records of regularly conducted activity, I hereby certify:

1. I am employed by _____ ("the Business") and my official title is _____. I am a person designated by the Business as a custodian of records with the authority to make this certificate.

2. I state that each of the records attached hereto is the original record, or a true duplicate of the original record, in the custody of the Business, and that I am the custodian of the attached records, consisting of _____ total pages.

3. I further certify that all records attached to this certificate were made at or near the time of the occurrence of the matters set forth, by or from information transmitted by, a person with knowledge of those matters.

4. I further certify that that all records attached to this certificate were kept in the course of the regularly conducted activity of the Business.

5. I further certify that it is the regular practice of the Business to make and retain each record attached to this certificate.

6. I further state that this certificate is intended to satisfy the requirements of Rule 902(11) of the FEDERAL RULES OF EVIDENCE.

Pursuant to 28 U.S.C. § 1746, I certify under penalty of perjury that the foregoing is true and correct.

Date: _____          _____
                                     Signature


                                     _____
                                     Print Name

# Exhibit B

Close

We use cookies and similar tools to give you the best website experience. By using our site, you accept our
Websites Privacy Policy.

# Information for NYU Langone Health Patients

On May 7, 2026, NYU Langone Hospitals ("NYULH") was one of several institutions that received a grand jury subpoena from the U.S. Attorney's Office in the Northern District of Texas. Among other requests, the subpoena directs NYULH to provide information pertaining to patients under the age of 18 who received gender affirming care at NYULH between 2020-2026, as well as the names of NYULH providers and others who were involved in offering such care at NYULH in that timeframe.

You can view the subpoena here.

Pursuant to the New York State Shield Law, any entity in New York State that receives a request for information regarding legally protected health activity, such as the provision of reproductive health care or gender-affirming care, must make a reasonable attempt to notify the individuals to whom that request pertains at least 30 days before complying with or providing information in response to the request. More information about the Shield Law is available here.

We understand that these developments may be concerning to our patients, providers, and others. Please know that NYU Langone takes the privacy of your protected health information very seriously and we are evaluating our response to the subpoena. We will post updates at this website.

For any questions or concerns please email TYHPsubpoena@nyulangone.org.



# Exhibit C



**Office of the Attorney General**
**Washington, D. C. 20530**

April 22, 2025

MEMORANDUM FOR SELECT COMPONENT HEADS

FROM:                    THE ATTORNEY GENERAL

SUBJECT:                PREVENTING THE MUTILATION OF AMERICAN CHILDREN

There is a radical ideological agenda being pushed throughout every aspect of American life—from TV programming and Hollywood film production to children's books and elementary school classrooms—that teaches children to deny biological reality.  Gender ideology, masked as science, teaches that children should process adolescent stress and confusion as a case of mistaken identity and that the solution is not to root out and eliminate the underlying condition but to acquiesce in it permanently through life-altering chemical and surgical intervention.   That ideology, pushed by far-left politicians, celebrities, politically captured academics, and legacy media, has infected an entire generation of children, who have in turn pushed transgenderism on their peers through social media and other means.  Dissenting voices are bullied into silence, and "allies" are praised and rewarded.  Tragic and absurd as it is that 1.4% of 13- to 17-year-olds now identify as transgender,[1] that is the predictable result of a coordinated, unchecked ideological attack on America's children.

The medical community, with its roots in hard science, is well-positioned to serve as a bulwark against this sociological disease. And indeed, parents who are desperate to help their confused, frustrated children have understandably turned to medical professionals for help. Unfortunately, those parents have been betrayed by politically captured profiteers at every step. These "professionals" have deployed junk science and false claims about the effects of so-called "gender-affirming care" to justify the barbaric practice of surgically and chemically maiming and sterilizing children.  Between 2019 and 2023, an estimated 14,000 children received "treatment" for gender dysphoria, with more than 5,700 subjected to life-altering surgeries.[2]  The practitioners who provided this so-called "care" profited while their patients were left permanently disfigured, scarred, and sterilized.  Those children will struggle for the rest of their lives to overcome regret, and their parents will struggle equally to overcome the guilt of ruining their children's lives on the

---

[1] Azeen Ghorayshi, *Report Reveals Sharp Rise in Transgender Young People in the U.S.*, N.Y. Times (June 10, 2022), https://www.nytimes.com/2022/06/10/science/transgender-teenagers-national-survey.html.

[2] Rikki Schlott, *Over 5,700 American children had trans surgery between 2019 and 2023, medical group claims: 'Treated like guinea pigs,'* N.Y. Post (Oct. 8, 2024), https://nypost.com/2024/10/08/us-news/over-5700-americans-under-18-had-trans-surgery-from-2019-23/.

Memorandum for All Department Employees                                      Page 2
Subject:  Preventing the Mutilation of American Children

false and misleading advice of medical providers who told them that surgery or hormone replacement was the best solution to their problems.[3]

Consider the case of Chloe Cole, whose story, sadly, is not unique.[4]  At just 11 years old, Chloe joined Instagram and was bombarded with "LGBT content and activism."[5]  She "saw how trans people online got an overwhelming amount of support," and that "really spoke to [her] because, at the time," she was just a child and "didn't really have a lot of friends of [her] own."[6]  She was especially vulnerable at that age because, like many young girls, Chloe felt that her "body didn't match beauty ideals," so she "started to wonder if there was something wrong with" her, even wondering whether she would "be better off as a boy."[7]  By the age of 12, Chloe identified as transgender, and she "was fast-tracked through her entire transition—from blockers to a mastectomy—in just two years."[8]  "The only pushback she . . . encountered came from the first endocrinologist she saw," but she bypassed that easily by going "to another doctor who gave her the prescription with no trouble."[9]  Despite the "vitriol from the transgender activist community," Chloe has bravely shared her regret with the world at just 17 years old because she simply "can't let this happen to other kids."[10]  Neither can I, and neither can President Trump.

The Biden administration bears enormous responsibility for the medical community's fraud and exploitation of parents and children who have fallen prey to radical gender ideology. President Biden personally advanced the agenda by hosting transgender activist influencers like Dylan Mulvaney at the White House,[11] opposing state-level bans on gender-affirming care for minors,[12] threatening legal action against Medicaid and Obamacare providers who fail to offer

---

[3] *See, e.g.*, Dr. Marc Siegel et al., *Detransitioning becomes growing choice among young people after gender-affirming surgery*, Fox News (Dec. 19, 2022), https://www.foxnews.com/health/detransitioning-becomes-growing-choice-young-people-gender-affirming-surgery.

[4] Chloe Cole, *Hearing on Gender Affirming Care before the Subcommittee on the Constitution and Limited Government of the H. Judiciary Comm.*, 118th Cong. (2023).

[5] *Rikki Schlott, 'I literally lost organs:' Why detransitioned teens regret changing genders*, N.Y. Post (June 19, 2022), https://nypost.com/2022/06/18/detransitioned-teens-explain-why-they-regret-changing-genders/.

[6] *Id.*

[7] *Id.*

[8] *Id.*

[9] *Id.*

[10] *Id.*

[11] Emma Colton, *Biden legacy includes relentless push for transgender agenda*, Fox News (Dec. 8, 2024), https://www.foxnews.com/politics/biden-legacy-includes-relentless-push-transgender-agenda.

[12] Edie Heipel, *In interview with trans activist, Biden condemns states banning sex changes on kids*, (Oct. 24, 2022), Catholic News Agency, https://www.catholicnewsagency.com/news/252633/in-interview-with-trans-activist-biden-condemns-states-banning-sex-changes-on-kids.

such care,[13] and appointing Rachel Levine—a leading transgender activist who personally identifies as transgender—to serve as Assistant Secretary for Health.  Under Levine, the Department of Health and Human Services promoted gender-reassignment surgeries and hormone replacement for the treatment of gender dysphoria in minors[14] and pressured the World Professional Association for Transgender Health ("WPATH") to eliminate age minimums for reassignment surgeries in its 2022 guidelines.[15]  All the while, NIH-funded studies admitted that "little to no empirical data" supported the long-term safety of puberty blockers and hormones, let alone sex-reassignment surgery.[16]  To address the lack of scientific support for his agenda, President Biden allocated more than $8 million of taxpayer funds for transgender hormone studies on mice.[17]

President Trump has put a stop to this by issuing his executive order "Protecting Children from Chemical and Surgical Mutilation," signed to halt the exploitation enabled by misguided Biden-era policies.  Pursuant to the President's directive, I am issuing the following guidance to all Department of Justice employees to enforce rigorous protections and hold accountable those who prey on vulnerable children and their parents.

## I.    Enforcement of Laws Outlawing Female Genital Mutilation

The Department of Justice will not sit idly by while doctors, motivated by ideology, profits, or both, exploit and mutilate our children.  Under my watch, the Department will act decisively to protect our children and hold accountable those who mutilate them under the guise of care.  I am putting medical practitioners, hospitals, and clinics on notice:  In the United States, it is a felony to perform, attempt to perform, or conspire to perform female genital mutilation ("FGM") on any person under the age of 18.[18]  That crime carries a maximum prison sentence of 10 years per count.[19]  I am directing all U.S. Attorneys to investigate all suspected cases of FGM—under the

---

[13] Executive Order 14075, *Advancing Equality for Lesbian, Gay, Bisexual, Transgender, Queer, and Intersex Individuals*, 87 Fed. Reg. 37189 (June 15, 2022).

[14] Timothy Nerozzi, *Biden administration endorses transgender youth sex-change operations, 'top surgery,' hormone therapy*, Fox News, March 31, 2022, https://www.foxnews.com/politics/biden-administration-transgender-agenda-youth-sex-change-hormone-therapy.

[15] Azeen Ghorayshi, *Biden Officials Pushed to Remove Age Limits for Trans Surgery, Documents Show*, N.Y. Times (June 25, 2024), https://www.nytimes.com/2024/06/25/health/transgender-minors-surgeries.html.

[16] Patrick Hauf, *Biden administration funds studies on danger of transgender hormonal treatments even as it pushes them on kids*, Fox News, (Oct. 20, 2022), https://www.foxnews.com/politics/biden-funds-studies-dangers-transgender-hormone-treatments.

[17] The White House, March 5, 2025, https://www.whitehouse.gov/articles/2025/03/yes-biden-spent-millions-on-transgender-animal-experiments/.

[18] *See* 18 U.S.C. § 116(a)(1).

[19] *Id.* § 116(a).

Memorandum for All Department Employees                                                  Page 4
Subject:  Preventing the Mutilation of American Children

banner of so-called "gender-affirming care" or otherwise—and to prosecute all FGM offenses to the fullest extent possible.

The Department will also ensure that victims and their families are able to report violations to federal law enforcement to expose violators and receive support.  The Federal Bureau of Investigation, alongside federal, state, and local partners, will pursue every legitimate lead on possible FGM cases.

## II.    Investigation of Violations of the Food, Drug and Cosmetic Act and False Claims Act

The Department of Justice will investigate and hold accountable medical providers and pharmaceutical companies that mislead the public about the long-term side effects of chemical and surgical mutilations.  To that end:

- I am directing the Civil Division's Consumer Protection Branch to undertake appropriate investigations of any violations of the Food, Drug, and Cosmetic Act by manufacturers and distributors engaged in misbranding by making false claims about the on- or off-label use of puberty blockers, sex hormones, or any other drug used to facilitate a child's so-called "gender transition."  Even if otherwise truthful, the promotion of off-label uses of hormones—including through informal campaigns like those conducted by sales reps or under the guise of sponsored continuing medical education courses—run afoul of the FDA's prohibitions on misbranding and mislabeling.[20]

- I am also directing the Civil Division's Fraud Section to pursue investigations under the False Claims Act of false claims submitted to federal health care programs for any non-covered services related to radical gender experimentation.  Examples include but are not limited to physicians prescribing puberty blockers to a child for an illegitimate reason (*e.g.*, gender dysphoria) but reporting a legitimate purpose (*i.e.*, early onset puberty) to the Centers for Medicare & Medicaid Services, and hospitals performing surgical procedures to remove or modify a child's sex organs while billing Medicaid for an entirely different procedure.  Falsely billing the government for the chemical or surgical mutilation of a child is a violation of the False Claims Act and is subject to treble damages and severe penalties.

- I am also notifying the public that the Department is eager to work with *qui tam* whistleblowers with knowledge of any such violations.  The False Claims Act allows private citizens to file these actions on behalf of the government against those who have defrauded the government.  In meritorious cases, the Department of Justice can intervene, and even if the Department takes over the case, the relator may receive a portion of the government's financial recovery.  In 2024 alone, *qui tam* relators received a $344 million share of victories won by the Department.  For more information about initiating a *qui tam* action,           please           visit           the           Department's           website           at

---

[20] *See* 21 U.S.C. §§ 321(m)-(n), 331, 352(a), (f); 21 C.F.R. §§ 201.100, 201.128, 202.1(l)(2).

https://www.justice.gov/archives/jm/criminal-resource-manual-932-provisions-handling-qui-tam-suits-filed-under-false-claims-act.

## III.    Ending Reliance on Junk Science by the Department

Consistent with Section 3 of the President's Order, the Civil Division has already directed that Department employees shall not rely on the ideologically driven WPATH guidelines, and that they should withdraw all court filings that rely on WPATH's guidelines in any case in which the Department of Justice is actively involved, whether as a party, an amicus, or through the submission of a statement of interest.  For the avoidance of doubt, I now expressly extend that direction to all Department employees.  I further direct the Civil Rights Division to work with the Civil Division to identify and purge all Department policies, memoranda, and publications and court filings based on WPATH guidelines.  WPATH has flouted basic standards for clinical guidelines, silenced its own evidence review team to bury doubts about the science WPATH promotes, muzzled dissenting members, and worked with the prior administration to push reckless policies—like doing away with age minimums for child surgeries.[21]  That is not science; it is radical ideology that endangers children with untested theories, and it has no place in the Department's work.  WPATH's guidelines are fundamentally flawed and unreliable, and the Department will not use them in any way that suggests otherwise.

## IV.    Establish Federal and State Coalition Against Child Mutilation

Federal law enforcement must stand ready to assist states that prioritize children's health over ideology.  Accordingly, the Department is launching the Attorney General's Coalition Against Child Mutilation.  Through this Coalition, I will partner with state attorneys general to identify leads, share intelligence, and build cases against hospitals and practitioners violating federal or state laws banning female genital mutilation and other, related practices.  The Department will support the state-level prosecution of medical professionals who violate state laws that protect children, such as Alabama's Vulnerable Child Compassion and Protection Act,[22] which makes it a felony for doctors to treat children with puberty blockers or hormones to affirm a gender identity inconsistent with biological sex.

## V.    Promoting New Legislation Protecting Children

I have instructed the Office of Legislative Affairs ("OLA") to draft legislation creating a private right of action for children and the parents of children whose healthy body parts have been damaged by medical professionals through chemical and surgical mutilation.  The proposed legislation will establish a long statute of limitations and retroactive liability, so that no one providing such "treatment" will escape liability.  The Department of Justice will work with members of the House and Senate Judiciary Committees to bring this bill to President Trump as soon as possible.  Further, I have instructed OLA to draft legislation amending 18 U.S.C. § 116 to enhance protections for children whose healthy body parts have been damaged by medical

---

[21] *See, e.g.*, Defs.' Mot., *Boe v. United States*, No. 2:22-cv-00184 (M.D. Ala. Jun. 26, 2024).

[22] Ala. Code § 26-26-1 (2022).

Memorandum for All Department Employees                                                Page 6
Subject:  Preventing the Mutilation of American Children

professionals practicing chemical and surgical mutilation.  I will also work with state legislatures to encourage the passage of similar legislation at the state level.

* * *

Protecting America's children must be our top priority, whether from drug cartels, terrorists, or even our own medical community.  Every day, we hear more harrowing stories about children who will suffer for the rest of their lives because of the unconscionable ideology behind "gender-affirming care."  Under my leadership, the Department of Justice will bring these practices to an end.

# Exhibit D



**U.S. Department of Justice**
Civil Division

---

*Office of the Assistant Attorney General*                    *Washington, DC 20044*

June 11, 2025

**MEMORANDUM**

**TO:**        All Civil Division Employees

**FROM:**    Brett A. Shumate
              Assistant Attorney General

BRETT SHUMATE

Digitally signed by BRETT SHUMATE
Date: 2025.06.11 12:27:50 -04'00'

**SUBJECT:**    Civil Division Enforcement Priorities

President Trump and Attorney General Bondi have directed the Civil Division to use its enforcement authorities to advance the Administration's policy objectives. This memorandum describes those policy objectives and directs Civil Division attorneys to prioritize investigations and enforcement actions advancing these priorities.

### 1. Combatting Discriminatory Practices and Policies

On January 21, 2025, President Trump issued Executive Order 14,173, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, 90 Fed. Reg. 8633 (Jan. 21, 2025), which established "the policy of the United States to protect the civil rights of all Americans and to promote individual initiative, excellence, and hard work." *Id.* § 2. To this end, the President "order[ed] all agencies to enforce our longstanding civil-rights laws and to combat illegal private-sector DEI preferences, mandates, policies, programs, and activities." *Id.* As part of these efforts, Attorney General Bondi has directed that the Department align its "litigating positions with [the] requirement of equal dignity and respect." Memorandum from Attorney General, *Eliminating Internal Discriminatory Practices*, at 2 (Feb. 5, 2025).

Consistent with these directives, the Civil Division will use all available resources to pursue affirmative litigation combatting unlawful discriminatory practices in the private sector. In particular, the Civil Division is authorized to bring suit under the False Claims Act for treble damages and penalties against any person who knowingly submits or causes the submission of false claims to the government. 31 U.S.C. § 3729 *et seq*. This includes entities that receive federal funds but knowingly violate civil rights laws. In support of these efforts, the Deputy Attorney General recently announced the Civil Rights Fraud Initiative. The Civil Division is committed to advancing the Initiative and will aggressively investigate and, as appropriate, pursue False Claims Act violations against recipients of federal funds that knowingly violate civil rights laws. The Civil Division will work with the Civil Rights Division, relators, other whistleblowers, and federal agencies to advance these efforts.

### 2. Ending Antisemitism

On January 29, 2025, President Trump issued Executive Order 14,188, *Additional Measures to Combat Anti-Semitism*, 90 Fed. Reg. 8847 (Feb. 3, 2025), which established the "policy of the United States to combat anti-Semitism vigorously, using all available and appropriate legal tools, to prosecute, remove, or otherwise hold accountable the perpetrators of unlawful anti-Semitic harassment and violence," *id.* § 2, and encouraged the "Attorney General … to employ appropriate civil-rights enforcement authorities … to combat anti-Semitism," *id.* § 3(c). The Executive Order also reaffirmed Executive Order 13,899, *Combating Anti-Semitism*, 84 Fed. Reg. 68779 (Dec. 16, 2019).

The Attorney General has established Joint Task Force October 7 ("JTF 10-7") and directed components to "prioritize seeking justice for victims of the October 7, 2023 terrorist attack in Israel" as well as "combatting antisemitic acts of terrorism and civil rights violations in the homeland." Memorandum from Attorney General, *Establishment of Joint Task Force October 7*, at 1 (Feb. 5, 2025). To assist these enforcement efforts, the Civil Division will prioritize investigations and enforcement actions against entities that make claims for federal funds but knowingly violate federal civil rights laws by participating in or allowing antisemitism.

### 3. Protecting Women and Children

The President has issued several Executive Orders protecting women and children. On January 20, the President issued Executive Order 14,168, *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, 90 Fed. Reg. 8615 (Jan. 30, 2025), which established the "policy of the United States to recognize two sexes, male and female." *Id.* § 2. On February 3, President Trump issued Executive Order 14,187, *Protecting Children from Chemical and Surgical Mutilation*, 90 Fed. Reg. 8771 (Feb. 3, 2025), which directed the Attorney General to, among other things, "prioritize investigations and take appropriate action to end deception of consumers, fraud, and violations of the Food, Drug, and Cosmetic Act by any entity that may be misleading the public about long-term side effects of chemical and surgical mutilation." *Id.* § 8(c).

Following these directives, Attorney General Bondi directed the Civil Division to "act decisively to protect our children and hold accountable those who mutilate them under the guise of care" and "to undertake appropriate investigations of any violations of the Food, Drug, and Cosmetic Act by manufacturers and distributors engaged in misbranding by making false claims about the on- or off-label use of puberty blockers, sex hormones, or any other drug used to facilitate a child's so-called 'gender transition.'" Memorandum from Attorney General, *Preventing the Mutilation of American Children*, at 3-4 (April 22, 2025). The Attorney General also directed the Civil Division "to pursue investigations under the False Claims Act of false claims submitted to federal health care programs for any non-covered services related to radical gender experimentation." *Id.* at 4.

The Civil Division will use all available resources to prioritize investigations of doctors, hospitals, pharmaceutical companies, and other appropriate entities consistent with these directives. These efforts will include, but will not be limited to, possible violations of the Food,

Drug, and Cosmetic Act and other laws by (1) pharmaceutical companies that manufacture drugs used in connection with so-called gender transition and (2) dealers such as online pharmacies suspected of illegally selling such drugs. 31 U.S.C. § 301 *et seq*. In addition, the Civil Division will aggressively pursue claims under the False Claims Act against health care providers that bill the federal government for impermissible services. This includes, for example, providers that attempt to evade state bans on gender dysphoria treatments by knowingly submitting claims to Medicaid with false diagnosis codes.

### 4. Ending Sanctuary Jurisdictions

On President Trump's first day in office, he issued multiple directives to secure the southern border. *See* Proclamation 10,886, *Declaring a National Emergency at the Southern Border of the United States*, 90 Fed. Reg. 8327 (Jan. 20, 2025); Executive Order 14,159, *Protecting the American People Against Invasion*, 90 Fed. Reg. 8443 (Jan. 20, 2025). To ensure that States and local governments promote the enforcement of our nation's immigration laws, he also issued Executive Order 14,287, *Protecting American Communities from Criminal Aliens*, 90 Fed. Reg. 18761 (April 28, 2025). This built on the President's previous Executive Order 13,768, *Enhancing Public Safety in the Interior of the United States*, 82 Fed. Reg. 8799 (January 25, 2017). Moreover, Attorney General Bondi has directed the Civil Division to "identify state and local laws, policies, and practices that facilitate violations of federal immigration laws or impede lawful federal immigration operations" and "take legal action to challenge such laws, policies, or practices," where appropriate. Memorandum from Attorney General, *Sanctuary Jurisdiction Directive*, at 3 (Feb. 5, 2025). Consistent with this directive, the Civil Division shall prioritize affirmative litigation to invalidate any State or local laws preempted by Federal law.

### 5. Prioritizing Denaturalization

The Department of Justice may institute civil proceedings to revoke a person's United States citizenship if an individual either "illegally procured" naturalization or procured naturalization by "concealment of a material fact or by willful misrepresentation." 8 U.S.C. § 1451(a). The benefits of civil denaturalization include the government's ability to revoke the citizenship of individuals who engaged in the commission of war crimes, extrajudicial killings, or other serious human rights abuses; to remove naturalized criminals, gang members, or, indeed, any individuals convicted of crimes who pose an ongoing threat to the United States; and to prevent convicted terrorists from returning to U.S. soil or traveling internationally on a U.S. passport. At a fundamental level, it also supports the overall integrity of the naturalization program by ensuring that those who unlawfully procured citizenship, including those who obtained it through fraud or concealment of material information, do not maintain the benefits of the unlawful procurement.

3

The Civil Division shall prioritize and maximally pursue denaturalization proceedings in all cases permitted by law and supported by the evidence. To promote the pursuit of all viable denaturalization cases available under 8 U.S.C. § 1451 and maintain the integrity of the naturalization system while simultaneously ensuring an appropriate allocation of resources, the Civil Division has established the following categories of priorities for denaturalization cases:

1. Cases against individuals who pose a potential danger to national security, including those with a nexus to terrorism, espionage, or the unlawful export from the United States of sensitive goods, technology, or information raising national security concerns;

2. Cases against individuals who engaged in torture, war crimes, or other human rights violations;

3. Cases against individuals who further or furthered the unlawful enterprise of criminal gangs, transnational criminal organizations, and drug cartels;

4. Cases against individuals who committed felonies that were not disclosed during the naturalization process;

5. Cases against individuals who committed human trafficking, sex offenses, or violent crimes;

6. Cases against individuals who engaged in various forms of financial fraud against the United States (including Paycheck Protection Program ("PPP") loan fraud and Medicaid/Medicare fraud);

7. Cases against individuals who engaged in fraud against private individuals, funds, or corporations;

8. Cases against individuals who acquired naturalization through government corruption, fraud, or material misrepresentations, not otherwise addressed by another priority category;

9. Cases referred by a United States Attorney's Office or in connection with pending criminal charges, if those charges do not fit within one of the other priorities; and

10. Any other cases referred to the Civil Division that the Division determines to be sufficiently important to pursue.

These categories are intended to guide the Civil Division in prioritizing which cases to pursue; however, these categories do not limit the Civil Division from pursuing any particular case, nor are they listed in a particular order of importance. Further, the Civil Division retains the discretion to pursue cases outside of these categories as it determines appropriate. The assignment of denaturalization cases may be made across sections or units based on experience, subject-matter expertise, and the overall needs of the Civil Division.