Q6NVCOEC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

CARTER COE, *et al*,

                    Plaintiffs,

          v.                          26 Civ. 4641 (KPF)

TODD BLANCHE, *et al*,

                    Defendants.             Argument

------------------------------x
                                      New York, N.Y.
                                      June 23, 2026
                                      2:40 p.m.

Before:

                  HON. KATHERINE POLK FAILLA,

                                      District Judge

                         APPEARANCES

LAMBDA LEGAL DEFENSE AND EDUCATION FUND, INC.
     Attorneys for Plaintiffs
BY:  OMAR GONZALEZ-PAGAN
     -and-
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
BY:  CHASE STRANGIO
     SHANA KNIZHNIK
     -and-
NEW YORK CIVIL LIBERTIES UNION
BY:  ROBERT A. HODGSON

U.S. DEPARTMENT OF JUSTICE, CIVIL DIVISION
     Attorneys for Government Defendants
BY:  LUKE MILLER
     SARAH WELCH

NIXON PEABODY LLP
     Attorneys for NYU Defendants
BY:  TIMOTHY SINI
     ZACHARY A. CUNHA
     LINDSAY MALESON

Q6NVCOEC

(Case called)

THE DEPUTY CLERK:  Counsel, please state your name for the record, beginning with plaintiff.

MR. STRANGIO:  Good afternoon, your Honor.

Chase Strangio, on behalf of the plaintiffs and the proposed class.

THE COURT:  Sir, are you able to stand?

MR. STRANGIO:  Of course.

THE COURT:  I'm asking this of all of the oralists simply because there are monitors that block my view of some of you.  Thank you.

MR. STRANGIO:  Of course.

MR. GONZALEZ-PAGAN:  Good afternoon, your Honor.

Omar Gonzalez-Pagan, on behalf of the plaintiffs and the proposed class.

THE COURT:  Thank you.

MR. HODGSON:  Good afternoon, your Honor.

Robert Hodgson from the New York Civil Liberties Union Foundation, also on behalf of the plaintiffs.

MS. KNIZHNIK:  Good afternoon, your Honor.  Shana Knizhnik, on behalf of plaintiffs and the proposed class.

THE COURT:  Thank you so much.

MR. MILLER:  Hello, your Honor.

Luke Miller, behalf of defendants Todd Blanche and the Department of Justice.

Q6NVCOEC

THE COURT:  All right.  Thank you.

MS. WELCH:  Good afternoon, your Honor.

Sarah Welch from the Department of Justice as well.

MR. SINI:  Good afternoon, your Honor.

Timothy Sini with Nixon Peabody, for the NYU defendants.

THE COURT:  Mr. Sini, do you expect to be speaking a lot this afternoon?

MR. SINI:  Mr. Cunha will be taking the lead.

THE COURT:  All right.  I'm not sure I have many questions for NYU, but I understand that you're there.  Thank you.

Mr. Cunha.

MR. CUNHA:  Good afternoon, your Honor.

Zachary Cunha, also from Nixon Peabody, also on behalf of the NYU defendants.

THE COURT:  Thank you so much.

MS. MALESON:  Good afternoon, your Honor.

Lindsay Maleson, also from Nixon Peabody, for the NYU defendants.

THE COURT:  Okay.  Thank you.

Because I know that you have ECF access and have looked at it, you are aware that this case was reassigned to me approximately 25 and one half hours ago.  I have read all of the papers, I've read the majority of the cases, and I've done

Q6NVCOEC

some independent research, but I'm sure you will be as understanding as you are capable of being.

It was my understanding that when this was before Judge Vargas, the parties had stipulated to extending the deadline for the production of documents or the information and materials at issue from June 10th to June 24th, presumably at 9 a.m.

There was discussion in the plaintiffs' submission of yesterday about some discussion about possibly extending the deadline, but I wasn't going to be told until 6 p.m. and, therefore, I could not make any -- I couldn't guarantee anything.  It would be my hope that the parties would agree to extend the deadline until approximately noon tomorrow so that I can render a decision before then.

Is that acceptable to my friends at the front table?

MR. STRANGIO:  It is, your Honor.  Thank you.

THE COURT:  Thank you.

Is it acceptable to my friends at the back table?

MR. MILLER:  Yes, your Honor.

MR. CUNHA:  No objection from NYU, your Honor.

THE COURT:  Thank you so much.

There's nothing wrong with NYU.  I'm sorry, just my focus was elsewhere.

All right.  I also did understand that Mr. Strangio and Mr. Gonzalez-Pagan wanted to split oral argument; is that

correct?

MR. STRANGIO:  That is correct, your Honor.

THE COURT:  And, sir, may I just have the pronunciation of your last name again.

MR. STRANGIO:  Strangio.

THE COURT:  Strangio.  I beg your pardon.  Excuse me.

I will allow that.

There was discussion as well about a briefing schedule for the contemplated motion for preliminary injunction. Perhaps that's something you want to discuss after we have the questions today.  But was there agreement between the parties on such a schedule?  Last I saw there was disagreement.

MR. STRANGIO:  Your Honor, there was disagreement.

THE COURT:  And there remains disagreement.

MR. STRANGIO:  I believe so.  I think we may revisit the topic after your Honor's decision on the temporary restraining order, but as of now there remains disagreement.

THE COURT:  Thank you so much.  All right.

Mr. Strangio, I think I begin with you.

MR. STRANGIO:  Yes.

THE COURT:  Was there an opening statement you wish to make to me?  It wasn't may plan to do that, but if you've prepared one, I'll let you speak.

MR. STRANGIO:  Whatever is best for your Honor.  Happy to answer your questions.

THE COURT:  Thank you.  I have several.

Sir, to what extent are plaintiffs' arguments for a temporary restraining order predicated on a finding that the government is somehow acting in bad faith either by issuing the executive orders, by pivoting from administrative subpoenas to grand jury subpoenas, or things similar.  I suppose, more fundamentally, are you asking me or am I obligated to make a finding about the *bona fides* of the government's investigation or the executive orders in order to resolve your motion?

MR. STRANGIO:  So, your Honor, I am prepared to speak on the question of jurisdiction, so I'll answer that question with respect to the Court's jurisdiction to adjudicate these claims; and I'll let may colleague Mr. Gonzalez-Pagan answer that question on the merits.

The answer on jurisdiction is no.  This Court has jurisdiction to adjudicate plaintiffs' claims.  Plaintiffs, consistent with Second Circuit precedent, come seeking relief from this Court in the jurisdiction where they received the medical care at issue, where the records were generated and are currently maintained, in order to prevent the imminent and ongoing violation of their Fifth and Fourth Amendment rights and rights under state law.

Under *New York Times v. Gonzales*, this Court has jurisdiction to adjudicate the claims, notwithstanding a grand jury investigation elsewhere.  And that precedent instructs

that the Court considers the *Dow Jones* factors for determining whether to exercise jurisdiction, and jurisdiction would be proper considering those factors.

I do think that the Justice Department's conduct and the history and context provide additional urgency for this Court to exercise jurisdiction in this case.  But on the question of whether this Court has jurisdiction, it is not necessary to make a finding that the actions of the Justice Department are improper.

THE COURT:  Mr. Gonzalez-Pagan.

MR. GONZALEZ-PAGAN:  Thank you, your Honor.

In response to the questions to the Court's question, a finding of improper purpose or of bad faith is not unnecessary for plaintiffs to prevail on either their Fifth or Fourth Amendment claims.  Certainly, given the bad faith and improper purpose that we believe is present in light of the language utilized in the gender order, the Bondi memo, which is Exhibit C to the complaint, and the like, that is indicative of the fact that these demands for information, both through administrative and grand jury subpoena to NYU, certainly violate the informational privacy rights of our plaintiffs and are unreasonable.  An improper purpose would constitute a violation of the Fourth Amendment by rendering the request or demands for this information to be unreasonable.

That said, we believe that plaintiffs can't prevail

without that finding.  That is because under the Fifth Amendment, the balancing of interests really pertains to the interests in preserving the confidentiality and the interest of the government obtaining the information.  And here, the government has not presented really any information or interest as to why it needs this information.  But we do know, certainly under Second Circuit precedent, that both the sensitive health information at issue here, as well as plaintiffs' transgender status, is of the utmost fundamental protections under the informational privacy right under the Fifth Amendment.

THE COURT:  I'm going to have you pause right there a moment.  I do have other questions, but I think I'm going to skip ahead to something that your answer just sort of brought into sharper focus.

You say to me they haven't demonstrated why they need this information, why they need it with such granularity, why they need the identities of the patients and, at times, their parents.  But there is something to be said for the government's argument that Rule 6(e) and the secrecy that normally adheres in grand jury investigations pertains here.

I'm sure you saw in the opposition that they still don't even acknowledge the NYU subpoena that was issued that we've seen that suggests -- they are not saying it's invalid, but they still can't, they believe, consistent with their obligations under Rule 6(e), acknowledge it.

So one of the problems I'm having here, putting aside the jurisdictional hurdle, is the idea that I'm being asked to make determinations and to balance factors based on information I don't have and they won't provide — and, indeed, they believe they can't provide.  So while you've spoken to me about the administrative subpoenas and what the focus of those subpoenas were, the folks at the back table are not committing that that's the -- that the investigations are coextensive or that they even are looking at the same parties.

So when you say to me, They haven't met their burden, the problem I have is how can I impose upon them that burden when they have an obligation on their own to keep this information shielded from disclosure?

MR. GONZALEZ-PAGAN:  So, your Honor, a couple of answers to that.

First and foremost is the fact that we need not ignore the context of all that is occurring and that is part of the record here.  The request at issue for the grand jury subpoena to NYU is the same requests that were included in the administrative subpoenas to NYU, as well as to other hospitals, including Rhode Island Hospital.  Two of those administrative subpoenas that went to NYU and Rhode Island Hospital are part of the record here.  Requests 11, 12, and 13 of the administrative subpoenas are identical — virtually identical — to requests 12, 13, and 14 of the grand jury subpoena.

Q6NVCOEC

The purpose here of the so-called investigations is that they are purportedly investigating offenses, healthcare offenses --

THE COURT:  But, sir — and I don't mean to interrupt you, but here I am doing that.  How do I know that?  I know you've told me what the administrative subpoenas were focused on, and that appears to be the FDCA, focused on violations of that act.  But the subpoena that I saw for NYU did not recite on its cover page, as old versions of the subpoena used to, the statutes that were being investigated.  I have no knowledge as to what the criminal investigation is, or do I?

MR. GONZALEZ-PAGAN:  Well, we do, your Honor.  We know because the Bondi memo specifies the strategy that the government will use to achieve its purpose, including the use of the FDCA and healthcare offenses, to try to coerce hospitals into ending gender-affirming medical care.  We know because the government has repeatedly represented before the issuance of the administrative subpoenas, after they transferred the administrative subpoenas, that the purposes were the same and consistent and consonant with the Bondi memo and the Shumate memo.

THE COURT:  That's as to the administrative subpoenas.

MR. GONZALEZ-PAGAN:  Correct.

And we know because, temporally, the grand jury subpoena at issue here was -- there was an administrative

subpoena at issue here.  It was withdrawn while the hospital and DOJ were still in negotiations, and information which was not known to plaintiffs until the pleadings in this case.  And then it was withdrawn and immediately reissued as a grand jury subpoena to the same entity and asking for the same information.

Not only that, your Honor, but the government asserts that they cannot reveal this information at all.  But we know that they can.  In the context of ascertaining the reasonableness of a subpoena, of a grand jury subpoena, a court may require the government — and the government may provide — the general subject matter of said subpoena in order to ascertain the reasonableness of that subpoena.

And not only that --

THE COURT:  To a court other than the district of issuance?

MR. GONZALEZ-PAGAN:  Well, certainly -- yes.  And, in fact, Rule 6(e), the exceptions allow for -- in connection with another judicial proceeding, for the government to — if they need to disclose this information — go to the court supervising the grand jury subpoena, petition for the opportunity to actually provide that information to the other court; and, in fact, that petition gets transferred.  This is F of -- subdivision F of Rule 6(e), transfer that petition to the court requesting the information.

Q6NVCOEC

THE COURT:  We know that they can and we know the process that they would use to do it.  But if they elect not to engage in that process, are you suggesting that I am to hold that against them or to find some sort of adverse inference because they refuse to do something they were not obligated to do?

MR. GONZALEZ-PAGAN:  I don't think it's an adverse inference, your Honor, so much as they have an opportunity to present their case and they decide not to.  At the end of the day, it's a balancing of the interest.

The information sought here is of the utmost private confidential nature; it pertains to our plaintiffs' transgender status which the Second Circuit has recognized is incredibly personal and fundamental and actually beyond debate as to it's excruciatingly private in nature.  And the sensitive health information likewise is incredibly private.  Not only that, it is incredibly broad.

The information at issue here seeks a full disclosure of the medical health information that NYU possesses with regards to our plaintiffs and the proposed members of the class; information that contains discussions of familial history, of mental health history, their problems in school, their development, socio-development and psychological development, as well as whatever other medical conditions that they may have or experience beyond gender dysphoria.  It seeks

Q6NVCOEC

a full picture of plaintiffs' lives, and it does so in a way that is incredibly intrusive and unnecessary.

At the end of the day, your Honor, the government has repeatedly shown that it doesn't need this information; it had, in fact, conceded as much.

THE COURT:  It conceded as much with respect to the administrative subpoenas; correct?

MR. GONZALEZ-PAGAN:  Correct.  But --

THE COURT:  And you're saying that there -- I mean, we can acknowledge that there's a difference between a civil administrative matter and a criminal matter; correct?

MR. GONZALEZ-PAGAN:  We can acknowledge that the vehicle is distinct, your Honor.  But the purpose and the actor is still the same.

(Indiscernible crosstalk)

THE COURT:  Excuse me, sir.

Do I know that?  Do I know that -- because in their opposition, the government is saying to me, Don't assume that this is coextensive with the administrative subpoenas.  Don't assume.  You don't know who the targets are.  And that's, in fact, the reason why this shouldn't be in front of you, Failla, because you are not the person -- this should be in the Northern District of Texas.

We'll get to that momentarily.

Because you're suggesting to me that in this civil

Q6NVCOEC

context, that I am basically -- I can force the government's hand to disclose information about the grand jury subpoena or the grand jury investigation; or, if they don't do that, then I can make whatever conclusions I draw from that in order to say that NYU doesn't have to comply with the subpoena.

There are many things that concern me on both sides. I don't want to suggest to you that this is easy for one side or the other. But the idea that I can inject myself into a criminal investigation — if that's indeed what I'm doing — by saying to the government, You either have to tell me — *in camera*, if you want — tell me *in camera*, consistent with Rule 6(e), get your permission from the Northern District of Texas, and tell me what this is about; or I am going to make a finding under the Declaratory Judgment Act that NYU doesn't have to comply with these subpoenas.

MR. GONZALEZ-PAGAN:  Your Honor, we agree that these are anomalous circumstances.

THE COURT:  Of course.

MR. GONZALEZ-PAGAN:  I think we all know that this is in some ways pretty novel. But it is because of the conduct of the government that it is novel.

Your Honor, the government's absence of -- the absence of a proffer of information or justification cannot be used against plaintiffs to infringe upon their constitutional rights.  Really, here what we have is the weaponizing of the

Q6NVCOEC

grand jury in at least the circumstance of the subpoena to NYU. And we would again proffer and just reframe that the relief that we're requesting is broader and pertains to all of these demands as it pertains to people that obtain care in New York City, both whether through a grand jury subpoena or an administrative subpoena.

But we are not seeking to intervene or quash the investigation.  We are seeking to protect limited information specific to our plaintiffs, information that the government has repeatedly said in relation to the same investigations, or at least similar investigations based on requests to other entities that are virtually identical, that they don't need.

In the context of Children's Hospital of Los Angeles, your Honor, they actually withdrew the request and agreed to redacted information with regards to responses to any other request.  And they have represented in court multiple times that they don't need identifying information.

And certainly they don't tell us here why.  And it cannot be, your Honor, that in the seeking of a criminal offense, the government can use the grand jury to obtain the medical records of every citizen and say, We're just investigating.  We don't even have to tell you what we're investigating.  We can just request the medical records of every person in New York state and not provide a reason.  And we may do so in Texas as opposed to in New York.

Q6NVCOEC

THE COURT:  Well, I think the government's response is that you are -- your clients could go to Texas and challenge this, could they not?

MR. GONZALEZ-PAGAN:  Your Honor, I don't think that is entirely clear.

THE COURT:  Please tell me why it's not.

MR. GONZALEZ-PAGAN:  Well, typically, it would be a recipient of the grand jury who would have the standing and the ability to file a motion to quash based on Rule 17.

THE COURT:  Yes.

MR. GONZALEZ-PAGAN:  But, here, the relief that we seek is much broader, and we're not seeking to limit or quash that particular one subpoena.  We are seeking to actually protect the information of our clients being sought through serial and multiple means, including administrative and grand jury subpoenas.  The grand jury subpoena to NYU is but one part of the many tools that the government is trying to use to coerce hospitals into ending the provision of gender-affirming medical care and to target transgender people, as they have for their executive orders and memoranda calling this care to be barbaric, and representing in the executive orders that people who are transgender have a false claim or a false belief in who they are.

This all animates this actions.  And it is actually -- we cannot divorce this one singular part from the totality and

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Q6NVCOEC

evaluate it in a vacuum.  And I think that actually informs why it is that we're here in front of the Court.

We also don't know if other grand jury subpoenas have been issued to other hospitals.  We know that Mt. Sinai has received a subpoena; we don't know the nature of that subpoena. And so, in that sense, we're very much in the same place that the plaintiffs in *New York Times v. Gonzales* were.  And there, the Court said that in those circumstances, it was appropriate to exercise jurisdiction.  And I think Mr. Strangio can speak to this more specifically.  I'm delving a little bit away from my area.

THE COURT:  We'll hold off on that for now.

If the government were to commit to seeking only anonymized information responsive to these subpoenas, no identities and no possibility of later coming back and seeking identities, would you agree?

MR. GONZALEZ-PAGAN:  Your Honor, we're happy to consider that.  We believe that we --

THE COURT:  I understand that that's not what was offered.

MR. GONZALEZ-PAGAN:  It hasn't been offered.  And certainly even to NYU, to the extent that there has been some sort of negotiation, it has been to provide some redacted information without -- with preservation of the ability to unmask and identify.

THE COURT:  Of course.

And is it your view that -- well, let's say we had that.  You're saying that the possibility that later on down the road they can seek to deanonymize, if that's even a word, this information, that gives you Article III standing to come here and complain about it.

MR. GONZALEZ-PAGAN:  Absolutely, your Honor.

We think that here, at the end of the day, the information being sought is of such granularity and individualized that it is virtually impossible to truly deidentify.  The Court in the Western District of Pennsylvania for that very reason actually refused to allow for the deidentified production of records.  This is in the *In re UPMC Subpoena* matter, your Honor.  And it is from March 2nd of this year.

THE COURT:  I read it, sir.  Thank you.

MR. GONZALEZ-PAGAN:  So that is instructive, I believe, here.  But, here, again, it is virtually impossible to deidentify.  And the injury to the informational privacy right is still present.

The government doesn't have the power or ability to actually collect such private information of its citizens without a showing as to why and the balancing of interest necessary here.  Typically, when medical information is provided, it is limited information for a limited purpose,

whether it's for public health monitoring or the like, and it is typically not a wholesale provision of somebody's whole medical records that discuss everything, from whether they had a cold to whether they had depression or anxiety because they were being bullied in school, to whether they actually have this stress with regards to how they are perceived in light of their gender identity, such a stress that requires a provision of gender-affirming medical care.  It seeks a broad picture of these people regardless of whether their name can be attached to it.

THE COURT:  Well, then that suggests that even if the government were to commit to receiving only anonymized information and never seeking to deanonymize that information, you'd still think that it is so granular and specific that your clients could be identified and, therefore, you wouldn't consent to it.  That's what I think I'm understanding you to argue now.

MR. GONZALEZ-PAGAN:  That's correct, your Honor.

And we would posit and agree that certainly it is a balancing test.  And the desire for privacy may lessen if there is anonymization versus there isn't.  But I think ultimately we think there will still be an injury, an injury of a constitutional nature, and one that we believe have standing to seek to protect.

At the end of the day, we want to protect our clients'

Q6NVCOEC

identities.  There is no reason for the government to be compiling a list of people who are transgender in this country, let alone transgender young people that are vulnerable and that feel — rightfully so — that they're under attack by this government that has expressed such hostility.

Second and apart from that, your Honor, there are concerns about how the government would use this data even if it were to be anonymized or deidentified.  The government has the ability to share this information with some of its partners that it routinely is partnering right now in attacking people who advocate for gender-affirming medical care or, like it just did, by filing a case with the Texas Attorney General against one of the organizations that provides clinical guidance for this care in Texas.

And it actually has partnered repeatedly with this other entities that have similarly expressed hostility towards transgendered people, including the Texas Attorney General, who has expressed that he considers this care to be child abuse.  And that is not that dissimilar from how this administration has expressed its own sentiments with regards to this care — care, mind you, that is incredibly important for these people, essential and necessary, but that is also legally protected in the state of New York.

THE COURT:  I just want to understand why I should be concerned about the uses to which the information could be put.

Q6NVCOEC

I suppose that's because in your Fifth Amendment analysis, there's a discussion of the safeguards, and that is one of the factors, if there are safeguards. And you are going to tell me there are no safeguards here.

But, as well, your problem predates what they are going to do with it. Your problem is their ability to seek that information in the first instance.

And I want to hear a little bit more about something you said a few moments ago, which is the idea that you're not actually really trying to move to quash per se. What you're trying to do is to prevent the disclosure — whether through administrative subpoena or grand jury subpoena or some threat against NYU, that they will lose funding if they don't do something, you're trying to prevent the disclosure of your clients' information. Do I understand that correctly?

MR. GONZALEZ-PAGAN: That is exactly it, your Honor. We're seeking that protection for all members of the proposed class, as well as the members of the NYU subclass. So it pertains to all transgender young persons that obtained care from 2020 to 2026 at any healthcare institution in New York City.

And what we're seeking to protect is the ability for them to preserve the confidentiality and their informational privacy as to their identities which would reveal their transgender status in connection with this care, as well as

Q6NVCOEC

just their sensitive health information, all that is contained within these records.

THE COURT:  I want to go back, please, to where this should be taking place.

MR. GONZALEZ-PAGAN:  If I may, your Honor, pass the ball.

THE COURT:  Okay.  Mr. Strangio, yes.  He's desperately seeking to speak to me, and now he can.

Sir, thank you very much and welcome back.

I really would like to understand this, because I'll say the same thing to the government.  I am not an activist judge, and I take very seriously the lanes in which I can legitimately operate.  And so I want to understand why it is appropriate for me to be considering this rather than the Northern District of Texas.

If you said to me, for example, that there's some quirk of law that would prevent the individuals whose medical records are subject to the subpoena from moving to quash in Texas, I would listen to you.  But I just would like to understand — and I want to be clear, to say to me -- well, in a quiet moment, sir, you might acknowledge that there's a bit of forum shopping going on; but then you'll tell me it's sort of reciprocal forum shopping, because they should never have brought the investigation in Texas in the first instance.  But here we are.

Q6NVCOEC

So let me understand, please, why this isn't impermissible forum shopping and why you can't go to Texas.

Thank you.

MR. STRANGIO:  Your Honor, I'll start where Mr. Gonzalez-Pagan ended, which is that the relief that the plaintiffs are seeking, young New Yorkers whose identifying information has been serially demanded by the government, is to prevent this serial demand from violating their constitutional and state law rights.  And the fact that there is one grand jury subpoena that we know about does not make the only or even the better remedy a motion to quash.  And I think in that sense, this is very similar to the circumstances in *New York Times v. Gonzales*, where the Second Circuit affirmed this Court's exercise of jurisdiction in a case, where, as I'm sure you're aware, *The New York Times* sought --

THE COURT:  I did read the case, sir, yes.  Thank you.

MR. STRANGIO:  Much like *The New York Times*.  In that case, many members of the class don't know if a subpoena has been served on their healthcare provider and, therefore, cannot seek relief through a motion to quash because they wouldn't know where to file such a motion.

And, in essence, what the government is asking of the plaintiff class members is to be forced into a guessing game of whack-a-mole across the country through jurisdictions to which they have no connection and where they could, as we've alluded

Q6NVCOEC

to, seek investigation and possibly arrest.  That is sort of the threshold precedential reason the Court can exercise its jurisdiction.  And then I think what *Gonzales* tells us is that the Court then balances the factors that *Dow Jones* lays out for whether or not the exercise of jurisdiction is proper.

And I think given the fact that there is not a singular subpoena that can be quashed, that the class can identify and protect its interests by quashing, the factors weigh in favor of this Court's exercise of jurisdiction. There's no better or more effective remedy.  They're subject to the ongoing legal uncertainty, as are the hospitals and the government, in terms of to what extent is this information constitutionally protected; and that weighs in favor of a singular relief from this Court in the jurisdictions where the plaintiffs both reside and received the medical care.

THE COURT:  Well, I think that's the point you're about to make to me because, of course, naturally, I appreciate very much your whack-a-mole analogy, sir, and your suggestion that you've been able to beat back the informational requests that you're aware of, but you can't fight the stuff you don't know about.  You may not be lucky enough to have an institution publish or make folks aware of the existence of the subpoena.

So this I get.

Please understand that, from my perspective, the issue is I might agree with you, but then why -- how is it that I get

to be the decider of this in the first instance?  I mean, there are obviously layers above me.

I guess what you're saying is, Well, Failla, this is all happening in New York City; that's why our class is limited to New York City.  The individuals have sought care here, they've received care here, they've given the most private of their medical information here.  And, therefore, it is here that preservation of the privacy inherent in that information should be decided.  Is that the argument?

MR. STRANGIO:  That is a substantial part of the argument, that here is where jurisdiction should lie for the reasons that we've discussed and the reasons that your Honor has helpfully just outlined.

And I think, coming back to your Honor's question about is this being used in such a way to fence for procedural fencing or otherwise improper purposes.  And I would submit the answer from plaintiffs' side is absolutely not.

When plaintiffs became aware of the grand jury subpoena, knowing the full context of everything that had been going on, the serial demand for this information and the new awareness that their information was now the subject of potentially multiple demands across New York City healthcare institutions, they came to the jurisdiction where they could seek relief on behalf of the full class of New York City patients whose information was now subject to this serial

Q6NVCOEC

demand.

I think what's interesting or perhaps instructive here too is plaintiffs, until the filing of this lawsuit, did not know about the administrative subpoena to NYU, which had been part of negotiations between the hospital and the Justice Department for the better part of a year, which I think highlights the equities of assuming jurisdiction here for nonrecipients who may not know that their information is being bargained over until it is too late.  And I think that's also what  *New York Times v. Gonzales* instructs in terms of this Court's ability to exercise its jurisdiction.

THE COURT:  All right.  But *Gonzales* only gets you so far, right, because *Gonzales*, you win the battle and lose the war.  They find jurisdiction, but then find that the privilege doesn't pertain or doesn't protect the disclosure of the information.  Is that not correct?  It's telephone service provider records.

MR. STRANGIO:  Yes, correct.

At the end of the day, this Court deciding to assume jurisdiction does not answer the merits question; those are distinct challenges that I will grant you.

The other thing I would just sort of offer, your Honor, is we're here on a temporary restraining order --

THE COURT:  Yes.

MR. STRANGIO:  -- to maintain the status quo in a very

fast-moving set of circumstances in which lots of information is being learned as we are moving forward to try to protect our individual clients' rights and the members of the proposed class. So this Court has broad equitable authority to maintain the status quo, while some of these questions about to what degree, if at all, can anonymization happen.

So we would urge that the Court assume jurisdiction, maintain the status quo in this emergency posture so that tomorrow, this hundreds — if not thousands — of young New Yorkers are all of a sudden unable to protect against the seizure and disclosure of their most personal information.

THE COURT: In *Gonzales*, the Second Circuit said that the existence of Rule 17(c), the ability to move to quash a subpoena, does not preclude per se a declaratory judgment. I am quoting from the decision at page 166. I'm not sure that I will call that a ringing endorsement of a court this Court's jurisdiction to evaluate a collateral challenge to a grand jury subpoena issued by another court.

I'm also not sure that *Gonzales* really got to the issue of whether I have the authority to issue the injunctive relief that you seek. So let me understand how I can read naturally or extrapolate naturally from *Gonzales* these two points.

MR. STRANGIO: So first, your Honor, I would not characterize what the plaintiffs have brought here as a

Q6NVCOEC

collateral attack on a grand jury proceeding.  And, again, the relief is about the serial demand for the information, in violation of their rights.  And I know that the defendants make a lot out of the fact that the Court was only considering the declaratory relief part of *The New York Times* claim in that case.  But I think for two central reasons that doesn't change this Court's ability to resolve the case here.

The first is it did not figure into the Court's analysis.  The fact that it was a declaratory judgment as opposed to an injunction was not the reason that the Court found jurisdiction balancing the *Dow Jones* factors.

And I think, more importantly, we're currently in this emergency posture.  And ultimately, this Court could still decide that declaratory relief is the most appropriate way to resolve this, balancing the *Dow Jones* factors.  But the ability to resolve this case in that manner on the merits would necessitate, we submit, this Court's exercise of its broad jurisdiction to maintain the status quo in the interim because of the irreparable harm that would flow to the individual plaintiffs and the proposed class members if the government was able tomorrow to go and access all of this information from all of the health providers in New York City that it seeks to demand it from.

THE COURT:  One moment, please.  Thank you.

If there's anything else you want to say about my

jurisdiction, I'll hear from you.

I do want to pivot now to the class relief that is being sought.

MR. STRANGIO:  I think, unless your Honor has other questions on jurisdiction, I will also answer questions on the class relief.

THE COURT:  Okay.  Then let's move to that, please.

You're asking me to certify a class and a subclass. The subclass seems easy, given that it is the entity that your named plaintiffs have obtained medical services from.  I'm not sure — and I don't want to understand — why it is appropriate for me to certify a class that includes other healthcare institutions located in New York City.

We don't know that any other institutions, with the possible exception of Mt. Sinai, has received such a subpoena. And so it is interesting.  You would say that that actually counsels in favor of granting the relief, and I just want to understand why.

If, for example — and I'm just picking a name here — New York Presbyterian were to receive a subpoena, wouldn't they have gone through the same process as NYU?  Wouldn't there be folks who see that the hospital at which they received gender-affirming care services has received such a subpoena, and they could bring a lawsuit similar to this one?

I want to understand why I need to extend to certify

Q6NVCOEC

provisionally — the government thinks I can't — a class that extends to folks who did not -- who received gender-affirming care places other than NYU.

MR. STRANGIO:  So a few responses, your Honor.

First, I do want to clarify that the named proposed class representative, Karl Koe, on complaint paragraph 17, has received care from both Mt. Sinai and NYU; and is therefore representing both entities in that regard.

And I think the reason this Court should certify the class provisionally, of course, that we propose is because of what we had been discussing.  It is very possible that those subpoenas are out there.  The New York Shield Law is open to interpretation.  It requires a 30-day notice about when information may be disclosed.  It's possible that those negotiations are ongoing and reaching some sort of resolution where the plaintiffs would not know about it, as evidenced by, for example, the administrative subpoena that was the subject of the negotiations between NYU and the Justice Department, at no point during that period of time were the plaintiffs notified in a manner comparable to the notice in the grand jury subpoena context.

So I think the reason is because of the necessary -- because the ways in which the government is using both grand jury and other forms of secrecy to shield plaintiffs from the ability to vindicate their rights — and they are, in fact,

Q6NVCOEC

nonrecipients of these subpoenas — the broader relief on behalf of the full class should be provisionally extended, your Honor, is what we would suggest.

THE COURT:  One moment.

MR. STRANGIO:  Your Honor, if I could just supplemental one additional point on that.

THE COURT:  You may.

MR. STRANGIO:  Additionally, because what the proposed class is challenging is the serial demand for the information that violates their rights.  The injury to the full proposed class is the same.

THE COURT:  You've anticipated my next question, so I guess I won't ask it.

MR. STRANGIO:  I will thank Mr. Gonzalez-Pagan for that.

THE COURT:  What do you consider to be the metes and bounds of the plaintiffs' right to informational privacy under the Fifth Amendment?  And if that's your colleague's, I'll let you hand the baton back.  Thank you.

MR. STRANGIO:  Thank you, your Honor.

MR. GONZALEZ-PAGAN:  I'm sorry, your Honor.  May you repeat the question?

THE COURT:  Yes.  I want to understand what you consider -- sort of, how I should conceive of or define your client's right to informational privacy in this setting.  And

then the next question is, to what degree, if at all, should that right yield in the face of a criminal investigation?

Because, remember, we began this discussion with my asking how much I needed to discredit the government's investigation in order to accept your legal arguments.  You suggested to me that I didn't, and it was appropriate for context, but it wasn't dispositive of any issue.  And if that's the case, I've got to say, I'm not sure I've really seen cases engaging with the interplay of an individual's right to informational privacy and the existence of a valid grand jury subpoena.

MR. GONZALEZ-PAGAN:  Yes, your Honor.

So the right, at the end of the day, has been already defined, at least as to the scope of the information by the Second Circuit.  And here we have two variants of this information.

We have, in the first instance, they are seeking the identities of the plaintiffs and members of the proposed class — that is request number 12 of the subpoena.  And in doing so, they are seeking to pair that with people who are — and this is limited to people who have obtained gender-affirming medical care.  And only transgender people obtain gender-affirming medical care to treat gender dysphoria, as the Supreme Court in *Skrmetti* has already recognized.

So it seeks the identities of our plaintiffs' — and,

therefore, the disclosure to the government and the collection by the government of our plaintiffs and members of the proposed class — transgender status.  I can hardly think of any interest that the government can have for actually collecting that information, certainly in a dragnet, broad way of all people to have obtained this care.

Second is the sensitive health information.  And here it is medical information.  The Second Circuit has repeatedly recognized that medical information is covered by the right to informational privacy, the right to confidentiality.  And here, as we've discussed already a couple of times, that information is broad encompassing; it's not just whether somebody received X medication or received X diagnosis.  It is actually the full history, the familial history, psychosocial history, developmental history, medical history, all other conditions that our plaintiffs might have experienced or been diagnosed with, as well as any other assessments that they may have received.  All of that is encompassed by the medical records that are being sought here by the defendants.  So that is on the one side the information that is being sought to be protected.

And then, as it pertains to the government and whether the use of a criminal investigation in the context of the one grand jury subpoena that we know about — and, again, I'll posit that our challenge is broader than this one subpoena alone —

the information is being sought.  And, your Honor, I cannot think of a single example in which the government has sought all of the medical information of a particular group of people, targeting a particular group of people, and required their identities and information.  This is an unprecedented case because these are unprecedented actions by the federal government.

And there are certainly instances in which some medical information can be and is sought in the grand jury subpoena context or in any healthcare investigation context. But usually the government seeks to do so in a targeted, noninvasive, nonintrusive way; in fact, HIPAA requires that. And the government here hasn't done so.

In fact, there's no evidence that the government is seeking to obtain this information for sampling or aggregate data to the extent that it needs any patient information at all.  And we know that it doesn't need it because of its conduct in relation to the broader context of this actions and investigations, where it has already disclaimed its need for this records or agreed to severely redacted forms of this information.

So here, your Honor, ultimately, the information is being sought of a third party — us, our plaintiffs — and it is targeted information of these plaintiffs that is being sought by the subpoena to the healthcare institutions, including the

Q6NVCOEC

grand jury subpoenas to NYU.  And that is information that is being sought to be protected, nothing more, nothing less.

THE COURT:  In your own analysis of the applicable law for the Fifth Amendment, you acknowledge that for actions of the executive, the inquiry that I am tasked with is determining whether it is so arbitrary as to shock the conscience.  Is that not correct?

MR. GONZALEZ-PAGAN:  That is correct, your Honor.

THE COURT:  And would you consider that to be a threshold issue before I even start balancing the factors?

MR. GONZALEZ-PAGAN:  No, your Honor.  The balancing test answers whether it shocks the conscience.  And, in fact, in *Hancock*, the Second Circuit explained that even under that test, the Court engages in a balancing of the interests.  And the stronger the interest in the preservation of confidentiality, the stronger the interest by the government in obtaining the information must be.

In any event, I believe --

THE COURT:  Well, I guess my concern, sir, is when I think of conscience-shocking behavior, I think of, you know, *Rochin* and stomach pumping and things of that nature.  You want me to determine by use of a multifactor balancing test that the government's seeking of this information from one identified group is sufficiently arbitrary to shock the conscience.

MR. GONZALEZ-PAGAN:  That's correct, your Honor.  And

that's what the Second Circuit has instructed in *Hancock* and *O'Connor* as to how to apply the test.

But, your Honor, I think the words of the New York Court of Appeals in the *Chanko* case — which we do cite in our briefs — with regards to the New York state law claim really speak to this.  The disclosure of a patient's sensitive health information that they have disclosed and discussed with their doctors, in the words of the Court, "naturally shocks our sense of decency and propriety."

Your Honor, the fact that we cannot come up with a single example in which the government has ever sought to attain the information of a particular group of people — certainly a minority -- vulnerable, minority group of people — and this broad encompassing set of information should shock the conference.  I believe it certainly shocks mine.

And the disclosure of such intimate personal information that is so critical for the preservation of everybody's health, the only way that we can have a healthy populous and, indeed, ensure public health is to ensure and promote trust between patients and their doctors; to allow for truly honest and disclosure of information that is necessary to address our health needs and prevent public health from being worsened.

By doing this in this manner, the government is actually endangering that very incredibly important public

Q6NVCOEC

interest, an interest that the state of New York has sought to preserve by enacting the New York Shield Law to protective care at issue here.

THE COURT:  Is the government correct that there is no court decision out there that has allowed informational privacy protection to be used to limit the scope of or compliance with a grand jury subpoena?  That may be because no one has ever tried this before.  I have found no precedent to aid me in this analysis, sir.

MR. GONZALEZ-PAGAN:  I agree, your Honor.  I agree that we cannot point to a precedent that would neatly resolve this case.  And so your Honor is presented with some questions of first impression.  But that is because it is such an unprecedented action by the government.

THE COURT:  I don't wish to repeat myself, but I'm about to repeat myself:  How is it that I get to make these determinations and evaluate these factors in a situation where I have not been made privy to the specifics of the grand jury investigation?  You're asking me to intuit from context, it seems.

MR. GONZALEZ-PAGAN:  Well, I would argue that it's a little bit more than context.

THE COURT:  Okay.

MR. GONZALEZ-PAGAN:  I would argue that it's the government's own words and own actions.

Q6NVCOEC

THE COURT:  Is that not context?

MR. GONZALEZ-PAGAN:  Well, it is further than context; it is their admissions, it is their actual --

THE COURT:  I see.

MR. GONZALEZ-PAGAN:  -- their actual express admission and explicit purpose with regards to this investigations, as in furtherance of the purpose to end gender-affirming medical care.  We know that from the Bondi memo; we know that from the Shumate memo; we know that from the representations to other courts.  I believe we made out the Court -- made available to the Court an excerpt of a transcript in the Rhode Island Hospital TRO hearing.  We know that from their representation to other courts.  And we've pointed the Court to both pleadings, as well as decisions in which that is contained.

So that's one part.

And again, your Honor, I would say that the government can disclose the general nature of their investigation.  The grand jury subpoena, for what it's worth, it exists.  We know it exists.  It is actually part of the record.  It has been actually attached.  It was publicized by NYU.  And, to their credit, they informed us, and this is what allowed us to be here in court.

But the government can seek -- I don't believe that Rule 6 prevents the government from actually disclosing the nature of their general investigations and actions here.  But

Q6NVCOEC

even if it did, they could seek authorization to provide to the Court, that information *in camera*, at a minimum, and they have not done so.  And, ultimately, the government is the one that has the burden to show why they need this information.

Taking a step back, the grand jury, as it is envisioned in our Bill of Rights and in our Constitution, was actually adopted to protect the people from the government. And here we have the complete opposite:  The weaponization of a grand jury to further both an improper purpose, but also to target a group of people and violate their constitutional rights.

As the Supreme Court has repeatedly noted, constitutional limits do apply to the grand jury.  And while there's no direct precedent as to whether the informational privacy right has been decided in the context of a grand jury investigation, it is a constitutional right as recognized by the Second Circuit.  And we posit that it's one that equally applies in the context of the grand jury.

And I would say that at least the Supreme Court has pronounced multiple times that the limits of the Fifth Amendment do apply to the grand jury.

THE COURT:  The government also seeks to distinguish the cases on which you rely by saying that those concerned the disclosure or the misuse of information that had been obtained, that had been lawfully obtained, rather than the authority to

Q6NVCOEC

obtain that information in the first instance.  You might believe that that's a distinction without a difference, but I would like you to engage with their argument.

MR. GONZALEZ-PAGAN:  Certainly, your Honor.

I believe in our reply we actually lay it out in a little bit cleaner manner.

The informational privacy right prevents the government from doing two things:  From collecting information, private protected information from its citizens that it doesn't have a right to, and then from disclosing or compelling the forcible disclosure of that information.  Both are at issue here.  The government seeks to collect this information, as well as compel NYU and other healthcare institutions to disclose this incredibly important, sensitive health information of our clients.  So the answer is that it's both. It prevents disclosure, as well as collection of information.

Your Honor, I would also add that the rights that we have embodied in our Constitution are rights against the government.  And so inherently the government is prevented from collecting the most intimate private aspects of our lives.

What the government is suggesting in their opposition is that the government can seek whatever information they want. And because they are using a grand jury, they do not have to abide by the limits of our Constitution.

THE COURT:  I would hope that's not what they are

Q6NVCOEC

suggesting.  I thought what they were suggesting is that if there is a grand jury investigation, that certain of the restrictions that you're identifying are things that simply might not apply.  And then to the extent there were constitutional problems or potential infirmities with what they were seeking, that you could go to the situs of the investigation, the place where the grand jury subpoenas emanated from, and go contest them there.

I appreciate how your colleague has already explained to me why that's not a thing that you wish to do, but I want you to be careful in making absolute statements here where I'm not sure I have a record to back it up.

MR. GONZALEZ-PAGAN:  100 percent, your Honor.  Totally understand.

But the government is suggesting that they can deploy a grand jury to collect information, and that -- any information from any person.  And that the fact that they have to use a grand jury is more than sufficient protection in and by itself; and that, therefore, the constitutional protections embodied in the Fifth Amendment with regards to informational privacy, which this circuit has recognized, do not apply or even prevent that disclosure and collection of information.

I just do not think that the government's use of a grand jury subpoena — because the actor here, at the end of the day, is the Department of Justice.  The government's use of a

grand jury subpoena to attain this information that it has already sought to attain through other means, been shut down, and because they've been shut down, they are now seeking the same — virtually identical — request, information for a grand jury subpoena to, in essence, fence us, procedurally fence us, from being able to protect the rights of our clients and the members of the proposed class.

THE COURT:  Sir, in your Fourth Amendment arguments it seems to me that the issue is really a question of how broadly I can interpret *Carpenter*.  Because there was, in fact, a disclosure of this information to third parties.  And we have to talk about whether your clients retain a legitimate expectation of privacy of this information despite its disclosure.

I am fully aware of the *Carpenter* decision.  What I will note is that there have been subsequent decisions in this circuit that to me seem to suggest that *Carpenter* is limited. For example, there is a decision in *United States v. Harry* from 2025, a Second Circuit decision that I believe declined to extend *Carpenter* to pole camera, a stationary pole camera footage, even though one could make the argument that a stationary pole camera might capture actions in the same way that cell site location information does.

I believe Judge Karas last year in a case called *Rinaldi v. Sylvester* found that the *Carpenter* theory of sort of

a residual expectation of privacy did not apply to license plate readers, even thought that might show where someone was in the same way that cell site location information was.

I haven't seen a situation where medical history information has been analyzed using the *Carpenter* method. And I'm not sure — and I'm being very transparent with you. I'm not sure *Carpenter* works for that information.

My understanding of *Carpenter* is that the disclosure of cell site information reveals such detailed granular information about someone's movements as to basically be surveilling that person. And I'm not sure that medical history is analogous to that. That's not to say that you can argue to me that there should be something like *Carpenter* for medical information — not sure I buy it. But what I'm trying to say is what I've seen since *Carpenter* are judicial decisions limiting the scope of *Carpenter*. Perhaps you're asking me to expand the scope, perhaps you're asking me to fit this case comfortably within that scope, perhaps you're asking for something else. But I wanted to communicate to you the concerns I had about the Fourth Amendment argument.

MR. GONZALEZ-PAGAN: Certainly. Thank you, your Honor.

With regards to *Carpenter*, as well as the reasonable expectation of privacy, at the end of the day, the question of whether the information sought here is one in which there is an

objective reasonable expectation of privacy, *Carpenter* only informs the broader point that just because there's a disclosure to a third party involved, that that reasonable expectation of privacy is not necessarily lost.  In that context, it pertain to the GPS data, cell site location data pertaining to persons, and that would reveal all aspects of their lives in many ways.

Here, the information at issue, there's a reasonable expectation of privacy because, as informed, as we know, informed by the Fifth Amendment, it is information that is already of a constitution -- protected by a constitutional right, the informational right to privacy.  But it is also one in which we know that federal law and state law recognize an incredibly important interest in protecting the privacy of this information.

We know that from New York Shield Law, we know that from HIPAA, we know that from the CPLR, both the physician-patient privilege, 4504, as well as the psychotherapist-patient privilege, 4507.  And we know that from New York Shield Law, which, in fact, your Honor, very emphatically says that even when there is to be disclosure of this information, for example, in the context of an out-of-state investigation of deidentified data, even in those circumstances, which must meet a stringent showing for that information, it requires the consent of the patient for that

Q6NVCOEC

disclosure.

And we know that here, because the information also is of its very intimate nature.  We talked a little bit about the nature of the doctor-patient relationship; the nature of all the discussions that are had between patients and their providers with regards to their health, their growth, their development, their familial history, their instances of bullying, abuse, neglect, whatever it may be that they may have experienced, trauma, all of those are things that can be encompassed in these medical records.  They paint a full picture.

And here, the government is seeking six years worth of that data for the plaintiffs and members of the class, to obtain a full picture of plaintiffs and members of the class, just like the provision of the cell site data did in *Carpenter*.

I agree, your Honor, *Carpenter* doesn't necessarily answer the question here; but I think the analysis in *Carpenter* helps inform this Court's analysis into, one, the fact that there is indeed a reasonable expectation of privacy and that, therefore, the fact that the information is possessed by a third party — in this case NYU or other healthcare institutions — doesn't diminish that reasonable expectation. And secondly, because the breadth of what is sought, just like in *Carpenter*, seeks to paint a whole picture of a person's lives and intimate details.

Q6NVCOEC

Your Honor, I would also add two parts to this, which is, both in *Carpenter* and *Jones*, the Court, in discussing why there was a reasonable expectation of privacy, noted that even doctors' visits would be disclosed through the cell site location data.  The Supreme Court indeed viewed that that information is private and would be disclosed through the obtaining of that data, that that is why it found that in *Carpenter* -- in part, it's a small part, but in part why it found that in *Carpenter* there was a reasonable expectation of privacy with regards to the data.

THE COURT:  I don't think the back table can seriously dispute that there is an objectively reasonable expectation of privacy in the data.  I think it's really just a question of whether the disclosure of the data to a medical provider results in the waiver of that protection or the loss of that protection.

So we have *Carpenter*.  *Carpenter* suggests that there are at least some categories of information that demand a residual retention of Fourth Amendment protections or reasonable expectation of privacy.

I'm trying to figure out where I have that other than *Carpenter*.  What I mean to say is where there is disclosure and yet it's not a loss of the protection.  I mean, you think about the attorney-client privilege context, right, people are not their own attorneys.  It is extremely important to have those

communications.  If you disclose to someone you believe to be assisting you in obtaining legal advice, the information remains privileged.  So there's analogy to be found there in the sense that someone is obligated to disclose very private information in order to get a remedy, be that legal or, in this case, medical.  I understand that.

I'm just not sure that I read *Carpenter* — which seems to be focused on a different path — to say that there is information that is so fundamentally private, and yet needs to be disclosed, that its disclosure doesn't amount to a loss of the reasonable expectation of privacy.  That's what I'm trying to find.

MR. GONZALEZ-PAGAN:  Well, your Honor, I apologize, I will blank for a second on the case name, but I can find it somewhere in this folders.

But we have cited and we've -- in our briefs one of the cases involving the Fourth Amendment in which disclosure of the urine test by the hospital to the government would violate the Fourth Amendment.  That in itself is medical information obtained and disclosed to a doctor.

And here, likewise, this is information that is in the possession of the healthcare provider of information that has been disclosed to them in the context of medical treatment, in the context of healthcare.  I believe there are analogies also to be had with regards to blood draws, for example, as well.

Your Honor, I'm being pointed to *Ferguson v. City of Charleston* is the case that I'm referring to.

So we would argue, of course, that that is a limited set of information that was being sought there. And it is a specific test that was being compelled the disclosure of.

THE COURT: Please slow down for court reporter and judge. Can you just repeat what you've just said. Thank you.

MR. GONZALEZ-PAGAN: I apologize.

We would posit that the disclosure there, while limited in terms of the test that was being sought to be disclosed or that was being requested by the government, that is still medical information, healthcare information, in the possession of a healthcare provider and for which the Fourth Amendment's protections applied.

THE COURT: What then would be the limiting principle that I could use if I were either to analogize *Carpenter* to these facts or to find -- either to extend *Carpenter* naturally or to find something *Carpenter*-like that would apply to medical information of this type?

MR. GONZALEZ-PAGAN: I think that when the information being sought seeks both the identities and broad-encompassing nature of all medical records pertaining to a person as opposed to, say, for example, a limited targeted request, that that is a limiting principle. And I think that's part of what animated *Carpenter*, is that there was a broad request that would have

Q6NVCOEC

been revealing of the entire history and life of the person. And equally here, it is seeking all the healthcare records of this patients in relation to both gender-affirming medical care and other treatment. And it seeks that information for six years. It actually -- and mind you, these are transgender young persons. Six years, for some of them, half, if not a third of their lives. It is actually seeking a full picture of the people that we represent.

THE COURT: Thank you very much.

MR. GONZALEZ-PAGAN: Thank you, your Honor.

THE COURT: Madam Reporter, do you wish to take a break before I turn to defendants?

Thank you very much. I'll be back in five minutes.

(Recess)

THE COURT: Mr. Miller, am I questioning you, sir?

MR. MILLER: Yes. That's correct, your Honor.

THE COURT: Thank you.

As the court reporter noted, the audibility in this courtroom is suspect, so I'll ask you to bring the microphone close to you. It is not you; it is us, sir.

Sir, just following on one of the statements or arguments made by your adversaries, once again, I have no interest in interfering with a legitimate grand jury investigation. But I will note that the optics here are noteworthy and not necessarily great for the government.

Q6NVCOEC

The executive orders do contain language that some people might consider inflammatory; and I'm not sure that there are facts to match the language of the executive orders.  They are executive orders and not statutes.  There are the series of administrative subpoenas that seem to be either pared down dramatically or rejected by a number of courts — and sometimes on the basis that there is no legitimate investigative purpose.

So NYU is in negotiations with the government over one of these subpoenas.  It gets pulled, and the next day there's a grand jury subpoena.

My concern, sir — and I want not to have this concern — is to cloak discredited subpoenas with the garb and the secrecy of the grand jury process, how does that address the fundamental problems that have been identified by so many courts?

MR. MILLER:  Thank you, your Honor.

And just I would like to -- before I answer your Honor's question, I would just like to make a note just for the record.  I know your Honor is already aware, but just for the record, I'm restricted by grand jury secrecy according to Rule 6(e).

THE COURT:  I understand, sir.

MR. MILLER:  I'm not at liberty to confirm or deny the existence of the grand jury subpoenas — alleged grand jury subpoenas, rather; nor am I at liberty to discuss the contents

of the alleged grand jury subpoenas.

THE COURT:  Fair enough.  Although, if I were to say that NYU didn't have to abide by it unless it were acknowledged -- the point is they believe that a subpoena was issued to them for this information.  And there's been no suggestion from the government that somebody else fabricated a subpoena to mess with NYU.

I am fully aware of your 6(e) obligations, sir; and I will let you operate within them.  But I have something that looks suspiciously like a grand jury subpoena.  And both you and plaintiffs' counsel have proceeded on the assumption that that is an actual grand jury subpoena, and we will continue to do that.

MR. MILLER:  Well, respectfully, your Honor, I think I would clarify.  I don't know if necessarily the department is proceeding on the assumption that it is a legitimate grand jury subpoena as much as it is that plaintiffs have created this bizarre posture in which the defendant — at least the department — feels obligated to sort of present something that looks sort of akin to a defense of a grand jury subpoena that, again, may or may not exist, but limited by Rule 6(e), because obviously we can't discuss whether those alleged subpoenas even exist in the first place.

THE COURT:  Some day you're going to read this transcript and realize how ridiculous everything you said just

Q6NVCOEC

sounded.

I understand your obligations, sir. If you knew my background, you would understand that I understand those obligations and my point remains.

The arguments that you are making to me in your submission sound like someone is, at least for purposes of this litigation, acknowledging that it is a grand jury subpoena. So I accept your proviso at the beginning that you can neither confirm nor deny the grand jury subpoena, or whether there are any others, or whether there's an investigation. But we have to somehow respond to the issues identified by plaintiffs, and we're going to do that this afternoon.

So with that in mind, go ahead.

MR. MILLER: I think I would say, your Honor, that, again, the way that I couch it — and I understand your Honor's point. And I would also like to address that this is awkward for me as well to, like, try and feel obligated to balance these obligations to answer your Honor's questions with candor, while also remaining within the strictures of the rules placed on me.

But I think that underscores the strength of the government's position in this posture because it is awkward; and the reason that it's awkward is because the Federal Rules of Criminal Procedure, particularly 17 and 6, contemplate that when there is a challenge to a grand jury subpoena, it's to be

Q6NVCOEC

done in the court in which the grand jury subpoena originates, which in this case allegedly, as according to plaintiffs' briefing, occurs in the Northern District of Texas.  And so that's the government's position, that to the extent that plaintiffs would like to challenge a subpoena, the Northern District of Texas would be the proper forum to do so.

THE COURT:  And yet we have the *Gonzales* decision.

Now, sir, I'm pretty good with Second Circuit law; I'm less good with the law of other circuits.  So I don't know if there are analogues to the *Gonzales* decision in other circuits, but I do know that the *Gonzales* decision exists here.  And it says specifically that a motion to quash under Rule 17(c) would not offer the same relief as a declaratory action under the circumstances of this case.

Here, there are similarities in the circumstances. The plaintiffs are not the targets of the subpoena; the plaintiffs do not know if the subpoenas have been issued to other healthcare institutions in New York City, and whether their identifying and sensitive information has already been disclosed.

So at least here — and this is the law that governs what I do — Rule 17(c) is not the exclusive mechanism for challenging grand jury subpoenas.

MR. MILLER:  That's not the understanding of the government, your Honor.

THE COURT:  Okay.

MR. MILLER:  At least as far as challenging this alleged grand jury subpoena.  I would like to clarify.  I'm not speaking necessarily broadly.

THE COURT:  Sure.  Okay.

MR. MILLER:  Yes.

THE COURT:  Well, are you arguing that -- you're not arguing I should disregard *Gonzales*; you're arguing that *Gonzales* is factually inapplicable here, or that legally it is cabined in by something else?

MR. MILLER:  Well, I would say in regards to *Gonzales*, your Honor, there's two points of clarification that I would make on *Gonzales*.

The first is that, as your Honor is aware, the movant in *Gonzales* sought only a declaratory judgment rather than an injunction, which the *City of Rome* case, which is in our briefing and also a Second Circuit case, describes as, quote, milder and less formidable than a preliminary injunction.  And we think that's an important distinction to make.

And in addition, *Gonzales* also notes that --

THE COURT:  But if I just issued declaratory relief, I mean, this is when -- this is when I think plaintiffs' counsel has -- there's some traction to the argument that I've got to be able to do something on the injunctive side to preserve my ability to issue meaningful declaratory relief at some point.

Q6NVCOEC

You think that's not the case?

MR. MILLER:  Do you mind rephrasing that question, please.

THE COURT:  I'll try and be more coherent this time, sir.

The point is you're saying to me, Look, Failla, *Gonzales* only gets you part of the way because, at most — and we're not even suggesting you can have this — *Gonzales* would give you the ability to issue some form of declaratory relief. And yet, in order for that relief to be meaningful in this circumstances, I would have to have the ability, at least on a temporary provisional emergency basis, to issue some form of injunctive relief while I sort out the declaratory relief. Otherwise, sir, if I let this go forward and it turns out I would be finding for the plaintiffs on the declaratory relief, the cat's out of the bag, the horse is out of the barn, whatever metaphor you'd like to use.  That's the concern I have.

MR. MILLER:  I think I would say also, your Honor, I understand; your point is well-taken.

THE COURT:  No, tell me why I'm wrong.

MR. MILLER:  I think Rule 17 dictates, at least in this case, that the proper mechanism is through the Northern District of Texas.  Now, Rule 17 says this Court is the one to properly adjudicate when there is a challenge to a subpoena;

Q6NVCOEC

and that naturally raises the follow-up question, which court. And if you look at 17(a), it's the court with the seal on the subpoena.  So I think, you know, at least --

THE COURT:  And yet *Gonzales* was a subpoena issued from the Northern District of Illinois.  It still was challenged here because they weren't sure where the subpoenas were being issued to.  They knew that they were being issued to telephone service providers.  They reached out to telephone service -- *The New York Times* being the "they" here, reached out to telephone service providers and asked/begged if they could please get advanced notice if a subpoena sought their records.  And the telephone service provider said no.  And that's why we have the *Gonzales* decision.  I don't know how that's any different from what's going on here.

MR. MILLER:  Well, I think in *Gonzales*, the Court necessarily mentioned that there was no conclusion that a grand jury subpoena existed.  There was a threat of a grand jury subpoena, but not necessarily a grand jury subpoena itself. And I think that that is an important distinction from this case, your Honor, allegedly.

THE COURT:  What does the "allegedly" modify, sir?  If we were diagramming sentences, I was about to lose it.

Go ahead.

MR. MILLER:  I don't mean to present to the Court that there is a subpoena in this case.

THE COURT:  Yes, of course.

MR. MILLER:  Or that there is not.

THE COURT:  Let's try and find a way for you and I to speak so that there's a standing understanding that you're neither confirming nor denying the existence of the subpoena.

MR. MILLER:  Understood, your Honor.

THE COURT:  I need to figure out what to do if there is a subpoena.  So let me please understand again, what you consider to be the significance or not of the threat of a subpoena in *Gonzales*, it would seem to me to be here, there is -- NYU put it on a website; so it's more than a threat.  I would have thought that the concerns in *Gonzales* would be even in sharper relief here.

Is it your belief that because it was only the threat of a subpoena that 17(c) was not an option and that's why we have the ability to go to the Southern District of New York in *Gonzales* for that relief?

MR. MILLER:  I think the answer to your question is that -- if I may collect myself quickly, your Honor.

THE COURT:  Of course.

MR. MILLER:  I think it's an important point that in this case the plaintiffs seek preliminary injunctive relief. And that's also a necessary distinguishing point from *Gonzales*, because obviously, to my understanding, to the department's understanding, there is no such thing as preliminary injunctive

Q6NVCOEC

relief.  And that's why *Gonzales* is distinguishable, is because they weren't seeking a preliminary injunctive relief in *Gonzales*, just a declaratory judgment, which is a judgment, necessarily a final judgment by the Court and not a preliminary action.

THE COURT:  Could you please engage with your adversary's argument that one of the problems here is that they don't even know where to look to try and beat back efforts to disclose their most sensitive of information.  Now, again, that's the argument they are making; you may find that this information is not so sensitive.

But the concern is this whack-a-mole argument that the plaintiffs have advanced — their words, not mine — that is that they tried to resist, but then they didn't even find out until the grand jury subpoena, allegedly, that there was an administrative subpoena that they weren't even a party to, where their rights could have been, in theory, compromised or violated without their knowledge.

What they are saying is the reason they are here with me now is because they don't know -- they are being buffeted by many different forces.  They don't even know where these forces are coming from, but they need to get out there and protect their information.  This, to them, is the only way that they can do that.

You're saying to me there's 17(c).  17(c) works if you

know about the subpoena, and it doesn't work if you don't. And it doesn't sound like any of these subpoenas — alleged subpoenas — are going to the patients.

MR. MILLER: I would say in response, your Honor, that the drafters of Rule 17 and also of Rule 6 and any other applicable rule of criminal procedure takes into account circumstances such as this, right. There's grand jury secrecy that exists for a reason. There are protocols that need to be followed in every grand jury proceeding. And the government intends to follow those in every grand jury proceeding.

THE COURT: Okay. I'll talk to you more on jurisdiction. I appreciate your view. Your view is I just don't have it. *Gonzales* doesn't give it to me. There are significant factual distinctions that you believe render *Gonzales* inapplicable or at least unable to give me the ability to consider this here. That's fine.

Please understand that I -- and I hope you saw this in my questioning of your adversaries. I am concerned about grand jury secrecy. I am concerned -- I would assume even plaintiffs' counsel doesn't want to interfere with an ongoing criminal investigation. That's not what we're here for. They are just saying they believe their information is entitled to privacy, and they just want to be able to defend that.

I'm now pivoting, sir, to the issue of class action treatment. You've suggested to me it's not appropriate here.

Q6NVCOEC

And I think, as I understand it, that your argument is that even if there was sort of a hint of this in the *AARP* decision, the preliminary or provisional certification of a class — in that case it was a class of detainees, and it was based on the possibility of irreparable harm caused by constitutional violations.

Am I understanding you to suggest that the *Trump v. CASA* decision from later that year sort of retreats from that position or something else?

You know what?  Let me ask you a better question:

Please harmonize the *AARP* decision and the *CASA* decision and let me know, in light of those decisions, what you believe my ability is to certify a class for a provisional remedy.  Thanks.

MR. MILLER:  I think the *CASA* decision clarifies the *AARP* decision, where the *AARP* decision, if I'm recalling correctly, was -- the decision was made, by and large, if not strictly, to preserve the Supreme Court's jurisdiction in that case.  And then in the *CASA* decision, it was quite a bit more of the central issue of the case.

Now, the provisional certification of a putative class that the plaintiffs request bears a lot of resemblance to the nationwide injunction that *CASA* obviously disclaimed, largely because unsuccessful plaintiffs can keep suing, while unsuccessful defendants need only lose once.  And that's kind

Q6NVCOEC

of the final say.

THE COURT:  But both *CASA* and *AARP* acknowledged the possibility that rights could still be vindicated on a classwide basis.  The decision from Judge McMahon in *American Council of Learned Societies v. McDonald* from last year finds that *CASA* did not seem to remove the possibility of classwide relief.  I'm just a little bit concerned about -- I appreciate what you're saying, and no one -- if we can't do a nationwide injunction, we can't do a nationwide injunction.  That's fine.  I thought both of these Supreme Court decisions left open the possibility that a class action could be certified and that relief could be vindicated on a classwide basis.

And I appreciate your point, which is that you can keep trying until you fail, but the issue is they still have to meet the criteria for certifying a class action.  And so it's not as though someone can just haphazardly come in and seek classwide relief without actually making an effort to comply with Rule 23.  So I don't know that the concerns that you have or that the Supreme Court has had about nationwide injunctions exist to the same degree if you have the hurdle, the procedural hurdle, of a class action.

MR. MILLER:  And I will note also, I have a citation, your Honor, I don't have it necessarily in front of me, but I believe it was in *CASA*, where they were discussing how Rule 23 oftentimes can be circumvented in just the situation that

you're describing.  And if I'm misquoting, I apologize, and we're happy to supplement the record.  But I will in review that that was the case.

Now, another thing that I would also say is, you know, your point is well-taken that they would, you know, properly have to go through checking all of the boxes of Rule 23.  But I think, you know, if a plaintiff or putative class is determined enough to do so, then they will be willing to do so and continue filing cases, continue adjusting the size and scope of their class, continue adjusting the description to their class and the arguments that they make.

THE COURT:  Of course.  But don't you then have to trust the judiciary knows Rule 23, and we'll certify the appropriate class and not certify the inappropriate class; and if the district court, heaven forbid, gets it wrong, that the Court of Appeals or the Supreme Court will say that they've gotten it wrong?

I mean, I appreciate your concerns about, sort of, litigation strategy, the Machiavellian approach to litigation.  But here what we're talking about is still a situation where a judge who has no interest in the case is going to have to decide whether they've adequately pleaded it or proven it or not.

MR. MILLER:  I think there's also a consideration of equity, your Honor, from the defendants' side of having to fend

Q6NVCOEC

off, you know, several — who knows how many — you know, putative class actions that may be raised against them. That's also an important consideration.

THE COURT: Absolutely. But I would have thought the converse would also be a concern, sir. Do you really want to have 50-individual-named-plaintiff actions alleging the same thing because you're only allowing injunctive relief for each individual? That may not bother the department. Speaking as the judge who would be presiding over some of them, I might be concerned about going that way.

There are equity arguments I think that can be made on either side, sir. And so I would think it would be easier to attempt to proceed on a classwide basis and be told that you can't than to say *ab initio* that you can't proceed on a classwide basis and make everybody file individual plaintiff actions. But tell me why I'm wrong.

MR. MILLER: Yes, I understand that point, your Honor.

And I will say, you know, the judiciary, at least in theory, as Congress views it, is equipped enough to handle all of those cases. Each of those district courts is competent to handle individual cases that are brought. And I think the other side of that coin is that it allows the district courts to be more familiar with the individual facts of each individual plaintiff, weighing in favor and against them.

THE COURT: All right. Just to your point about *CASA*,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

sir, my thoughtful law clerk was looking for the issue that you raised, and perhaps someone on your team will find it as well. But the actual reference to circumvention was in the context of a universal injunction. And the statement was that universal injunctions circumvent Rule 23's procedural protections and allow courts to create *de facto* class actions at will. Why bother with a Rule 23 class action when the quick fix of a universal injunction is on the table?

If that's the quote that you're remembering — and it may not be, sir — that would suggest that what the Court was saying was that class actions are good. Universal injunctions are bad. And not that class actions are an end-run around the proscription of universal injunctions in *CASA*. But, of course, if you find other things, you'll certainly let me know.

Please continue, sir.

MR. MILLER: Sure.

I was also going to add — I think maybe I did a poor job of explaining, but we are not necessarily squaring off the idea that these, like, classes can be certified writ large post *CASA*. We are just asserting that they need to make a Rule 23 showing to obtain class right relief; and we're just kind of emphasizing that point, even in the case of preliminary classwide relief.

THE COURT: All right. And I did see in your briefing, you not only sort of challenged the use of a class

action, you say even if you can use a class action, the requirements are not met here.

MR. MILLER:  Correct.  That's correct, your Honor.

THE COURT:  Okay.  I understand that.

Some of those arguments were a little stronger than others; though I do remember -- with respect.  Because there was an argument that maybe there are people who want to give their information.  I very much agree with the plaintiffs' reply that what we're trying to do, what they are trying to do, what I'm being asked to do, is to not obligate someone to turn over information.  If I were to grant the injunctive relief plaintiffs seek — a decision I'm not making at the moment — nothing would prevent a member of the class from voluntarily disclosing that information for any reason.  But, okay, let's not make that the fulcrum on which this argument rests.

Let's please then talk, sir, about the fifth -- I'm moving from jurisdiction and class action to the actual issues.  Because for me, the interesting question at this moment is whether plaintiffs have demonstrated a likelihood of success on — and this is my focus at the moment — the Fifth or Fourth Amendment issues.

So let's please talk about the Fifth Amendment issue.

I think you sort of describe it in a very sort of black-and-white way as sort of the contrast between informational privacy, which you're not saying it doesn't

exist, but you're saying it must give way in the face of Rule 6(e) or a grand jury subpoena.  Have I misunderstood that?

MR. MILLER:  Well, I think I will say as a preliminary matter, to the extent that at least the Supreme Court has discussed informational privacy right in the context of the Fifth Amendment, to my recollection, there has not been an explicit patent recognition that has been spelled out in plain detail.

Now, we admit in our briefing also that the Supreme Court in some cases seems to maybe assume that such a right exists.  But, yes, we also recognize and emphasize that in the grand jury context, there are several cases that stress that there is a diminished reasonable expectation of privacy largely due to the grand jury secrecy rules.

THE COURT:  And now we're right back in the problem that bedeviled me at the beginning of this argument:  Can't force you — wouldn't force you — to disclose the grand jury -- the nature of the investigation.  But how am I supposed to do this balancing if I don't even know what I'm balancing it against?

MR. MILLER:  And, again, this is a difficult question for your Honor to respond to because this is properly in front of Judge O'Connor in the Northern District of Texas.

THE COURT:  Judge O'Connor the only judge in the Northern District of Texas, or is that the judge who signed off

on the subpoena?

MR. MILLER:  Allegedly, your Honor, the Northern District of Texas.

THE COURT:  Yes, of course.  The alleged signatory of the alleged subpoena, yes.

MR. MILLER:  Correct, your Honor.

THE COURT:  Okay.  Interesting.

I'm sorry.  In olden days, I issued subpoenas by -- I could sign on behalf of the U.S. Attorney a grand jury subpoena.  I don't recall -- they were countersigned by the Clerk of Court.  I don't recall having to get a judge in the district to sign off on them.

MR. MILLER:  I may be have misspoken; I may be have -- was like referring to Judge O'Connor's oversight or whoever the judge is, referring to the alleged subpoena in the Northern District of Texas.

THE COURT:  We're going to be stuck speaking in hypothetical terms, sir, and I will.  But, again, I am trying to understand how it has already progressed to the stage of being before a single judge.  If you can give me ways in which that could happen, and the answer is maybe you can't, but I -- again, when I -- in the old days, when I issued grand jury subpoenas, number one, they were cited an actual criminal violation on the face of the subpoena.  So the folks who received them had a sense of what it is that was being

investigated.

It astounds me — but, again, not my lane — that right now you can issue a subpoena without telling anybody what the nature of the investigation is.  So either -- I don't think 6(e) got amended in this way in the last couple of years to make -- to require -- to not include this information.  But I also didn't understand that grand jury subpoenas were countersigned or placed under the jurisdiction of a judge.

MR. MILLER:  I don't recall the text of the rule, your Honor, and then procedurally how that works.

THE COURT:  Okay.  Then let's not.

But please understand the difficulty I have, sir.  And telling me that it's because the case is not properly before me is not an answer.  I understand that's your basic answer.  I need to find a different answer, which is, I'm being asked to consider extremely weighty issues.  And I've got nothing on the other side from the government.  You're telling me that Judge O'Connor would have all of the answers to all of this.  I would think not.

MR. MILLER:  Well, I think the Northern District of Texas would be the proper forum to challenge those for plaintiffs.

THE COURT:  And then we go right back to the issue raised by your adversaries a few moments ago, which is, they didn't know, for example, about the administrative subpoena

Q6NVCOEC

until the grand jury subpoena came out.  There's nothing to suggest to them that they know the totality of districts from which these subpoenas are emanating.  So telling them to go to these courts, where they don't even know where the subpoenas are and fight them, is a bit illusory, no?

MR. MILLER:  Well, I think that's what's contemplated by the Federal Rules of Criminal Procedure, that, you know, to the extent that -- well, first of all, as a preliminary matter, grand jury secrecy, in some circumstances, the government acknowledge, may prevent people whose information is being subpoenaed by third parties, they may not be aware of those and that's contemplated by the rules.

And secondarily, when those parties become aware that that information might be disclosed, then it's Rule 17 that provides the proper forum to challenge.

THE COURT:  One of the other arguments you make in the Fifth Amendment context is that I can have some comfort in Rule 6(e) itself.  Because there is a question -- if I am able to think about these issues, there is a question about what safeguards are in place to prevent information from being disclosed improperly.  I can't imagine, for example, that you could commit to me today that you would not bring a criminal -- that DOJ would not bring a criminal charge against any of the patients whose information is being sought.

MR. MILLER:  What's your question, your Honor?

Q6NVCOEC

THE COURT:  I'll say it again.  Yes.

You can't even disclose the existence of the investigation, and I get that.  But, by extension, you cannot commit to today that none of the patients whose records are being sought will be prosecuted.

MR. MILLER:  That's correct, your Honor.

THE COURT:  Right.

And you can't commit that the parents of the minor patients won't be prosecuted based on the information that's being sought by the subpoenas.

MR. MILLER:  Well, I would say, your Honor, like -- sorry.  Do you mind if I convene with my co-counsel, your Honor?

THE COURT:  Yes, of course.

(Counsel conferred)

MR. MILLER:  No patients will be prosecuted, your Honor.  I may have backtracked.  I'm sorry.

THE COURT:  No patients in your alleged investigation will be allegedly -- no, and again, please -- I hope you figured out after the last two and a half hours, I'm not trying to trick you here, sir.  I want to have the most complete record I can to make the best decision I can, even if that decision is to deny injunctive relief and let this case go to Texas.

The point is the folks at the front table are worried,

and they've presented a parade of horribles to me as to what the government — this government — could do with that information. I don't know that you're not going after patients; I don't know that you're not going after their parents; I don't know that you're not going after the hospitals. You can't, understandably, even acknowledge the existence of the investigation.

So the problem is Rule 6(e), which has salutary purposes, also complicates my ability to discern any safeguards here because, number one, you can't commit — although maybe you just did — to not prosecuting a group of people; and number two, you can't commit to not sharing this information because I'm fully aware of 6(e) orders and how they can be shared with state and local law enforcement authorities. So there's nothing to prevent widespread dissemination in the law enforcement community of the information that you seek.

MR. MILLER: That's correct, your Honor.

And I will say it is -- acknowledging that it's difficult in this context. But to refer your Honor to the briefing on the balancing test on pages 9 and 10 of our brief, I think that will shed some light into this. But also just acknowledging that the government views the plaintiffs and anyone else who is in a similar situation as generally as the victims in this circumstance.

THE COURT: There's a whole Crime Victim Rights Act

that would protect them, no?  Why would you have to do this?  I mean, there is something from an atmospheric perspective that suggests that what the government is doing is rounding up an entire group of people, identifying them, listing them, finding out the most personal information about them, and giving them no reason to have any comfort that they are not going to be ostracized or somehow harmed.  There are episodes of this in our history.  They are bad episodes.

You might not be able to, but other people, the objective observer who's not involved and is not employed by either side, might look at this and see it as a rounding up of people for all bad purposes.  And I don't -- and that's why I'm looking for safeguards.  I have none.

MR. MILLER:  Well, again, I would refer your Honor to the procedural safeguards of the secrecy of the grand jury process.  In addition, the government also -- I would just like to say for clarity's sake, the government takes the secrecy of everything in the grand jury process with extreme care.  And we understand the fears of the plaintiffs and those similarly situated that --

THE COURT:  But, for example, with respect -- was there not an agreement reached with an organization in Texas that does detransitioning?

MR. MILLER:  That's correct your Honor.

THE COURT:  Right.  Well, I mean, if that's where

everything is going to be pushed, folks who are transgender could have a legitimate concern that they are going to be forced into something they don't wish to do.  Because right now many of them cannot get the care they used to because hospitals have, for various reasons, decided not to offer that care.  So if the only care they have is care to detransition, that might cause them concern as well, no?

MR. MILLER:  I understand, your Honor.  And at the risk of sounding repetitive --

THE COURT:  That's why we have to go to the Northern District of Texas.

MR. MILLER:  Correct, your Honor.

THE COURT:  Yes.  Okay.  Well, today -- maybe some day.  But today you're here, so I understand that.

If there are other Fifth Amendment issues you'd like to raise, I will certainly hear from you.

I would like to pivot to the Fourth, please.

MR. MILLER:  Okay.

THE COURT:  All right.  Do you at least acknowledge as a matter of first principles that the patients have an objectively reasonable expectation of privacy in their medical information?

MR. MILLER:  Broadly speaking, yes.

THE COURT:  Okay.  Well, what about their -- what about the matching of their identity to the information?  That

was a terrible question, so I'm going to ask it better.

One of the subpoena requests is for identities of individuals who've received gender-affirming care. There is another request of information about the specifics of the care that they have received. It would not be difficult to match up the individual to the care they received. And indeed your adversaries are arguing that even if I anonymize the production of data, one might be able to discern who received this.

So what I'm saying is if that -- do you acknowledge an expectation of privacy in that combination of information?

MR. MILLER: Generally, I would say the answer is yes, your Honor. I will say with the caveat that, of course, in the grand jury context there are several courts that have held that the reasonable expectation of privacy is diminished.

THE COURT: To me, your strongest argument in the Fourth Amendment is the disclosure to the hospitals, and that's why we've had the discussions we've had about *Carpenter*.

I know and you know that *Carpenter* dealt with cell site location information, and that a lot of the decisions post *Carpenter* have really focused on analogues to that type of information. You heard me discuss several of those with your adversary.

I think plaintiffs are asking me to reason from *Carpenter* a broader legal principle, which is that the third-party doctrine is not categorical.

Could you respond to that, please, sir.

MR. MILLER:  Well, I would say to the extent that they request that your Honor would extend *Carpenter* and move forward from *Carpenter*, I think *Carpenter* itself strictly forbids that. The citation 585 U.S. 316, *Carpenter* itself strictly limits it to the cell site location information.  So to the extent, again, that my opponents on the other side would request that your Honor extend *Carpenter*, *Carpenter* itself does not contemplate as much.

THE COURT:  But does that suggest that forever more courts are limited to finding this residual protection in cell site location information and nothing analogous?  I appreciate, sir, that the decision wasn't designed to provide a test for future analyses where one could say, Ah, *Carpenter* admits of this category of information as well.  But am I really forbidden from extrapolating from *Carpenter*?  The answer may be yes.

MR. MILLER:  I think for now I would say that is the standard.  Now, your Honor also mentioned when you were questioning my opponents on the other side those cases that declined to extend *Carpenter*.  And I think those are the appropriate mechanism through which to look -- to analyze whether *Carpenter* may be extended.

Now, I think, to your point also, your Honor, that you mentioned when you were questioning my opponents, was the

Q6NVCOEC

healthcare information that is allegedly at stake in this case is certainly very different than the cell site location information.  And I think that is a good point.  And I think it would take several steps, several courts, and several years of precedent before it would be appropriate to extend it this far, and the reasoning would have to logically follow.

THE COURT:  I understand that.  And my thoughtful law clerk is helping us both out by providing the information -- the quote from page 316.  And it says:  Our decision today is a narrow one.  We do not express a view on matters not before us.  And I won't read the whole thing in because I'll keep you here all afternoon.

It appears that the Supreme Court is doing what the Supreme Court does, to the consternation of district judges everywhere, which is deciding the case on the facts before it and not offering broad-based analytical structures for courts to use on a going-forward basis.  I don't think I would read the language that you're citing to me as proscribing or even expressing a view on techniques outside of cell site location information.  Would you agree with that?

MR. MILLER:  I think that's a fair characterization, your Honor, again, with the caveat that, you know, for example, the cases that you mentioned I think appropriately assessed -- they also, you know -- those probably would have been a lot shorter opinions if they had just been able to -- you know, to

Q6NVCOEC

cite *Carpenter* and say case closed.  I think I would then agree.

THE COURT:  Okay.  Fair enough.

And that's exactly why I was asking your adversaries about those questions, because the cases that I saw, generally speaking, have kept -- have not expanded *Carpenter* to other forms of electronic monitoring or electronic surveillance for the reasons that they've given.  And I appreciate that you agree with that assessment.  And perhaps the final word has not yet been written on what *Carpenter* or what this residual protection would apply to, but you would argue it would not apply here, which I understand.

Sir, those were the questions that I had for you.

If there were responses to questions that you heard your adversaries give and you thought to yourself, I wish to be heard on those things, now would be a great time for you to tell me about that.

MR. MILLER:  If I may just take a look at my notes, your Honor.

THE COURT:  Of course.  And you may also please consult with your colleague while I figure out what to ask NYU.

(Counsel conferred)

MR. MILLER:  Are you ready for me, your Honor?

THE COURT:  I am, sir.  Thank you.

MR. MILLER:  The only last point that I would just

like to emphasize is on page 9 of our brief, where we cite *United States v. Calandra*, for the quote that a witness -- excuse me, quote:  "A witness has no right of privacy before the grand jury, which is entitled to 'responses that might prove embarrassing or result from an unwelcomed disclosure of his personal affairs.'"

Now, with that being said, as your Honor is well aware, grand juries routinely subpoena sensitive information. And I think to be overly concerned in any given case would undercut the reason for, you know, the secrecy rules that are in place to begin with.  So that's my final point of emphasis, your Honor.

THE COURT:  Thank you so much.

MR. MILLER:  Thank you.

THE COURT:  Mr. Cunha.

MR. CUNHA:  Your Honor.

THE COURT:  When I began working on this case a scant 27 hours ago, I was really focused on the plaintiffs and on the government.  And it seemed to me from reading your submission that what you were arguing was basically that you were an interpleader.  You did not want to run afoul of federal authorities, you did not want to run afoul of state or local authorities, and you were hoping for guidance from the Court.

As a result of that, that's really why I didn't focus on questions because, I mean, sure, I'd love your -- no, I'm

Q6NVCOEC

being glib, and that's my great failing in life.  I really do care about people's views on the very weighty legal issues that I have before me, because my only concern is getting it right. But I didn't know if I should pose those questions to you because, for example, you found yourself caught between two poles here.

So if you have a view as to, for example, my jurisdiction or the concerns that you might have with responding to the subpoena or the Fourth and Fifth Amendment issues that NYU feels have been implicated ought to be vindicated, terrific, I'd love to hear from you.  But I didn't have specific questions precisely because of the manner in which your arguments presented themselves.

MR. CUNHA:  Your Honor, I appreciate that.  And I think the Court has correctly construed NYU's position here betwixt in between the compulsion of a federal grand jury subpoena and the institution's candid recognition of the privacy interests and the heartfelt concerns that the plaintiff and putative plaintiff class have raised.

The only thing I would add just as a factual matter, your Honor, is that to this date, NYU has not produced any patient information.  We have been at pains both to negotiate additional protections in terms of not providing identifiable information in the first instance, as well as a reservation of right such that that issue, if the government at some future

time seeks to unmask patient information, that can be contested.

We have also undertaken a considerable effort to attempt to redact and deidentify to the greatest extent practicable. I want to be very clear that in the age of artificial intelligence and multiple points of data that are inherent in a complex medical record, that I cannot stand here and tell the Court with complete absolute philosophical certainty — nor within the scope of the HIPAA statute itself, which speaks to particular categories of redaction — that we can guarantee anonymization. But what I can say is that NYU has endeavored valiantly, and intends to continue to do so, to make every effort to redact and remove identifying information with respect to the individual patients should it be compelled to respond to the grand jury subpoena.

THE COURT: If it turns out I agree with the government, are you ready to produce tomorrow?

MR. CUNHA: We are ready to produce some patient records tomorrow, and thereafter on a rolling basis to do so consistent with that redaction effort that I identified, your Honor. And I'm happy to lay out additional details regarding what that redaction effort entails if that's useful to the Court.

THE COURT: I'm not sure it is.

I guess what I'd like to know in sort of a CliffsNotes

Q6NVCOEC

version is the current status of negotiations with the government. The understanding that you had was that you could produce anonymized information with the possibility that they could come back and ask for it to be deanonymized or re-identified or whatever adjective you'd like to use for it.

MR. CUNHA: That's exactly correct, your Honor.

THE COURT: I see.

And I'll just ask, because I've seen some strange things as a judge. The redactions are such that no one would be able to get behind the metadata or -- that absent volitional activity on the part of NYU, no one could deanonymize the data. You get my idea.

MR. CUNHA: I do, your Honor.

THE COURT: Right. Because I've seen people -- you'd be shocked at the redactions I've seen, including things that I myself with my lack of computer knowledge could remove from Adobe. So I just want to understand -- like, people are very worried about this information getting out there. How comfortable can they be that folks' identities would be anonymized?

MR. CUNHA: So I want to be clear, your Honor. I don't mean to sound cavalier about this.

THE COURT: Not at all.

MR. CUNHA: I don't believe that the problem would be that the searchable PDF identifies the text that's behind the

Q6NVCOEC

blacked-out block.  I think the problem would be, in a complex medical record that is dealing with somebody's transitional process in the course of gender-affirming care, there may be any number of references to situational circumstances, familial dynamics, prior psychological treatment and otherwise.  And so even if — and we certainly are undertaking to redact names, identifiers, names of parents, numbers that associate with government records or medical records, etc.  Even taking all of those things as a given, what I'm saying to the Court is that represents a very significant, very time and labor-intensive effort that is made in good faith to attempt to anonymize.  But I can't stand here and make a representation to the Court that that is potentially bulletproof.

THE COURT:  I understand, sir.

Are there other things you'd like me to know?

MR. CUNHA:  There are not, your Honor.  Unless the Court has any other questions, we rest on our papers.

THE COURT:  Thank you so much.

Mr. Strangio, the briefest of replies.

MR. STRANGIO:  I think that we are all set.

Thank you, your Honor.

THE COURT:  All right.  Thank you, everyone.

Just one moment, please.

(Pause)

THE COURT:  Friends, as it stands right now, I have a

Q6NVCOEC

10 a.m. arraignment that cannot be moved.  What I propose is an 11 a.m. oral decision.  I won't make you come back here.  We'll give you a number to call into.  My deputy will circulate it to you.  And I will be working from now until then on the decision.

So with that, I'll let you go.

Let me thank you all for your argument.  Everybody came well-prepared.  And I really do appreciate it.  And I also appreciate the grace that you extended me by not requiring me to have it yesterday.  So thank you for that.  And I'll give an answer as soon as I can.

Take care, everyone.

Oh, and also I'm thanking the amicus folks.  I've gotten two.  If there were others, I'm sorry, then I forgot about you, but I did get two.  So thank you.

*     *     *